# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

FILED US District Court-UT
MAY 08 '26 AM08:48

THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS,
Plaintiff,

v.

JOHN DEHLIN;
OPEN STORIES FOUNDATION,
Defendants.

Case No. 2:26-cv-00321 —JCB

---

## MOTION TO INTERVENE OR, IN THE ALTERNATIVE,

## FOR LEAVE TO FILE AMICUS CURIAE BRIEF

---

## INTRODUCTION

Movant respectfully moves this Court, pursuant to Rule 24 of the Federal Rules of Civil Procedure, to permit intervention in this action, or, in the alternative, to grant leave to file an amicus curiae brief.

This motion is not brought to adjudicate theology, assess religious truth, or interfere with worship. It is brought because the relief sought in this action—the application of trademark doctrines to restrict use of the terms "MORMON" and "BOOK OF MORMON"—would require the Court to treat historically and religiously referential terminology as proprietary commercial assets, despite their intersection with Indigenous history and faith that predates the Plaintiff institution.

Plaintiff's Complaint expressly asserts that the terms "MORMON" and "BOOK OF MORMON" function as exclusive institutional identifiers of the Plaintiff and constitute a family of marks denoting origin, sponsorship, and authorization by the Church. Plaintiff further alleges that these terms are inherently distinctive, uniquely associated with the Church, and subject to exclusive enforcement as a matter of law. Those assertions place the terms themselves, not merely particular logos or visual branding, squarely at issue in this action.

Movant appears because no party before the Court is positioned or authorized to advise whether granting exclusive institutional identification over such historically and religiously referential terminology would operate upon **Indigenous custodial records and faith traditions protected by federal law and treaty policy.** Although the teachings and records maintained within the Midewiwin lodges and traditions have historically been preserved within Indigenous custodial systems and not asserted in public litigation, the enforcement theory advanced here would necessarily bring those Indigenous faith traditions, records, and terminology within the scope of trademark control.

Absent such participation, the Court risks extending trademark law into an area where constitutional, statutory, and treaty-based constraints prohibit the privatization or suppression of Indigenous history and religion.

## IDENTITY AND REPRESENTATIVE CAPACITY OF MOVANT

Movant appears not in a personal capacity, but in a representative, custodial, and treaty-based capacity as:

Ogimaa Songab Midegah Ogichidaa Zozep Anishaa,
Traditional Chief (Ogimaa) of the Adik Doodem (Caribou Clan);
Gautawaewauwissoowin (Senior Chief) of the Anishinaabe 8th Fire Traditional Governance Lodge;
Treaty Chief and authorized representative for lineal treaty interests, including interests arising under the 1789 Treaty of Harmar and the 1863 Treaty of Old Crossing; and
Senior High Priest of the Midewiwin, an Indigenous governance, ceremonial, and knowledge-keeping institution.

Movant appears solely to represent Indigenous custodial, governance, and treaty-protected interests in historical records and faith traditions maintained under Indigenous law and custom. Movant does not assert ownership over any religious terminology, does not seek exclusive control over any narrative, and does not request that the Court adjudicate historical authenticity or theological meaning.

## PURPOSE OF MOVANT'S PARTICIPATION

Movant does not appear to offer duplicative legal argument or to advocate for either party. Movant appears because the subject matter of this action directly intersects with Indigenous historical records and faith traditions for which Movant is a recognized custodian and treaty-authorized representative.

The terms "MORMON" and "BOOK OF MORMON," though anglicized and used within a modern religious context, function in public discourse as references to narratives and histories that intersect with Indigenous records and traditions predating the Plaintiff's institutional formation. Those records exist outside the authority of any party to this case and are not otherwise before the Court.

No party before the Court can lawfully present this custodial context. Plaintiff cannot do so without conceding that the terms are not confined to institutional origin, and Defendants cannot do so without presuming authority they do not hold. Movant's participation is therefore necessary to advise the Court that granting exclusive trademark enforcement over these terms would require treating Indigenous history and faith as proprietary commercial speech, an outcome foreclosed by the First Amendment, federal treaty law, and federal policy protecting Indigenous religious expression.

Movant seeks only that the Court decline to treat the terms "MORMON" and "BOOK OF MORMON" as instruments of exclusive trademark enforcement in this action unless the Court determines, consistent with constitutional and statutory limits, that such treatment would not suppress or preempt protected Indigenous history and faith.

Movant does not address claims concerning specific logos, visual design elements, or copyrighted images, which present distinct issues of consumer confusion and copyright law. Movant's participation is limited to the treatment of the terms themselves as allegedly exclusive institutional identifiers.

---

## FEDERAL POLICY PROTECTING INDIGENOUS RELIGION AND HISTORY

Congress has declared it the policy of the United States to protect and preserve the inherent right of Indigenous peoples to believe, express, and exercise their traditional religions. *See* American Indian Religious Freedom Act ("AIRFA"), Pub. L. No. 95-341, 92 Stat. 469 (1978).

While AIRFA does not create a standalone private cause of action, it reflects a strong federal policy that informs judicial interpretation of generally applicable laws when their application would burden Indigenous religious or cultural expression. Courts must avoid interpretations that unnecessarily or indirectly suppress such protected interests.

Applying trademark law to restrict Indigenous custodial reference to historically and religiously significant terminology—particularly terminology alleged to describe narratives predating the claimant institution—implicates AIRFA policy, the federal trust responsibility, and First Amendment protections. Movant's participation ensures these constraints are properly considered.

## BASIS FOR INTERVENTION OR AMICUS PARTICIPATION

A. Rule 24(a) and Rule 24(b)

Movant represents legally protectable treaty-era and constitutional interests in the lawful preservation and reference of Indigenous history and faith. Disposition of this action may impair those interests, and they are not adequately represented by existing parties.

Alternatively, permissive intervention or amicus participation is appropriate because Movant's participation will assist the Court by addressing threshold legal limits—including the First Amendment, the scope of the Lanham Act, AIRFA policy, and federal treaty principles—without expanding factual disputes or requiring adjudication of historical truth.

## SUMMARY OF POSITION

Movant's anticipated submission would address:

1. First Amendment limits on trademark enforcement where enforcement suppresses lawful religious, historical, custodial, or identity-based expression;

2. Statutory limits of the Lanham Act, which does not authorize ownership over history, religion, or belief, nor enforcement that removes historically referential terminology from public or custodial discourse;

3. AIRFA-informed constraints and federal treaty principles requiring heightened caution when private enforcement would indirectly suppress Indigenous religion and history; and

4. The necessity for the Court to exclude historically referential religious terms from proprietary treatment in this action absent constitutional authority to do otherwise.

Movant's participation does not require the Court to adjudicate theology, sovereignty, or historical authenticity.

## LIMITED RELIEF REQUESTED

Movant respectfully requests that the Court:

• grant leave to intervene for the limited purposes stated herein; or

• in the alternative, grant leave to file an amicus curiae brief addressing the constitutional, statutory, treaty-law, and AIRFA-informed limits implicated by the claims asserted.

Movant seeks no damages, injunctive relief, declaratory judgment of ownership, or determination of religious truth.

## CONCLUSION

Although framed as a trademark dispute, this action raises a threshold question of jurisdictional restraint: whether trademark law may be applied in a manner that privatizes or suppresses Indigenous history and faith protected under federal law and treaty policy. Limited participation by Movant will assist the Court in ensuring that resolution of this case remains within constitutional and statutory bounds.

For the foregoing reasons, Movant respectfully requests that this Motion be granted.

Movant submits the attached Declaration and Appendixes for the Court's consideration in support of this Motion.

Respectfully submitted,                                                     5/8/2026

David Scott Taylor
Ogimaa Songab Midegah Ogichidaa Zozep Anishaa
Gautawaewauwissoowin (Senior Chief)
Anishinaabe 8th Fire Traditional Governance Lodge
Treaty Chief and Authorized Custodial Representative
124 Ulmer Road
Kooskia, ID 83539

## APPENDIX A

## FIRST AMENDMENT AND LANHAM ACT LIMITATIONS ON TRADEMARK CONTROL OF HISTORICAL AND RELIGIOUS TERMINOLOGY

## I. FIRST AMENDMENT CONSIDERATIONS

The First Amendment imposes substantive limits on the application of trademark law where enforcement would suppress lawful speech, historical inquiry, or identity expression. Trademark protection may not be applied in a manner that restricts public discourse concerning history, religion, culture, or matters of public concern. See *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 972–76 (10th Cir. 1996).

Words and phrases that possess historical, religious, or cultural significance beyond a single commercial source occupy a protected space in constitutional law. Where a term functions as the name of a tradition, historical narrative, people, or belief system, the First Amendment constrains attempts to monopolize its use through civil enforcement mechanisms. See *Rogers v. Grimaldi*, 875 F.2d 994, 998–99 (2d Cir. 1989); see also *Cardtoons*, 95 F.3d at 972.

Courts have repeatedly held that trademark law cannot be used as a backdoor to silence criticism, historical discussion, scholarship, or identity-based speech. Even valid trademarks may not be enforced where doing so would conflict with expressive rights, particularly where the challenged use is non-commercial, educational, scholarly, or rooted in historical record preservation. See *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research*, 527 F.3d 1045, 1056–60 (10th Cir. 2008).

**The terms "Mormon" and "Book of Mormon" are not merely commercial identifiers. They are historically and religiously referential terms that implicate theology, historiography, and Indigenous custodial histories that predate the institutional formation of the claimant.** Their use in public discourse—especially for commentary, preservation, education, or identity assertion—constitutes expressive speech protected by the First Amendment. See *Cardtoons*, 95 F.3d at 972 ("The danger of silencing free expression is especially acute where...trademark...is asserted over matters of public interest.").

Where enforcement of trademark claims would chill lawful discussion of historical narratives or prevent Indigenous custodians from speaking about records predating the claimant institution's founding, heightened First Amendment scrutiny is required. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–70 (1964).

The First Amendment protects not only belief, but also the right to speak about belief, history, and identity without being subjected to economic punishment or litigation pressure. See *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–56 (1988).

Accordingly, any attempt to treat historically significant religious terminology as exclusively controlled expression must be evaluated in light of constitutional safeguards favoring open discourse over privatized control of history.

---

## II. LANHAM ACT LIMITATIONS

The Lanham Act does not authorize ownership over history, belief, culture, or identity. Its purpose is limited to preventing consumer confusion regarding the source of goods or services. See *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33–34 (2003).

### A. Failure of Exclusive Source Identification

To qualify for trademark protection, a term must function as a source identifier. Words that primarily describe a religion, historical tradition, or body of narrative frequently fail this requirement. See *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216–17 (10th Cir. 2004).

Terms that preexist the founding of the claimant institution, or that are used by multiple communities to describe shared narratives or identities, are inherently weak trademarks. See *Utah Lighthouse*, 527 F.3d at 1054–55.

Even alleged secondary meaning cannot extinguish prior historical usage or negate the right of third parties—particularly Indigenous custodians—to truthfully describe historical records and identity. See *KP Permanent Make Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122–24 (2004).

### B. Genericness, Descriptiveness, and Public Domain Use

Generic or descriptive terms are not protected absent proof of exclusive commercial association. See *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–69 (1992).

Material that has entered the public domain through longstanding historical usage cannot be removed from public discourse by later trademark claims. See *Dastar*, 539 U.S. at 33–35.

### C. Nominative and Descriptive Fair Use

The Lanham Act expressly permits nominative and descriptive fair use. Parties may use a mark to refer to the thing itself, particularly where no adequate substitute exists. See *KP Permanent*, 543 U.S. at 122–23.

Use of "Mormon" or "Book of Mormon" for scholarship, historical preservation, commentary, or identification of disputed narratives constitutes protected nominative fair use and does not imply sponsorship or endorsement. See *Utah Lighthouse*, 527 F.3d at 1056–58.

## D. Prohibition on Trademark as a Tool of Suppression

Courts have repeatedly cautioned against use of trademark law to suppress dissent or alternative historical viewpoints. See *Cardtoons*, 95 F.3d at 972–76.

Trademark law is not a mechanism for resolving historical disputes or enforcing theological orthodoxy.

---

## III. APPLICATION TO THIS ACTION

**If the terms "Mormon" and "Book of Mormon" are enforced as exclusive trademarks without recognition that historically referential and custodial records predating the claimant institution exist, trademark law risks suppressing lawful speech in violation of the First Amendment.** See *Utah Lighthouse*, 527 F.3d at 1058–60.

The Court's role is not to adjudicate theological truth but to ensure enforcement remains within constitutional and statutory bounds. See *Dastar*, 539 U.S. at 34.

---

## IV. CONCLUSION

The First Amendment and the Lanham Act jointly prohibit privatization of historically and religiously significant terminology where such enforcement suppresses lawful discourse, historical inquiry, or identity expression.

## APPENDIX B

**TREATY OBLIGATIONS, THE FEDERAL TRUST RESPONSIBILITY, AND LIMITS ON PRIVATE APPROPRIATION OF INDIGENOUS HISTORY AND IDENTITY**

---

## I. TREATIES AS SUPREME LAW OF THE LAND

Treaties entered into by the United States are the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. Indian treaties are binding federal law and must be interpreted liberally in favor of Indigenous signatories. See *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999); *Jones v. Meehan*, 175 U.S. 1 (1899).

Treaties are not grants of rights to tribes but reservations of rights not relinquished. See *United States v. Winans*, 198 U.S. 371, 381 (1905).

The 1789 Treaty of Harmar established a protective relationship between Indigenous nations and the United States, obligating federal protection of Indigenous identity, continuity, and self-representation. See *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 551–52 (1832).

Nothing in treaty law authorizes delegation of treaty-protected Indigenous history or identity to private parties for exclusive commercial control.

---

## II. THE FEDERAL TRUST RESPONSIBILITY

The United States bears a fiduciary obligation toward Indigenous nations and their descendants. See *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831).

This trust responsibility extends beyond land to include protection of governance continuity, culture, and treaty-era identity. See *United States v. Mitchell (Mitchell II)*, 463 U.S. 206, 225 (1983).

Federal courts must avoid applying generally applicable laws in ways that indirectly erode treaty-protected interests. See *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979).

---

## III. LIMITS ON PRIVATE APPROPRIATION OF INDIGENOUS HISTORY AND IDENTITY

Federal law does not recognize private ownership of Indigenous identity or treaty-era narratives absent explicit congressional authorization. See *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234–36 (1985).

Trademark and intellectual property regimes do not supersede treaty rights. See *Fishing Vessel*, 443 U.S. at 690.

**Construing generally applicable laws to permit private entities to convert Indigenous historical identity into proprietary assets would conflict with federal Indian law, equity, and constitutional supremacy.** See *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 149–50 (1982).

## IV. HISTORICAL SUPPRESSION AND LEGAL CONSEQUENCES

Federal policies criminalizing Indigenous religion and forcibly disrupting family structure materially interfered with Indigenous ability to preserve and assert custodial rights. Silence produced by such policies does not constitute waiver. See *Tee Hit Ton Indians v. United States*, 348 U.S. 272, 288–89 (1955).

Courts must evaluate present assertions in light of historical legal barriers. See *Mille Lacs*, 526 U.S. at 205.

## V. APPLICATION TO THIS ACTION

Applying trademark law to grant exclusive private control over terms tied to Indigenous treaty-era narratives—without examining custodial context—risks violating:

- The Supremacy Clause;
- Federal treaty canons;
- The trust responsibility; and
- Principles of equity.

The Court need not resolve historical truth to acknowledge these limits. See *Winans*, 198 U.S. at 381.

## VI. CONCLUSION

Treaties remain binding federal law. Courts are obligated to prevent indirect erosion of treaty-protected identity and custodial rights through private enforcement schemes.