Mark A. Miller (#9563)
miller.mark@dorsey.com
Elliot Hales (#16684)
hales.elliot@dorsey.com
Olivia McQuarrie (#19621)
mcquarrie.olivia@dorsey.com
**DORSEY & WHITNEY LLP**
111 S. Main Street, Suite 2100
Salt Lake City, UT 84111
Telephone: (801) 933-7360
Facsimile: (801) 933-7373

Mike Keyes (pro hac vice)
keyes.mike@dorsey.com
**DORSEY & WHITNEY LLP**
701 Fifth Ave., Suite 6100
Seattle, WA 98104-7043
Telephone: (206) 903-8800
Facsimile: (206) 903-8820

Elissa Brockbank Reese (pro hac vice)
ereese@potomaclaw.com
**POTOMAC LAW GROUP, PLLC**
1717 Pennsylvania Avenue, NW, Suite 1025
Washington, DC 20006
Telephone: (202) 558-5557
Facsimile: (202) 318-7707

Ryan E. Hatch (pro hac vice)
ryan@hatchlaw.com
**HATCH LAW PC**
13323 Washington Blvd., Suite 302
Los Angeles, CA 90066
Telephone: (310) 279-5079
Facsimile: (310) 693-5328

*Attorneys for Defendants Open Stories Foundation and John P. Dehlin*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| INTELLECTUAL RESERVE, INC., a Utah non-profit corporation; THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole,<br><br>    Plaintiffs,<br><br>v.<br><br>OPEN STORIES FOUNDATION, an Arizona non-profit corporation; JOHN P. DEHLIN, an individual,<br><br>    Defendants. | **ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR TRADEMARK INFRINGEMENT AND COPYRIGHT INFRINGEMENT**<br><br>Civil No. 2:26-CV-00321<br><br>Judge Robert J. Shelby<br>Magistrate Judge Jared C. Bennett |

Pursuant to Rule 7 of the Federal Rules of Civil Procedure, Defendants Open Stories Foundation ("OSF") and John P. Dehlin ("Dehlin") (collectively "Defendants" or "Mormon Stories") submit this Answer to the Complaint filed by Intellectual Reserve, Inc. and The Church of Jesus Christ of Latter-day Saints (collectively "the Church" or "Plaintiffs"). Defendants also hereby submit the following Counterclaims against Plaintiffs. Unless expressly admitted in this pleading, Defendants deny all allegations in the Complaint. Specifically, for their Answer and Counterclaims, Defendants deny and allege as follows:

## **INTRODUCTION**

1. Defendants admit that they operate the MORMON STORIES podcast and deny all other allegations in paragraph 1.

2. Defendants admit that, despite their disagreement with the Church's allegations, Defendants generously offered to and did make numerous changes to their logo and online content, including the addition of a disclaimer on their website and in the description of the podcast, which disclaimer remains in place. Defendants admit that they did not agree to include the audible disclaimers at the beginning of and repeated throughout each podcast episode. Defendants deny all other allegations in paragraph 2.

3. Denied.

4. Denied.

## **THE PARTIES**

5. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 5 and on that basis deny them.

6.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 6 and on that basis deny them.

7.   Admitted.

8.   Admitted.

9.   Defendants admit that Dehlin is an individual resident of Salt Lake City, Utah and is a founder and current CEO of OSF.  Defendants deny all other allegations in paragraph 9.

## NATURE OF ACTION AND JURISDICTION

10.   Paragraph 10 of the Complaint contains conclusions of law to which no response is required. To the extent a response is required for the remaining allegations of the paragraph, Defendants deny them. Defendants deny that Plaintiffs have any valid cause of action against them and deny any liability associated with or arising from Plaintiffs' alleged claims.

11.   Paragraph 11 of the Complaint contains conclusions of law to which no response is required. To the extent a response is required for the remaining allegations of the paragraph, Defendants deny them.

12.   Paragraph 12 of the Complaint contains conclusions of law to which no response is required. To the extent a response is required, Defendants do not contest that the Court may exercise personal jurisdiction over them.

## PLAINTIFFS' ALLEGED FACTS

I.   **Plaintiffs' Alleged Trademarks and Copyrights**

13.   Admitted.

14.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 and on that basis deny them.

15.     Denied.

16.     Defendants admit that the Church represented to the United States Patent & Trademark Office ("USPTO") that its first use of BOOK OF MORMON STORIES in connection with podcasts was November 1, 2010, several years after Dehlin began using MORMON STORIES as the name for his podcast, and also represented under oath that no other use of a name similar to BOOK OF MORMON STORIES for podcasts at that time (which would include Defendants) would create a likelihood of confusion with the Church's podcast name. Defendants deny all other allegations in paragraph 16.

17.     Denied.

18.     Defendants admit that the public has used the term "Mormon" as a nickname and generic term describing a broad category of organizations founded on and adherents to a religious tradition based, in part, on the "Book of Mormon" as scripture. Defendants deny all other allegations in paragraph 18.

19.     Denied.

20.     Defendants admit that the Church owns a trademark registration for a design feature that the Church describes as "a collection of geometric shapes comprising a rectangle and three overlapping triangles extending therefrom, with two triangles extending from a first side of the rectangle and a third triangle extending from an opposite second side of the rectangle, with the various shapes in the design having differing shading."  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 20 and on that basis deny them.

21. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 21 and on that basis deny them.

22. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22 and on that basis deny them.

23. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 and on that basis deny them.

24. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24 and on that basis deny them.

25. Denied.

26. Denied.

27. Denied.

28. Defendants admit that the Church purports to own the trademark registrations identified in paragraph 28 and Exhibit 1 to the Complaint and that the records at the USPTO of said registrations, including the Church's misrepresentations to the USPTO contained therein, speak for themselves. Defendants deny all other allegations in paragraph 28.

29. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 and on that basis deny them.

30. Defendants admit that the Church purports to own the copyright registrations identified in paragraph 30 and Exhibit 2 to the Complaint and that the records of said registrations at the United States Copyright Office speak for themselves. Defendants deny all other allegations in paragraph 30.

**II.    Defendants' Alleged Unlawful Conduct**

31.    Admitted.

32.    Admitted.

33.    Defendants admit that Mormon Stories began using the gold logos with light ray design features shown in paragraph 33 in connection with the MORMON STORIES podcast and related non-profit operations several years before the Church began using what it now calls its Light Ray Design.  Defendants deny all other allegations in paragraph 33.

34.    Defendants admit that in December 2022, Mormon Stories began using the blue MORMON STORIES logo depicted in paragraph 34.  Defendants deny all other allegations in paragraph 34.

35.    Defendants admit that after receiving Plaintiffs' notice of alleged infringement in November 2025, Mormon Stories began using different orange MORMON STORIES logos in an effort to cooperate with the Church, despite Defendants' strong disagreement with the Church's allegations. Defendants admit that Mormon Stories has used the orange MORMON STORIES logo depicted in paragraph 35, which was adopted during the parties' negotiations in early 2026 with the Church's acknowledged agreement at the time. Defendants deny all other allegations in paragraph 35.

36.    Defendants admit the first two sentences of paragraph 36. Defendants deny that Defendants infringe any of Plaintiffs' intellectual property rights, and therefore, deny the final sentence of paragraph 36 as stated.

37.    Admitted.

38.    Defendants admit that they offer other podcasts featuring the term "Mormon," including in connection with the Mormon Stories podcast, such as "Mormon Matters" and "Mormon Mental Health." Defendants deny that they use the singular term "Mormon" as a trademark and that anyone else, including Plaintiffs, own valid trademark rights in the term "Mormon." Defendants deny any remaining allegations in paragraph 38.

39.    Defendants admit they have used certain images relating to the history and teachings of the Church, including images of leaders of the Church, in connection with Mormon Stories' commentary and interviews about Mormon-themed topics in a manner that constitutes fair use. Defendants admit that nearly all of said images are offered by the Church for free download to be used for media purposes. Defendants deny all other allegations in paragraph 39.

40.    Denied.

41.    Defendants admit they have used certain images relating to the history and teachings of the Church, including images of leaders of the Church, in connection with Mormon Stories' commentary and interviews about Mormon-themed topics in a manner that constitutes fair use. Defendants admit that nearly all of said images are offered by the Church for free download to be used for media purposes. Defendants deny all other allegations in paragraph 41.

42.    Admitted.

43.    Denied.

44.    Defendants admit that Mormon Stories has always been aware of the Church. Defendants deny all other allegations in paragraph 44.

45.    Denied.

46.     Defendants admit that Mormon Stories adopted a blue logo in December 2022. Defendants deny all other allegations in paragraph 46.

47.     Denied.

48.     Defendants admit that Mormon Stories adopted a blue logo in December 2022. Defendants deny all other allegations in paragraph 48.

49.     Denied.

50.     Defendants deny that the Church has not at least implicitly authorized Mormon Stories to use any of Plaintiffs' purported trademarks. Defendants deny that Mormon Stories requires permission from the Church to use "Mormon," MORMON STORIES, or any other aspect of Defendants' branding and online content. Defendants deny that Mormon Stories is or has ever used any of Plaintiffs' purported marks as trademarks.

51.     Defendants admit that Intellectual Reserve, Inc. sent Defendants the email in Exhibit 5 to the Complaint on November 14, 2025, more than 20 years after the MORMON STORIES podcast began and three years after Mormon Stories began using the blue logo. Exhibit 5 speaks for itself.  Defendants deny all other allegations in paragraph 51.

**III.    Alleged Effect of Defendants' Actions**

52.     Denied.

53.     Denied.

54.     Denied, and Defendants affirmatively state that the allegations in paragraph 54 are false as explained below in the counterclaim allegations.

55.     Denied.

56.     Denied.

57.    Denied.

## COUNT I
### Federal Trademark Infringement (15 U.S.C. § 1114(1))

58.    Defendants incorporate and reallege their responses to the foregoing allegations in the foregoing paragraphs as if fully set forth herein.

59.    Denied.

60.    Denied.

## COUNT II
### Violation of Lanham Act § 1125(a)

61.    Defendants incorporate and reallege their responses to the foregoing allegations in the foregoing paragraphs as if fully set forth herein.

62.    Denied.

63.    Denied.

## COUNT III
### Trademark Infringement under Utah Common Law and Utah Code Ann. § 13-5a-103

64.    Defendants incorporate and reallege their responses to the foregoing allegations in the foregoing paragraphs as if fully set forth herein.

65.    Denied.

66.    Denied.

67.    Denied.

## COUNT IV
### Copyright Infringement Under 17 U.S.C. § 501

68.    Defendants incorporate and reallege their responses to the foregoing allegations in the foregoing paragraphs as if fully set forth herein.

69.    Denied.

70.    Denied.

## PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to any of the requested relief.

## DEFENDANTS' AFFIRMATIVE DEFENSES

Defendants allege and assert the following defenses in response to the allegations in the Complaint, undertaking the burden of proof only as to those defenses deemed "affirmative" by law, regardless of how such defenses are denominated herein. In support of their affirmative defenses, Defendants hereby incorporate by this reference the allegations set forth above in their answer to the Complaint and the allegations set forth below in their Counterclaims.

### FIRST AFFIRMATIVE DEFENSE
### (FAILURE TO STATE A CLAIM)

Plaintiffs' Complaint, in whole and/or in part, fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
### (NON-INFRINGEMENT)

Defendants do not infringe and have not infringed any valid and enforceable trademark or copyright of Plaintiffs and have not otherwise engaged in any act constituting unfair competition.

### THIRD AFFIRMATIVE DEFENSE
### (INVALIDITY)

Some, or all, of the trademark rights asserted in the Complaint are not valid by reasons of, for example, genericness, fraud, and/or abandonment, among others.

## FOURTH AFFIRMATIVE DEFENSE
### (EQUITABLE DEFENSES-LACHES)

Plaintiffs' trademark infringement claims are unenforceable against Defendants or barred, in whole or in part, due to the equitable defense of laches. Plaintiffs unreasonably delayed for two decades in asserting their claims for trademark infringement against Defendants' use of MORMON STORIES as the title for their 20-year-old podcast, and Defendants have been materially prejudiced by Plaintiffs' inexcusable delay.

## FIFTH AFFIRMATIVE DEFENSE
### (ACQUIESCENCE)

Plaintiffs' infringement claims are unenforceable against Defendants or barred, in whole or in part, due to the equitable defense of acquiescence. Certain of the complained-of acts have taken place for years, in some cases decades, with Plaintiffs' knowledge and without comment or complaint.  Plaintiffs, through their knowledge of the accused actions of Defendants, interactions and communications with Defendants, and persistent inaction and lack of complaint against Defendants with regard to intellectual property issues, have acquiesced to the accused actions and caused Defendants to justifiably rely to their detriment on Plaintiffs' acquiescing actions and inaction to invest and expand Defendants' operations, including its podcast operations, barring Plaintiffs' claims.

## SIXTH AFFIRMATIVE DEFENSE
### (COPYRIGHT FAIR USE)

The actions of Defendants accused by Plaintiffs in the Complaint as infringing Plaintiffs' copyrights qualify as fair use under 17 U.S.C. § 107 and, therefore, do not constitute copyright infringement.

## SEVENTH AFFIRMATIVE DEFENSE
### (TRADEMARK & COPYRIGHT MISUSE)

Plaintiffs are using and have used their intellectual property rights asserted in the Complaint for the illegitimate purpose of silencing or diminishing the constitutionally protected free speech of Defendants with regard to the name and content of the MORMON STORIES podcast. Plaintiffs' trademark and copyright claims are not a genuine effort to enforce such rights against legitimate competitive infringing conduct, rendering the trademark and copyright rights asserted in the Complaint unenforceable with regard to Defendants. Plaintiffs have improperly maintained federal registrations for abandoned marks using deceptive means in order to use the registration for improper enforcement activity, including the filing of this lawsuit, in order to wrongly use the process and expense of litigation, rather than the merits of the claims, to compel Defendants and others to stop or restrict the impact of their podcasting operations.

## EIGHTH AFFIRMATIVE DEFENSE
### (STATUTE OF LIMITATIONS)

Plaintiffs' claims are barred, in whole or in part, including Plaintiffs' copyright claims, by delay in bringing this suit, whether by statute or precedent. Alternatively, recovery of certain of the complained-of damages, including under the Copyright Act, is barred, in whole or in part, by delay in bringing this suit, whether by statute or precedent.

## NINTH AFFIRMATIVE DEFENSE
### (UNCLEAN HANDS)

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands based on, for example, Plaintiffs' actions of expressly and publicly abandoning its trademark rights relating to the term "Mormon" while also misrepresenting their continued use of "Mormon" to

12

the USPTO in order to improperly maintain federal trademark registrations to use in improper enforcement actions, like the present action, to assert abandoned trademark rights.

## TENTH AFFIRMATIVE DEFENSE
### (FRAUD ON THE TRADEMARK OFFICE)

Plaintiffs' Trademark Registration Nos. 2,766,231; 2,913,694; 5,020,314, 7,840,811 and 5,020,309 are all subject to cancellation on grounds of fraud.

## ELEVENTH AFFIRMATIVE DEFENSE
### (PRIORITY)

Plaintiffs' claims are barred, in whole or in part, because Defendants have prior trademark rights based on Defendants' use of the MORMON STORIES mark and accompanying logos in connection with podcast services.

## TWELFTH AFFIRMATIVE DEFENSE
### (TRADEMARK FAIR USE)

The allegedly infringing actions of Defendants with respect to the use of the term "Mormon" set forth in the Complaint constitute fair use, including but not limited to nominative, descriptive, and statutory fair use under 15 U.S.C. § 1115(b)(4), because, *inter alia*, Defendants use "MORMON" for purposes of identifying, describing, referring to, commenting upon, and otherwise truthfully referencing the Church and its policies and practices, other Mormon religious sects (of which there are hundreds), other organizations stemming from Mormon religious and cultural traditions, and people who identify in any way with Mormon religious and cultural traditions; and/or (b) to describe in good faith Defendants' goods and services.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (ESTOPPEL)

Plaintiffs' claims are barred by the doctrine of equitable estoppel. Plaintiffs' acts, omissions, representations, delay, and failure to timely assert the alleged claims induced the Defendants to reasonably rely on Plaintiffs' conduct to the Defendants' detriment.  Plaintiffs unreasonably delayed in asserting the claims alleged in the Complaint despite having actual and constructive knowledge of the facts giving rise to such claims. As a result of Plaintiffs' delay and conduct, Defendants have suffered prejudice. Plaintiffs also failed to appeal the genericness finding by the United States Patent and Trademark Office concerning the term "Mormon." Accordingly, Plaintiffs are estopped from obtaining the relief sought, and their claims are barred. Plaintiffs' claims are also barred by the doctrine of judicial estoppel due at least to the sworn declarations submitted to the USPTO expressly disavowing any confusion from the Defendants' use of MORMON STORIES, and the USPTO relying on Plaintiffs' sworn statement to grant Plaintiffs a trademark registration.

### FOURTEENTH AFFIRMATIVE DEFENSE
### (FIRST AMENDMENT PROTECTION OF EXPRESSIVE TRADEMARK USE)

Defendants' use of the term "MORMON" is entitled to protection under the First Amendment to the United States Constitution, U.S. Const. amend. I, and Plaintiffs' Lanham Act and related state-law trademark claims therefore fail as a matter of law.

### FIFTEENTH AFFIRMATIVE DEFENSE
### (COPYRIGHT REGISTRATION INVALIDITY)

Plaintiffs' copyright claims are barred, in whole or in part, because one or more of the copyright registrations upon which Plaintiffs rely are invalid under 17 U.S.C. § 411(b).

14

## SIXTEENTH AFFIRMATIVE DEFENSE
### (COPYRIGHT LICENSE)

Plaintiffs' copyright infringement claim is barred, in whole or in part, because Defendants' use of at least certain of the copyrighted works at issue was authorized by an express or implied license granted by Plaintiffs.

### RESERVATION OF ADDITIONAL SEPARATE DEFENSES

Defendants reserve the right to supplement their Answer and to assert any and all additional such other defenses as they may arise during the course of discovery in this matter.

## DEFENDANTS' COUNTERCLAIMS

Defendants Open Stories Foundation ("OSF") and John P. Dehlin ("Dehlin") (collectively "Defendants" or "Mormon Stories") submit the following counterclaims against Plaintiffs Intellectual Reserve, Inc. and The Church of Jesus Christ of Latter-day Saints (collectively "the Church" or "Plaintiffs") and state and allege as follows:

### NATURE OF THE ACTION

1.      This is a civil action seeking a declaratory judgment of: (a) non-infringement of the Church's trademark rights; and (b) non-infringement of the Church's copyright in the works accused in the Complaint.

2.      This action also seeks an order directing full or partial cancellation of the Church's U.S. trademark registrations on the grounds of fraud on the trademark office, abandonment, and/or genericness.

### INTRODUCTION

3.      No single source, including the Church, has the legal right to control the use of "Mormon."

4.      "Mormon" is a vast and complex term that millions of people use, and have used for over 200 years, to identify themselves or others, their upbringings, genealogical roots, cultures, religious beliefs, and traditions—regardless of their affiliation with the corporate institution of The Church of Jesus Christ of Latter-day Saints.

5.      "Mormon" belongs to the public—including members of the over 400 different Mormon sects currently existing nationwide that trace their heritage back to the founder of

Mormonism, Joseph Smith, and those with varied connections to Mormon history, genealogy, beliefs, and culture.

6. Over twenty years ago, Defendant John Dehlin, as an active member of the Church, began the MORMON STORIES podcast to help sincere people navigate the journey to answer hard questions relating to the Church and Mormonism.

7. Dehlin, a lifelong member of the Church before being ex-communicated from the Church in 2015 due to the content of his MORMON STORIES podcast, continues today to self-identify as "Mormon."

8. MORMON STORIES, believed to be the longest-running active podcast in the world, has achieved unparalleled renown in the genre, with hundreds of millions of views and tens of millions of hours watched, as well as being featured on national news and media outlets like ABC's Good Morning America, New York Times, HBO, and The Washington Post over the past 20 years.

9. Since the podcast's inception, officials at the highest level of the Church have been aware of Dehlin and MORMON STORIES podcast without once suggesting any intellectual property concerns regarding the name of the podcast, its logos, or any aspect of its branding.

10. The Church's awareness includes multiple direct interactions, such as letters and lunch meetings with Apostles of the Church and extensive research work in collaboration with the Church's chief historians under the approval of the Church's apostolic leadership.

11.     Despite the Church's knowledge of and extensive and personal interactions with Defendants for two full decades, the Church never once raised trademark or other intellectual property objections.

12.     Instead, in 2018, the Church publicly and expressly abandoned (to the extent it owned any rights in "Mormon," which Defendants do not concede) the very word "Mormon" that it now claims ownership and control of and sues to protect. Church President at the time, Russell M. Nelson, declared that the Church would no longer use "Mormon" as an identifier, declared that "Mormon" was simply an "adjective," and condemned its use as antithetical to the Church's religious teachings and beliefs.

13.     Following this mandate, the Church took dramatic measures for a period of years to omit all signs of "Mormon" from its official branding and trademark uses by, among other things:

(a) Renaming the Mormon Tabernacle Choir (a 150-year-old institution) to the Tabernacle Choir at Temple Square;

(b) Renaming its Mormon Channel to the Latter-day Saints Channel;

(c) Renaming its Mormon Messages to Inspirational Messages;

(d) Renaming over 1,000 products that bore the word "Mormon";

(e) Updating 300 web-based applications and acquiring 800 domain names to purge "Mormon" from its vernacular and web presence;

(f) Eliminating the entire website at www.mormon.org and simply redirecting the domain to one of its web pages located at www.churchofjesuschrist.org; and

(g) Issuing a Style Guide that is still in force today, explaining that "Mormon" is simply an "adjective" or "proper name" (not a brand), eliminating all use of the term "Mormon" as an identifier of the Church, and instructing the media and public to stop calling the Church "Mormon" and to stop referring to its members as "Mormons."

14. This explicit and sweeping abandonment, however, did not extend to its averments made to the United States Patent and Trademark Office ("USPTO") to speciously maintain federal registrations for the abandoned marks.

15. Even as the Church spent years publicly dismantling every trace of "Mormon" from its branding, it simultaneously submitted sworn declarations to the USPTO falsely representing the true nature of the Church's ongoing trademark use, or lack thereof, regarding the term "Mormon."

16. In November 2025, more than twenty years after the MORMON STORIES podcast launched and nearly three years after Defendants adopted the blue logo of which the Church complains, the Church raised trademark or copyright concerns to Defendants for the first time.

17. Defendants responded within twenty-four hours voluntarily making numerous changes in the spirit of good faith cooperation, despite believing that the Church's claims were unfounded.

18. Defendants' efforts to resolve the Church's concerns cooperatively included changing the color of the MORMON STORIES logo, changing the font, ceasing use of Defendants' longstanding light-rays design, adding a reference to "Dr. John Dehlin" near the logo, removing all copyrighted images that the Church identified, and adopting a disclaimer across every page of Defendants' website and the podcast descriptions on YouTube, Spotify, and Apple stating that "Mormon Stories is not affiliated with, endorsed or sponsored by The Church of Jesus Christ of Latter-day Saints."

19.    Even as evidenced by the Church's own asserted examples of alleged consumer confusion in the Complaint, no consumers are actually or likely to be confused as to the source of the MORMON STORIES podcast.

20.    The Church's response to Defendants' gestures of extraordinary and voluntary amenability was to file this lawsuit and issue a false and misleading press release depicting Defendants as uncooperative and deceptive.

21.    Because the Church is a multi-billion-dollar religious institution with unlimited resources to wield in its enforcement efforts, the very existence of the present lawsuit alone (despite the merits thereof) has the potential to ultimately silence Defendants through attrition (which may possibly be by design) and thereby create a chilling effect for other Church critics and questioners who, like Defendants, engage in constitutionally protected speech about Mormonism.

**PARTIES**

22.    John P. Dehlin is an individual resident of Salt Lake City, Utah and the CEO of Open Stories Foundation.

23.    Open Stories Foundation is an Arizona non-profit corporation with an address in Salt Lake City, Utah.

24.    On information and belief, The Church of Jesus Christ of Latter-day Saints is a Utah corporation organized under the laws of Utah with an address of 50 East North Temple, Salt Lake City, UT 84150.

25.    On information and belief, Intellectual Reserve, Inc., is a non-profit corporation organized under the laws of Utah with an address of 50 East North Temple, Salt Lake City, UT

84150. Intellectual Reserve, Inc. is an asset management entity for The Church of Jesus Christ of Latter-day Saints, which holds legal title to the Church's intellectual property, including its trademarks and copyrights.

## JURISDICTION AND VENUE

26.     These counterclaims arise, in part, under federal statutory law, including the Declaratory Judgment Act, 28 U.S.C. §§ 2201, the Lanham Act, 15 U.S.C §§ 1051 et seq., the Copyright Act, 17 U.S.C. § 101 et seq., and common law. Accordingly, this Court has original subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1338. The Court has supplemental jurisdiction over Defendants' common law counterclaims pursuant to 28 U.S.C. § 1367.

27.     Upon information and belief, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

28.     Venue and jurisdiction are proper in this District because Plaintiffs and Defendants are residents of and operate their organizations in the State of Utah.

## FACTS

**A.     Dehlin and MORMON STORIES Podcast**

29.     Dehlin was born and raised as a sixth-generation member of the Church.

30.     Dehlin served a 2-year LDS mission in Guatemala and Arizona from 1988 to 1990, during which he witnessed recruitment and baptism practices by missionaries and mission leaders that Dehlin disagreed with and caused him concern.

31.     On February 11, 1992, Dehlin wrote a letter to Dallin H. Oaks, currently President of the Church but at the time a member of the Quorum of the Twelve Apostles for the Church,[1] expressing concern about the corruption he experienced on his mission. *See* https://www.mormonstories.org/other/oaksdocs/JohnDehlin-ElderOaksMissionCorrespondance.pdf

32.     In the summer of 1992, Apostle Oaks called Dehlin while he was completing a BYU internship in Washington D.C., thanked him for his letter, and promised to follow up regarding the concerns Dehlin expressed about problematic missionary practices.

33.     On June 8, 1992, Apostle Oaks wrote Dehlin to inform him that he shared Dehlin's letter with the full Quorum of the Twelve to help improve LDS missionary practices. A copy of this letter is inserted below.

---

[1] Generally, the Church is led by 15 "apostles," three of whom form what's called the First Presidency and the remaining form the Quorum of the Twelve Apostles. These two groups constitute the highest leadership and governing bodies in the Church. *See* https://newsroom.churchofjesuschrist.org/topic/organizational-structure-of-the-church and https://www.churchofjesuschrist.org/learn/global-leadership-of-the-church?lang=eng.

THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

The Council of the Twelve
47 East South Temple Street, Salt Lake City, Utah 84150

June 8, 1992

Mr. John P. Dehlin
31 Waterwood
Huntsville, Texas  77340

Dear Brother Dehlin:

I write to report what was done with your memo of February 11, 1992.

Following our phone conversation, I copied the memo and shared it with the members of the Council of the Twelve.  What happens now is up to them.  As I advised you on the telephone, it is quite possible that some of them would hand it to someone in a Church department, or take steps on their own to investigate this matter.  I think it quite likely that your memo may be of assistance in the instruction given at the forthcoming mission president's seminar.

Thank you for sharing this very valuable information.

Sincerely,

Dallin H. Oaks

dd

cc: Professor F. Lamond Tullis

34.     On June 25, 1992, Apostle Oaks sent Dehlin a copy of a talk he gave that month to outgoing Church mission presidents addressing some of Dehlin's concerns. A copy of the note from Apostle Oaks is inserted below.

23



35.     In 1993, Dehlin graduated summa cum laude from Brigham Young University with a degree in political science.

36.     On January 9, 2002, Apostle Oaks sent Dehlin a letter acknowledging the positive impact his letter had on worldwide church missionary practices.

January 29, 2002

John Dehlin
Evangelism Manager
Microsoft Corp
One Microsoft Way
Redmond WA  98052-6399

Dear Brother Dehlin:

On my flight to Asia (from which I have just returned) you left me a letter while I was sleeping.  Since I did not get a chance to respond on the plane, hurrying to the next flight, I use this means to respond and to thank you for that gracious message.

I remember your letter very well.  It was of great concern to me, and alerted me to conditions I needed to understand, though my capacity to correct them at that point was very limited.  Ever since that time I have never spoken to missionaries without stressing the fact that we want real conversions and that they should not consider their "success" to be linked to the exercise of the agency of others.  I believe mission presidents get into trouble when they give missionaries goals for baptisms (dependent on the agency of the investigators) rather than goals for what the missionary can do himself or herself.

I was glad to know that our communications had been helpful to you, and that you are happily married and the father of three beautiful daughters and currently serving as a seminary teacher in the Bellevue Washington Stake.  Thanks also for the work you are doing with BYU's business school.

You have my best wishes.

Sincerely,

Dallin H. Oaks

DHO/mm

37.    In 2007, Dehlin received a master's degree in instructional technology from Utah State University.

38.    In 2015, Dehlin received a Ph.D. in clinical and counseling psychology from Utah State University.

39.    Following his undergraduate studies, Dehlin worked in the software field for several years for a variety of companies.

40.    In the early 2000s, while working for Microsoft, Dehlin experienced a crisis of faith due to some of the difficult and generally unknown aspects of the Church's history and policies. Dehlin discovered facts previously unknown to him about the Church's history, beliefs and practices that he felt the Church hid from him throughout his life.

41.    Dehlin struggled with his doubts, but found reasons to remain an active member of the Church.

42.    Dehlin realized that the internet was growing rapidly and expanding in such a way that more and more people would be exposed to the problematic and complicated aspects of the lesser-known history, practices, and doctrines of the Church, which he believed can cause significant confusion and distress, especially to life-long members of the Church like Dehlin. Dehlin wanted to help people in the Church to process such things in healthy and positive ways as he had been trying to do himself.

43.    In 2005, Dehlin launched the MORMON STORIES podcast and blog with the goal of creating a supportive space for people to discuss and process complicated stories from the Church's history as well as share their own stories about what being "Mormon" means or has meant to them.

44.    Dehlin registered the mormonstories.org domain on July 10, 2005.

45.    Dehlin's first MORMON STORIES blog entry and podcast discussed Dehlin's experience as a Church missionary in Guatemala, which he conveyed to Apostle Oaks as explained above, and were posted on September 4, 2005, using the blue background shown below.



46.    The first four episodes of the podcast were posted on Apple iTunes the same day—September 4, 2005.

47.    The first MORMON STORIES video podcast was titled, "A Mormon Story: On Black People and Racism" and was posted on the MORMON STORIES YouTube page more than 20 years ago on March 15, 2006.

48.    The MORMON STORIES Facebook page was created on April 22, 2009.  A screen capture of the Facebook page from January 17, 2010 is depicted below, including a MORMON STORIES podcast logo using Mormon-themed images to illustrate the subject matter of the podcast.



49.     As early as April 2011, Dehlin began using a gold MORMON STORIES logo with a light rays design ("Gold Light Rays Logo") in connection with the podcast, as shown below in a 2011 screen capture of the mormonstories.org website.



50.     In January 2011, Dehlin formed the Open Stories Foundation as a non-profit entity with the mission of "Exploring Mormonism through stories."  OSF was formed to operate

the MORMON STORIES podcast and other Mormon-themed podcasts. From the beginning, OSF's website stated that OSF is "a secularly based organization with no affiliation to the LDS church." A portion of the OSF website homepage from April 5, 2012, is depicted below.



51.    The OSF website continues to state that it is "a secular organization, with no affiliation to any church."  https://www.openstoriesfoundation.org/our-team/

52.    Shortly after forming OSF, the "About" page for the MORMON STORIES website was created to include similar statements, specifically that "Mormon Stories is a secular organization with no affiliation to the LDS church."  A screen shot of this page from April 8, 2012 is depicted below.

28



53.     Over the years, the specific content on the "About" page of the MORMON STORIES website has changed, but that content has never suggested that Defendants or the MORMON STORIES podcast has any affiliation with or sponsorship from the Church.

54.     For years, and continuing today, the MORMON STORIES "About" page and the description of every episode of the podcast has identified the podcast's affiliation with the Open Stories Foundation.

55.     Any use by Defendants of "Mormon" and other images pertaining to the Church has been for the purpose of describing in good faith the nature and content of Defendants' podcast and associated services, which include identifying, describing, referring to, commenting upon, or otherwise truthfully referencing Mormon culture, history and tradition, as well as the Church of Jesus Christ of Latter-day Saints, other Mormon sects, and people who identify in any way with Mormon religious and cultural traditions.  This use of "Mormon" was and is

reasonably necessary to identify and describe the subject-matter of Defendants' podcast and associated services.

56.     Since 2024 and continuing today, the "About" page from the mormonstories.org website provides a history of the MORMON STORIES podcast and Dehlin's excommunication from the Church, making it abundantly clear that there is no formal, official, or informal affiliation between the MORMON STORIES podcast and the Church.

https://www.mormonstories.org/home/about/

57.     In 2007, several years before the Church first used what it refers to as its "Light Rays Design," Dehlin launched the MORMON MATTERS podcast at www.mormonmatters.org to explore current events and pop culture relating to Mormonism.  A screen capture from the 2007 MORMON MATTERS homepage using a blue background with light ray design features is shown below.



58.    Dehlin was the first host of MORMON MATTERS podcast, which was eventually brought under the OSF umbrella with Dan Wotherspoon as the host.  MORMON MATTERS podcast content has been continuously available from 2007 through today via OSF. The Church has never taken any action against, or communicated any trademark or branding concerns about, the MORMON MATTERS podcast.

59.    OSF's MORMON MATTERS Podcast has utilized at least two shades of blue in the podcast logos, which use design elements depicting sun rays, shown below.



60.    In 2011, OSF created the MORMON MENTAL HEALTH blog at mormonmentalhealth.com to provide mental health resources and information to Mormon communities and anyone who self-identifies as Mormon for any reason.  The MORMON MENTAL HEALTH podcast was launched in December 2012 and was hosted by therapist Natasha Helfer Parker. Content for the MORMON MENTAL HEALTH podcast and website was created from December 2012 through April 2022 and has been continuously available through today.

61.     The Church has never taken any action against, or communicated any trademark or branding concerns about, the MORMON MENTAL HEALTH podcast.[2]

62.     In August 2012, OSF launched a podcast called A THOUGHTFUL FAITH (athoughtfulfaith.org) as a MORMON STORIES-affiliated podcast dedicated to providing stories from intelligent, thoughtful believers in the Church who maintain their faith despite some of the troubling aspects of the Church's history and policies.  For nearly a decade, the A THOUGHTFUL FAITH podcast has consistently been promoted by OSF on its website using the following blue logo in connection with the MORMON STORIES name. *See* https://www.openstoriesfoundation.org/



63.     Content for the A THOUGHTFUL FAITH podcast and website has been continuously available from 2012 through today. The Church has never taken any action against,

---

[2] On information and belief, Plaintiffs made allegations of trademark infringement against the Mormon Mental Health Association (www. https://mormonmentalhealthassoc.org) in or around 2015. The host of MORMON MENTAL HEALTH podcast is also the original founder of the Mormon Mental Health Association. The Electronic Frontier Foundation responded to Plaintiff's accusations on behalf of the Mormon Mental Health Association in December 2015, explaining the weaknesses in Plaintiffs' claim of trademark rights in "Mormon" and demanding they withdraw their claims. On information and belief, Plaintiffs took no further action in the matter.

or communicated any trademark or branding concerns about, the A THOUGHTFUL FAITH podcast logo above.

64.    In February 2012, OSF launched the website at www.whymormonsquestion.org to help build understanding about why some people have doubts and questions about their Mormon faith. The Why Mormons Question website was launched with the following blue logo.



65.    On May 2, 2012, OSF posted an episode of MORMON STORIES podcast showing a presentation titled "Why Mormons Question" given by Dehlin at Utah Valley University as part of a Mormon Studies Conference using this same blue logo. Employees of the Church and Brigham Young University attended the presentation and subsequently wrote about it online.

66.    In September 2017, OSF launched the domain mormonfaithcrisis.com and a podcast called THE GIFT OF THE MORMON FAITH CRISIS.  The last post for THE GIFT OF THE MORMON FAITH CRISIS podcast occurred November 25, 2019, and all content has continuously been available through today. The Church has never taken any action against, or communicated any trademark or branding concerns about, THE GIFT OF THE MORMON FAITH CRISIS podcast.

67.     For years, from 2018 to 2024, the MORMON STORIES website (www.mormonstories.org) included a page accessible via the "About" link depicting the OSF's Mormon-themed podcasts, including the use of blue and light rays in its podcast logos. An example from 2020 is shown below.



68.     The foregoing Mormon-themed podcasts have been and remain available through the OSF website homepage, as depicted below. See https://www.openstoriesfoundation.org/.



69.     The MORMON STORIES podcast was first published on iTunes in 2005. The Gold Light Rays logo was first incorporated into the podcast on iTunes around 2011. Later, MORMON STORIES was published on Anchor (which later became Spotify) on December 8, 2017, using the Gold Light Rays Logo shown below.



70.     In 2022, a YouTube consultant that OSF had recently engaged recommended that the MORMON STORIES YouTube banner be updated.

71.     In December 2022, the YouTube consultant worked with OSF's contracted graphic designer to create a new logo design for YouTube.  Consistent with Defendants' historical online designs implementing blue backgrounds and light ray motifs, OSF adopted a blue background for the new MORMON STORIES logo.

72.     Given Defendants' long-time use of light ray designs in the Gold Light Rays Logo and elsewhere, OSF's web designer wanted to continue that theme and downloaded the following free blue design from Freepik[3] at https://www.freepik.com/free-vector/modern-abstract-blue-transparent-crystal-pattern-background_15681036.htm to create the new logo.



---

[3] Freepik is a site that offers high quality design images for marketers and designers, some of which are provided for free. Freepik was recently rebranded as Magnific.  *See* https://www.magnific.com/freepik#from_element=topbar_banner

73.     Ultimately, the following updated logo was adopted across many of the MORMON STORIES podcast platforms in and after December 2022.



74.     The new MORMON STORIES logo was designed to fit within and maintain consistency with OSF's historical logo designs dating back more than a decade. Below is a depiction of the 2022 MORMON STORIES blue logo with the logos for OSF's other podcasts.



75.     OSF did not intentionally design its blue MORMON STORIES logo to mimic or resemble the Church's branding in any way.

76.     Over two decades, Defendants have expended significant time and resources promoting the Mormon-themed podcasts associated with OSF, and the public has come to know the OSF's Mormon-themed podcasts as offering perspectives and content about Mormonism wholly independent from the Church.

77.     Across YouTube, Apple, Spotify and other social media platforms, Defendants' MORMON STORIES podcast has collectively garnered hundreds of millions of views/plays,

tens of millions of hours watched/listened, and hundreds of thousands of subscribers and followers.

78.    For example, on YouTube alone, Defendants' MORMON STORIES channel has over 300,000 subscribers and more than 146 million views of more than 2000 videos dating back many years, totaling over 52 million hours watched.  On Apple Podcasts, Defendants' MORMON STORIES podcast has more than 300,000 listeners and over 76 million plays of the podcast. And on Spotify, Defendants' MORMON STORIES podcast has nearly 4 million plays totaling more than 2.5 million hours of listening time.

79.    Since 2007 through 2025, Dehlin and the MORMON STORIES podcast have repeatedly appeared on or been featured in stories or shows from various national outlets, including ABC's "Good Morning America" and "Nightline," the "New York Times," NPR, TEDx Talks, CNN, NBC News, "The Washington Post," HBO News and Documentaries, Hulu, Vice, and third-party YouTube channels. Attached as Exhibit A is a non-exhaustive list of some news and entertainment outlets across the country that have featured Dehlin and the MORMON STORIES podcast over the years.

80.    For example, on June 19, 2007, Dehlin appeared on ABC's Good Morning America television show to discuss the presidential campaign of Mitt Romney. Dehlin also appeared on ABC's Nightline to discuss his Ph.D. research regarding LDS LGBTQ mixed-orientation marriages (shown below).  *See* https://www.youtube.com/watch?v=iaxrN1IUDYA. ABC's YouTube channel has 19.6 million subscribers, and this video has received over 370,000 views.



81. ABC released an article at the same time titled, "Some Mormons Worry as Faith Comes Under Scrutiny," which mentions Dehlin and the Mormon Stories website. *See* https://abcnews.com/GMA/Politics/story?id=3293303&page=1.  At the time, ABC's Good Morning America program was attracting more than 4.5 million viewers, according to AdWeek. https://www.adweek.com/tvnewser/morning-show-ratings-week-of-june-6/.

82. In another example, ABC News ran a story about Dehlin and the MORMON STORIES podcast in 2014 when Dehlin was facing excommunication. https://abcnews.com/video/24121034/.



83.    In 2013, The New York Times published an article entitled, "Some Mormons Search the Web and Find Doubt," which discusses the MORMON STORIES podcast. *See* https://www.nytimes.com/2013/07/21/us/some-mormons-search-the-web-and-find-doubt.html. At that time, The New York Times reported average weekday circulation of approximately 1.22 million and average Sunday circulation of approximately 1.17 million, as measured by the Alliance for Audited Media. https://investors.nytco.com/news-and-events/press-releases/news-details/2013/The-New-York-Times-Announces-Solid-Circulation-Gains-20131031000000/default.aspx

84.    In 2015 alone, The New York Times published three articles about Dehlin and MORMON STORIES podcast. The first was titled "Mormon Church Threatens Critic With Excommunication" which discussed "John P. Dehlin … host of the 'Mormon Stories' website and podcast." *See* https://www.nytimes.com/2015/01/16/us/john-dehlin-mormon-critic-facing-excommunication.html  The second was entitled "Excommunication of a Mormon Critic" and was a transcript of a meeting between Dehlin and his stake president discussing Dehlin's pending excommunication, which included discussion of the MORMON STORIES podcast. *See* https://www.nytimes.com/interactive/2015/02/11/us/11mormons-docs.html.  The third was titled "Mormon Church Expels Outspoken Critic" again discussing Dehlin and the MORMON STORIES podcast. *See* https://www.nytimes.com/2015/02/11/us/mormon-church-expels-critic-for-apostasy.html  At that time, The New York Times reported average weekday circulation of approximately 2.18 million and average Sunday circulation of approximately 2.62 million, as measured by the Alliance for Audited Media. *See* https://www.nytco.com/press/the-times-sees-circulation-growth-in-first-quarter/.

40

85.     The MORMON STORIES podcast and Dehlin have become widely known as an independent source of information, expression, and commentary about, *inter alia*, the history, beliefs, policies and practices of the Church, other Mormon denominations, and people of self-identify as "Mormon," with no formal or official affiliation or endorsement from the Church or any church.

**B.      The Church's Knowledge of and Acquiescence to Dehlin's MORMON STORIES Podcast**

86.     As shown above, President Dallin H. Oaks, the Church's current President, has been personally aware of Dehlin since 1992.

87.     In November 2005, Dehlin sent an email to the FAIR listserv, which included many employees of the Church, introducing himself and the MORMON STORIES podcast. FAIR, at the time, stood for the Foundation for Apologetic Information & Research and is an organization dedicated to defending the Church and offering faithful answers to questions about the Church.  Dehlin told the people at FAIR about a video he was making called "Why People Leave the LDS Church and What We Can Do About It" and said he hoped to provide it to the families of people who have left the Church to help them deal with the situation in healthy and productive ways. https://www.mormonstories.org/why-people-leave-the-lds-church-and-what-we-can-do-about-it/

88.     From 2004 to 2011, Dehlin's brother, Joel Dehlin, was the Chief Technology Officer for the Church.

89.     A few months later, in May 2006, Dehlin noticed people with ISP addresses from inside the Church's headquarters browsing the mormonstories.org website and emailed his brother about it.



90.     Within the first year of the MORMON STORIES podcast, Dehlin's local bishop[4] became aware of Dehlin's podcast and was initially supportive and allowed him to hold various positions in his local Mormon congregation, including as an instructor.

91.     In January 2007, Dr. Richard Bushman, a Columbia University professor and one of the Church's highest profile historians and defenders, appeared on 5 episodes of MORMON STORIES Podcast.

92.     In May 2008, Bushman invited Dehlin to the Neal A. Maxwell Institute for Religious Scholarship at Brigham Young University to speak on the "Faith Crisis" problem and discuss why people were leaving the Church.  Bushman's email indicated that the Maxwell

---

[4] The leader of a local congregation in the Church is called a bishop. A group of congregations forms a "stake," and the leader of a stake is called a stake president. In between the top apostolic leadership and local bishops and stake presidents are "general authorities" called Seventies and Area Seventies.  *See* https://newsroom.churchofjesuschrist.org/topic/organizational-structure-of-the-church and https://www.churchofjesuschrist.org/learn/global-leadership-of-the-church?lang=eng.

Institute's aim was to find the best ways to respond to people "who run into the problems you dealt with on your ipod broadcasts."

93.     In attendance for Dehlin's Maxwell Institute speech were several professors from Brigham Young University and religious instructors employed by Plaintiffs' Church Educational System (CES). Bushman asked Dehlin if he would be willing to review and comment on the essays the group was preparing to help the Church address various problematic topics about the Church and its history.

94.     In June 2009, Dehlin was invited to have lunch with his brother Joel and one of the Church's most senior leaders, Elder Jefferey R. Holland from the Church's Quorum of the Twelve Apostles.[5]  During the lunch, they talked about Dehlin and his podcast, including recent topics Dehlin had covered on the podcast.

95.     During the June 2009 lunch, Dehlin asked Elder Holland if he wanted "people like me" in the Church, meaning people with doubts or who do not hold a literal belief in the Church's doctrine. Elder Holland indicated that as long as people followed the counsel of Church leadership, he wanted and needed people like Dehlin in the Church. In fact, Elder Holland stated that he wished they had "100,000 Joel and John Dehlins in the Church."

96.     At no time during the June 2009 lunch did Elder Holland ever ask Dehlin to stop the podcast. Nor did Elder Holland state or suggest that Dehlin's MORMON STORIES podcast was violating any of Plaintiffs' intellectual property rights or causing source or affiliation confusion.

---

[5] *See* footnote 1, *supra*.

43

97.    In October 2009, Dehlin again noticed activity from the Church's headquarters browsing his mormonstories.org website and again emailed his brother about it.



98.    On March 16, 2010, Dehlin again went to lunch with his brother Joel and Elder Holland at Elder Holland's invitation to follow up on the lunch meeting from the prior year. During this lunch meeting, the three again discussed Dehlin's MORMON STORIES podcast, including the topic of couples getting divorced after one spouse loses their faith, which had been troubling Dehlin at the time.

99.    During the March 2010 lunch, Elder Holland told Dehlin that although there was likely not enough internal support to make a statement in a General Conference[6] talk, Dehlin was free to tell his listeners that losing one's faith alone should not necessarily be grounds for divorce. Once again, Elder Holland never suggested that the MORMON STORIES podcast, any

---

[6] The Church holds two world-wide General Conferences every year where top Church leadership speak to the global Church membership.

of the other OSF podcasts, or any of the content of the podcasts violated any of Plaintiffs' intellectual property rights. Nor did Elder Holland ask Dehlin to stop the podcast for any reason. Rather, Elder Holland's comments encouraged Dehlin to continue communicating with his listeners.

100.    On November 28, 2010, an emergency fireside meeting was held in Stockholm, Sweden by Elder Marlin K. Jensen (the Church's chief historian at the time) and Elder Richard Turley (assistant Church historian) to address a faith crisis that ensued among an entire group of members and leaders of the Church in Stockholm, including a very prominent member named Elder Hans Mattsson, a former member of the Church's Quorum of the Seventy and Area Authority.[7]

101.    The meeting, referred to by some as the "Swedish Rescue," was attended by about 25 Swedes including local bishops and stake presidents, and focused on aspects of the Church's history and truth claims that had become troubling for a number of Swedish Church members (many of the same issues that originally troubled Dehlin).

102.    In May 2011, in a post on the Mormon Stories website titled "You, the church and Mormon Stories," Dehlin informed his listeners that he had been granted "the opportunity to meet with a church leader" soon and invited people to share their feeling about the Church and their personal faith journeys, and how MORMON STORIES and MORMON MATTERS had

---

[7] Some members of the Church's Quorums of the Seventy are Area Authorities, today called "Area Seventies," and are regional leaders of the Church "called by the First Presidency to be 'especial witnesses' and to assist" the Twelve Apostles in their assigned areas. https://www.churchofjesuschrist.org/learn/area-seventies?lang=eng

helped (or harmed) them. https://www.mormonstories.org/you-the-church-and-mormon-stories/#comment-196763203.

103.    On May 4, 2011, Mattson posted a response to Dehlin's foregoing invitation, stating that he felt MORMON STORIES had helped him "to keep the faith" and was an "answer to my prays [sic] about the church history." He also stated that because of his position as a Seventy, he was acquainted with the Church's top leaders and had engaged in "hours of talks about the problems with the church founding history" with the Church's leadership.

104.    Around that same time, a New York City-based brand strategist, Travis Stratford, met with LDS historian Greg Prince in Washington, D.C. and discussed the above-mentioned events in Sweden and the problematic treatment of questioning members of the Church by some well-intentioned but untrained local leaders. In particular, the two discussed the ongoing tension between their mutual friend and scholar, John Dehlin, and his local leaders in North Logan, Utah.

105.    On May 24, 2011, Stratford (a returned Church missionary from Sweden), contacted Mattsson in Sweden proposing a team project aimed at helping the leadership of the Church in Salt Lake City to better understand the experience of a faith crisis (*e.g.*, the emotional distress and strained relationships resulting from members discovering Church history facts that do not align with the traditional Church narrative).

106.    Mattsson agreed to help and recommended that the team meet with Elder Marlin K. Jensen, a member of the First Quorum of the Seventy and official Church Historian at the time, who was also a personal friend of Mattsson and Prince.

107.    After clearing the meeting with Boyd K. Packer, the President of the Quorum of the Twelve Apostles at the time, on June 18, 2011, Jensen agreed to meet on October 24, 2011 in Manhattan.

108.    This team, comprised of Jensen, Prince, Mattsson, and Stratford, and approved by the Church's apostolic leadership, enlisted Dehlin's help, and by the end of September 2011, Dehlin had assembled a research team and designed an ethnographic survey aimed at collecting data that could be used at the October 24, 2011 meeting in New York City.

109.    On October 13, 2011, Dehlin's survey went live to a self-selected group of survey participants recruited via social media. By October 19, 2011, the survey had captured over 3,000 responses.

110.    On January 27, 2012, Dehlin had a personal meeting with Jensen to discuss the "Why Mormons Question/Leave" research. Dehlin and Jensen spoke at length about MORMON STORIES podcast and Dehlin's motivations for starting it.  At no point did Jensen express concern about trademark or copyright infringement, or any other type of brand confusion.

111.    On January 30, 2012, Dehlin and Stratford received the following email from Jensen via Jensen's official Church email account, letting them know that Apostle Quentin Cook and Apostle L. Tom Perry would be recommending that the Church's Public Affairs Committee allow Stratford to share Dehlin's research with Church leadership in Salt Lake City.



112.    In March 2012, Dehlin published the survey results in a report titled, "Why Mormons Disbelieve," which he presented at the Utah Valley University Mormon Studies conference attended by various BYU professors using the following blue logo.  *See* https://www.youtube.com/watch?v=7gVUuWd2gP0



113.    At the request of Church Historian Jensen, Dehlin's report did not include the Church-approved impetus for the research or the fact that the report's findings were already being shared with Church leaders.

114.    In May 2013, Harvard Business School professor and former Area Seventy Clayton Christensen suggested to Stratford that the team capture additional first-person narratives to supplement the initial report for Church leadership. The team again enlisted the help of Dehlin, and a second survey was launched to capture individual faith crisis experiences expressed in 700 words or less.  Over 1,500 stories were collected from participants in North America, South America, Europe, Asia, and Oceania.

115.    The data from Dehlin's foregoing surveys was ultimately used to create a June 2013 report titled "LDS Personal Faith Crisis" for the Church's most senior leadership—specifically President Dieter F. Uchtdorf, who at that time was the Second Counselor in the Church's First Presidency. A copy of that report can also be found online. *See* https://faenrandir.github.io/a_careful_examination/documents/faith_crisis_study/Faith_Crisis_R2 8e.pdf; and https://archive.org/details/FaithCrisisReportR24B/mode/2up. On August 23, 2013, brand strategist Stratford met with President Uchtdorf in Uchtdorf's personal office in Salt Lake City to discuss the Faith Crisis Report.

116.    The Faith Crisis Report presented to President Uchtdorf expressly identified Dehlin as a "Collaborator" in the project and explained Dehlin's central role in acquiring the survey data underlying the report. To explain the impetus and background of the research project, the Faith Crisis Report refers to "the ongoing tension between their mutual friend LDS podcaster and scholar, John Dehlin, and his local leaders in North Logan, Utah" leading to the collaborators meeting to discuss how to best educate Church leadership about the faith crisis problem.

117.    The Faith Crisis Report also explained that "Dehlin had designed an ethnographic survey aimed at collecting data" from over 3,000 respondents. It also explained that "Dehlin later published the survey results in his March 2012 report, 'Why Mormons Disbelieve.'"

118.    Some of the survey responses in the Faith Crisis Report cite to interviews they heard on the MORMON STORIES podcast as playing a role in their faith crisis experience.

119.    No survey respondents claimed to mistakenly believe that MORMON STORIES podcast was affiliated with or sponsored by the Church. Quite the contrary, it was obvious to *every* respondent who mentioned MORMON STORIES in the report that the podcast contained content that was *critical* of the Church's history and hierarchy.  *See* Faith Crisis Report, p. 92 (stating that the podcast "introduced much of the history of the church that I never knew existed, much of it which was deeply troubling and not in-line with the church that I had known throughout my life"); p. 100 (stating after listening to MORMON STORIES "[s]lowly things began to unravel the more we learned about the early church history and about how things work in the church's corporate hierarchy"); p. 117 (after "devouring" MORMON STORIES podcasts "[w]e spent the next year involved in lots of online discussion and exploring lots of the issues with the church"). And nothing in the 71-page Faith Crisis Report given to President Uchtdorf ever suggested a problem with branding confusion from Defendants' use of MORMON STORIES as the title of the podcast.

C.      **The Church's Excommunication of Dehlin**

120.    Prior to 2014, as the MORMON STORIES podcast grew, Dehlin was investigated by his local Church leaders multiple times and called into meetings to discuss his membership status in the Church, none of which resulted in excommunication.

121.    On October 10, 2013, Dehlin delivered a TEDx talk titled, "The Ally Within," sharing preliminary results from his Ph.D. research on the LGBTQ Mormon experience.  The results suggested strong mental and physical health benefits for same-sex marriage amongst LGBTQ Mormons. *See* https://www.youtube.com/watch?v=0MxCXjfAunk

122.    On November 24, 2013, Dehlin published an essay in support of gender equality within the Church. *See* https://ordainwomen.org/project/hi-im-john/

123.    On January 26, 2014, Dehlin's new bishop called him in for a meeting to express concern about Dehlin conveying public support for progressive causes (*e.g.*, same-sex marriage and gender equality), and for sharing content on the Internet that could lead others to have doubts and leave the Church.  Dehlin's bishop read a scripture from the "Book of Mormon" about shepherds protecting their sheep from wolves and stated that he had been asking himself, "Is John a wolf or is John a sheep?" Dehlin was not excommunicated at this time.

124.    On August 7, 2014, Dehlin received a letter from his newly called stake president summoning him to a disciplinary council on the grounds of "apostasy."  Dehlin's stake president placed Dehlin on "informal probation" and indicated that Dehlin's membership status would not be in jeopardy if Dehlin took the following actions:

- "Publicly renounce and apologize for the false concepts that you have widely expressed regarding God, Jesus Christ, the atonement, the restoration of the gospel, and the Book of Mormon."

- "Cease providing a public forum for any person that is critical of the church or the doctrine."

- "Stop promoting groups or organizations that expound doctrines contrary to The Church of Jesus Christ of Latter-day Saints."

- "Resign your status as an ordained minister in another faith."

125.    Dehlin refused to take the foregoing actions requested by his stake president.

126.    The disciplinary council was convened on February 8, 2015.

127.    On February 9, 2015, the Church sent Dehlin a letter confirming that he had been excommunicated based on the opinions and information he had spread "widely via the Internet to hundreds of people" and his refusal to stop.

128.    On February 10, 2015, the Church issued a press release about Dehlin's excommunication titled, "Church Responds to John Dehlin's Public Comments."

https://newsroom.churchofjesuschrist.org/article/church-responds-to-john-dehlins-public-comments

129.    Dehlin appealed his excommunication to the First Presidency on March 10, 2015, arguing that his actions had not met the Church's definition of apostasy. A few months later, the First Presidency notified Dehlin via his stake president that his appeal was denied.

130.    On information and belief, on December 8, 2015, the Church's Quorum of the Twelve Apostles held a meeting, part of which addressed reasons that people leave the Church. On information and belief, a presentation from that meeting included the following slide identifying Dehlin as a major cause for the Church losing members—effectively an admission that his MORMON STORIES podcast did not create confusion about the podcast being affiliated with or sponsored by the Church.



131.    Shortly after becoming President of the Church in October 2025, and shortly after the Church began the surprising intellectual property enforcement campaign against Defendants and other Mormon-themed podcasters in November 2025, President Oaks gave a talk on February 10, 2026, warning Church members about the dangers of podcasts, stating, "An abundance of speculation and false information in podcasts and on social media surrounds us. Some may protest or question the truth of Church doctrine without knowing or even understanding the fulness of that doctrine." https://speeches.byu.edu/talks/dallin-h-oaks/coming-closer-to-jesus-christ/.

### D.    The Generic Meaning of "Mormon"

132.    Allowing ownership, including via registration, of "Mormon" as a trademark improperly restricts the use of a generic term that should be available for all the public to use for services related to religious and cultural traditions tracing their origins to Joseph Smith Jr. and/or the "Book of Mormon," including podcasts to tell the stories of Mormon history and of current and former adherents to Mormon religious traditions and culture.

133.    The public understands the term "Mormon" to refer to the beliefs, practices, history, teachings, and members associated with The Church of Jesus Christ of Latter-day Saints, the broader Latter-day Saint movement, and other traditions based on Joseph Smith, Jr. and his account as published in the "Book of Mormon".  Such Mormon religions are comprised of over 400 denominations, including, for example, the Latter-day Church of Christ, Fundamentalist Church of Jesus Christ of Latter-Day Saints, Apostolic United Brethren, Centennial Park Group, Restoration Branches, Reorganized Church of Jesus Christ of Latter-day Saints (now known as the Community of Christ), Remnant Church of Jesus Christ of Latter-day Saints, New Order Mormons, and others. Members of these groups further classify themselves as Orthodox or Mainstream Mormons, Liberal or Progressive Mormons, Cultural or "Jack" Mormons, Fundamentalist Mormons, and Ex or Post-Mormons (each of which is considered "Mormon"). See https://en.wikipedia.org/wiki/Mormons.

134.    When used in connection with religious education or entertainment services, consumers recognize the use of "Mormon" as describing the subject matter or type of religious education or entertainment they are seeking, not the identity of a particular provider of such services.

135.    The term "Mormon" is and has been widely used by multiple providers of religious education or entertainment services, including those critical of the Church,[8] to describe the content and focus of their offerings, including, for example, the following:

---

[8] This is not endemic or unique to the Church. For example, the National Catholic Reporter and U.S. Catholic are news outlets that are, at times, critical of the Catholic Church. Neither is affiliated with the Catholic Church.

- Mormon History Association (https://mormonhistoryassociation.org/)

- Journal of Mormon History (https://mormonhistoryassociation.org/journal-of-mormon-history/)

- Mormon Expression podcast (https://podcasts.apple.com/us/podcast/mormon-expression/id1584187206)

- Mormon Discussions podcast (https://mormondiscussionpodcast.org/)

- Radio Free Mormon Podcast (https://radiofreemormon.org/)

- Mormonism Live podcast (https://mormonismlive.org/)

- Mormon Land podcast (https://www.sltrib.com/podcasts/mormonland/)

- Sunstone Mormon history podcast (https://sunstone.org/series/sunstone-history/)

- Mormon Book Reviews podcast (https://podcasts.apple.com/us/podcast/mormon-book-reviews-podcast/id1602618243)

- Mormon.ish podcast (https://www.mormonishpodcast.org/)

- Mormons in Media podcast (https://open.spotify.com/show/52k0NhlbE9xz4YVgwyAizo)

- Book of Mormon play (https://bookofmormonbroadway.com/)

- Secret Lives of Mormon Wives TV show (https://tv.apple.com/us/show/the-secret-lives-of-mormon-wives/umc.cmc.3qra5yae20s5wfrm3dc7pnjjp)

136.    The term "Mormon" is also used by multiple sects that identify with Mormonism as a religious practice, including the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS Church), the Apostolic United Brethren (AUB) and the Latter Day Church of Christ. *See* https://en.wikipedia.org/wiki/Mormons#Groups_within_Mormonism.

137.    The media uses the word "Mormon" to describe members of multiple sects of religions that trace their roots to Joseph Smith.  *See, e.g.*, https://www.nbcnews.com/news/us-news/fundamentalist-mormon-town-modernization-highlights-stark-divide-n948281 (a story about "a fundamentalist Mormon town"); https://www.nytimes.com/2026/05/10/style/dirty-soda-mormon-wives-utah-tiktok.html?searchResultPosition=1 (a story about "Mormon wives").

138.    The media also uses the term "Mormon" to refer generally to Mormonism writ large, including Mormon doctrine, Mormon history, Mormon religious traditions, Mormon culture, Mormon experiences, and the people who identify with Mormon tradition and culture. *See, e.g.,* https://www.newsweek.com/mormon-moment-67951 (discussing "Mormon faith," "Mormonism itself," "Mormon populations," "Mormon roots," and "Mormon tradition"; Mormonism "centers on the distinctive values and characteristics that have come to define Mormons outside the church walls—in their communities, in their careers, and in the culture at large."); https://www.nbcnews.com/news/us-news/fundamentalist-mormon-town-modernization-highlights-stark-divide-n948281 (discussing changes in a "fundamentalist Mormon town"); https://archive.nytimes.com/opinionator.blogs.nytimes.com/2012/09/16/why-i-love-mormonism/ (discussing "Mormonism," "The Book of Mormon," "Mormon theology," "the Mormon vision"); https://www.glossy.co/beauty/how-mormon-culture-became-mainstream-and-why-the-beauty-industry-wants-a-piece-of-it/ (discussing "Mormon culture," "Mormons," "Mormon community," "Mormonism," and "The Secret Lives of Mormon Wives").

139.    The Church itself has publicly declared that "Mormon" has long been used as a "nickname" for members of the Church and is "correctly used in proper names" or "when used

as an adjective." https://www.thechurchnews.com/2018/8/16/23221370/mormon-is-out-church-releases-statement-name-of-organization/; https://newsroom.churchofjesuschrist.org/style-guide.

140.    Numerous groups use the word "Mormon" to refer to education services regarding Mormonism and its various sects. For example, Claremont Mormon Studies (https://mormonstudies.cgu.edu/about/about-claremont-mormon-studies/), The Mormon Studies Program at the University of Virginia (https://mormonstudies.as.virginia.edu/), and Mormon Studies at the University of Illinois Press (https://www.press.uillinois.edu/books/find_books.php?type=subject&search=MOR&page=1).

141.    Despite the Church's questionable claim to trademark rights in the word "Mormon" in connection with "educational services," (*see* Complaint Ex. 1, Trademark Registration No. 3,239,919), on information and belief, there has never been a time in which the Church has enjoyed exclusivity in the use of "Mormon" in the offering of educational services, nor has the Church ever attempted to or claimed to have such exclusive use.

142.    The USPTO and Trademark Trial and Appeal Board concluded "Mormon" was generic in connection with Ser. No. 78/161,091, explaining that "Mormon" "is a word similar to 'CATHOLIC'" as a generic term denoting a religion.

143.    Since the 1800s, people have used and understood the term "Mormon" as a generic term that identifies a broad category of religious traditions, cultures, and beliefs and the adherents thereto, including the Church and its members (regardless of formal membership, belief, or association with the Church organization), and not as a reference to a unique and known source for any specific services or goods. This is reflected in a recent analysis published in Dialogue, an academic journal pertaining to Mormon subject matter. In the article, the author

analyzed dozens of news articles employing the term "Mormon", finding that "Mormon" is applied broadly by the public to refer to various faith traditions that ascribe to the teachings of Joseph Smith Jr. and/or the Book of Mormon. *See* Cragun & Nielsen, *Fighting over 'Mormon': Media Coverage of the FLDS and LDS*, Dialogue, A Journal of Mormon Thought, Vol. 42:1 (2009) (https://www.dialoguejournal.com/articles/fighting-over-mormon/).

> The second way we found "Mormon" being used was as a reference to any group that has roots in the religion founded by Joseph Smith in the 1830s. Thus, any religion that traces itself back to Joseph Smith and the Book of Mormon can call itself a "Mormon" religion. This use of the term is reflected in scholarly writing about the various sects that have followed from Joseph Smith as well as in scholarship about Mormonism and polygamy.
>
> This understanding of the label was quite common in our 145-article sample. It was also generally clear what this label meant, but, admittedly, it requires understanding that there is not a single religious body descended from Joseph Smith but many religious groups that claim to be descendants of Smith's restoration. ("Thus, any religion that traces itself back to Joseph Smith and the Book of Mormon can call itself a "Mormon" religion. … This understanding of the label was quite common in our 145-article sample.").

### E.      The Church's Express Abandonment of MORMON

144.    In 2002, Plaintiff Intellectual Reserve, Inc. filed U.S. Trademark Application Ser. No. 78/161,091 to register "Mormon" for "religious services, namely, operating places of assembly for worship and gatherings; ministerial services, namely, providing religious worship services and conducting church sponsored programs."  The examiner refused registration finding that "Mormon" was generic because it would be understood as "a religion or church."  Office Action, March 18, 2003.  Notwithstanding multiple attempts by Plaintiff Intellectual Reserve, Inc. to overcome this genericness refusal, the examiner issued no fewer than four separate office actions refusing registration based on genericness grounds.  Even though Plaintiff appealed the

refusal to the Board, Plaintiff failed to file its brief, resulting in dismissal of the appeal on July 23, 2007, and causing the USPTO to issue a formal "notice of abandonment" on August 22, 2007.

145.    Following its abandonment of "Mormon" at the USPTO in 2007, the Church has explicitly and intentionally abandoned the use of "Mormon" as a brand or source identifier for the Church and has discouraged individuals from using the term "Mormon" to describe the Church since at least 2010.

146.    In an article dated April 19, 2010, a blogpost by Lyman Kirkland was posted on the Church's website entitled "Using the Term 'Mormon.'" *See* https://newsroom.churchofjesuschrist.org/blog/using-the-term-mormon-

147.    The blogpost sets forth the Church's official position on the term, noting that "the Church does not refer to itself as 'the Mormon Church' and discourages use of that term." *Id*.

148.    In 2018, the Church expressly abandoned the word Mormon as a trademark or source-identifier for the Church and strongly condemned its use as antithetical to the Church's mission and brand.

149.    On August 16, 2018, the Church definitively declared "'Mormon' is Out". President Russell M. Nelson, then President of the Church, announced that the Church would no longer use "Mormon" as a brand-identifier for the Church and would limit its use moving forward to descriptive of nominative references to the "Book of Mormon" or other proper nouns and use as an "adjective." *See* https://www.thechurchnews.com/2018/8/16/23221370/mormon-is-out-church-releases-statement-name-of-organization/.

150.    Around the same time, the Church released a new Style Guide for the media to use when reporting about the Church. *See* https://newsroom.churchofjesuschrist.org/style-guide. This style guide contains the following directions:

a.   While the term "Mormon Church" has long been publicly applied to the Church as a nickname, it is not an authorized title, and the Church discourages its use. Thus, please avoid using the abbreviation "LDS" or the nickname "Mormon" as substitutes for the name of the Church, as in "Mormon Church," "LDS Church," or "Church of the Latter-day Saints.

b.   When referring to Church members, the terms "members of The Church of Jesus Christ of Latter-day Saints," "Latter-day Saints," "members of the Church of Jesus Christ" and "members of the restored Church of Jesus Christ" are preferred. We ask that the term "Mormons" and "LDS" not be used.

c.   "Mormon" is correctly used in proper names such as the Book of Mormon or when used as an adjective in such historical expressions as "Mormon Trail."

d.   "The term 'Mormonism' is inaccurate and should not be used. When describing the combination of doctrine, culture and lifestyle unique to The Church of Jesus Christ of Latter-day Saints, the term 'the restored gospel of Jesus Christ' is accurate and preferred.

151.    This Style Guide remains in force today, almost eight years later.

152.    Upon hearing the news, some immediately recognized that such a rebranding undertaking (*i.e.*, officially removing the word "Mormon" from all of the Church's many properties and services) would be a "monumental lift." *See* https://www.deseret.com/2018/8/16/20651374/the-church-of-jesus-christ-of-latter-day-saints-issues-new-name-guidelines-dropping-terms-mormon-lds/

153.    In October 2018, President Nelson spoke in a globally-broadcast talk explaining the Church's decision to abandon the use of "Mormon," calling the definitive action a "correction" that was commanded by God.  President Nelson explained, "[t]he name of the

Church is not negotiable… for much of the world, the Lord's Church is presently disguised as the 'Mormon Church.' When we omit his name from the Church, we are inadvertently removing *him* as the central focus of our lives." He went so far as declaring that every use of "Mormon Church" is "a major victory for Satan." *See* https://www.churchofjesuschrist.org/study/general-conference/2018/10/the-correct-name-of-the-church?lang=eng

154.    In the talk, President Nelson acknowledged that some had criticized the decision using "worldly arguments" about branding in view of "the digital world in which we live and with search engine optimization that helps all of us find information" online.  To the critics, he explained,

> If this were a discussion about branding a man-made organization, those arguments might prevail. But in this crucial matter, we look to Him whose Church this is and acknowledge that the Lord's ways are not, and never will be, man's ways.

*Id*.

155.    Consistent with President Nelson's directive, the Church followed through with the monumental undertaking of abandoning "Mormon" in all of its branding and trademark usage.

156.    To "institutionalize the correction" of removing "Mormon" from all of the Church's branding, President Nelson assigned President M. Russell Ballard, acting president of the Quorum of the Twelve Apostles, to lead the effort.  See https://www.deseret.com/2023/11/16/23953064/president-nelson-asked-president-ballard-to-help-correct-churchs-name-heres-how-he-led-the-twelve/

157.    Signaling the permanent nature and seriousness of the abandonment of "Mormon," the effort included changing the name of the Church's "biggest international brands" such as "The Mormon Tabernacle Choir" and "Mormon.org." *Id.*

158.    The Church reported that "over 1,000 products that had the name 'Mormon' or 'LDS' attached were renamed." *Id.*

159.    The Church also "updated 300 web-based apps and acquired 800 domain names in the United States and around the world for use of the full church name," to prevent use of the name "Mormon" to describe the Church. *Id.*

160.    As part of the Church's abandonment of "Mormon" in its branding, in October 2018, the Church publicly announced that The Mormon Tabernacle Choir – an institution dating back more than 150 years – had abandoned the use of "Mormon" in its name and is today known as the Tabernacle Choir at Temple Square.  See https://newsroom.churchofjesuschrist.org/article/world-renowned-mormon-tabernacle-choir-changes-name

161.    One of the Church's URLs, www.mormon.org, which used to serve as a landing page for The Church's main public-facing website, now serves only as a redirect to the Church's "Come Unto Christ" page of its current primary domain churchofjesuschrist.org, which includes no trademark use of "Mormon." *See* https://www.churchofjesuschrist.org/comeuntochrist.

162.    A search of the Church's website located at www.churchofjesuschrist.org shows that, consistent with the Church's 2018 Style Guide, the word Mormon is not used as a trademark or brand anywhere, but only as part of the title of a religious scripture called the "Book of Mormon" or as an adjective to describe historical figures or events.

163.    In the Frequently Asked Questions "FAQ" section of The Church's website located at https://www.churchofjesuschrist.org/comeuntochrist/common-questions, the following FAQ appears prominently, expressly admitting that the term "Mormon" is not exclusive to the Church, that it originates from the teachings of Joseph Smith, and that it is frequently used to describe the Church and its members.

> **Why don't we call ourselves Mormons?**                                    ⌃
>
> The term "Mormons" is a nickname that comes from a book of scripture unique to our Church called the Book of Mormon. We didn't come up with the nickname, but lots of people use it to describe the Church and its members. In the past, we've embraced the term and even used it ourselves, but recently we have asked people to call the Church by its full name: The Church of Jesus Christ of Latter-day Saints. This re-emphasis of the Church's name helps us follow the Lord's command given to the prophet Joseph Smith: "For thus shall my church be called in the last days, even The Church of Jesus Christ of Latter-day Saints" (Doctrine and Covenants 115:4). It also helps everyone know that Jesus is the core of our religion and beliefs.
>
> "Latter-day Saints" is a good way to refer to your friends who are members of the Church.

164.    The Church's website used for genealogy services located at the domain familysearch.org also demonstrates the discontinued use of "Mormon" and the exclusive use only according to its dictionary meaning and as a part of proper nouns, such as Mormon Battalion.

165.    The genealogy website reiterates, "In compliance to the Style Guide released March 5, 2019 regarding the usage of the official name of The Church of Jesus Christ of Latter-day Saints, the unofficial references, such as, 'LDS' and 'Mormon' have been removed from the FamilySearch Research Wiki except in the following instances" and goes on to list uses of the word in proper names and other generic or descriptive terms.

https://www.familysearch.org/en/wiki/FamilySearch_Wiki:Manual_of_Style#References_to_The_Church_of_Jesus_Christ_of_Latter-day_Saints_on_the_FamilySearch_Wiki

166.    As part of the Church's abandonment of "Mormon" as a source identifier, the Church announced in 2019 that "The Mormon Channel, a Church media channel that publishes inspirational videos, live video events, 24-hour music and radio streams, podcasts and blog posts, has changed its name to Latter-day Saints Channel." *See* https://newsroom.churchofjesuschrist.org/article/church-name-alignment.

167.    The Church also changed its "Mormon Messages" video spotlight on its website to "Inspirational Messages." *See* https://newsroom.churchofjesuschrist.org/article/church-name-alignment.

168.    Following the Church's public denunciation of the term Mormon to describe the Church, its members and its goods and services, Plaintiffs ceased use of the word Mormon as a trademark in 2018, have not resumed use of the word as a trademark in commerce in connection with the services identified in its trademark registrations and have no bona fide intent to resume use of the term Mormon in commerce in connection with the services identified in its asserted trademark registrations.

169.    The Church's repudiation of the term "Mormon" received extensive media coverage, causing not only members of the Church but the public at large to no longer view "Mormon" as a source identifier for the Church.

170.    Indeed, given the nature of the Church's express abandonment—presenting it as a mandate from God and labeling the use of "Mormon" as a "major victory for Satan," – the public has come to view any use of "Mormon" in the branding of goods or service to be a definitive

64

signal that such goods or services are **not** provided by, affiliated with, or sponsored by the Church.

171.    Given the Church's express, public, and definitive statements of abandonment of "Mormon" in its branding, the Church has relinquished all trademark rights in or connected to "Mormon"-styled names. By its own admissions and express directives, any residual token use of "Mormon" by the Church is purely descriptive in nature, or de minimis, and cannot overcome or reverse the Church's explicit abandonment of the name and the public's recognition of the same.

### F.    The Church's Fraudulent Filings at the USPTO

172.    Despite the Church's explicit, public and intentional abandonment of "Mormon" as a mark, including the wholesale renaming of all prior Mormon-styled branding, the Church engaged in an improper and fraudulent scheme, inconsistent with its actual real-world branding activities, to try to maintain federal trademark registrations for its abandoned MORMON marks, presumably for the purpose of improper enforcement efforts, as is occurring in the present case.

173.    On information and belief, the Church deliberately withheld the news of its express and intentional abandonment of "Mormon" as a mark from the United States Patent and Trademark Office ("USPTO") and submitted inconsistent and false declarations of continued trademark use to the USPTO to improperly maintain federal registration for the Mormon-styled trademarks that the Church had deliberately abandoned.

#### *Filings Regarding MORMON TABERNACLE CHOIR Marks*

174.    The Church explicitly and publicly abandoned the use of "Mormon" in the name and branding of the Tabernacle Choir at Temple Square in 2018. Since then, the Church has

exclusively marketed the choir's music and performances under the name "Tabernacle Choir at Temple Square" and has not used "Mormon" in connection with advertising or promotion of the choir.

175.    For example, the press releases from the Church for the Tabernacle Choir's annual Christmas concerts from 2019 to 2025 exclusively refer to the choir as "The Tabernacle Choir" and do not use the word "Mormon" in any way.

2019: https://newsroom.churchofjesuschrist.org/article/christmas-season-celebrated-at-tabernacle-choir-christmas-concerts

2020: https://newsroom.churchofjesuschrist.org/article/tabernacle-choir-at-temple-square-cancels-2020-christmas-concert-and-auditions

2021: https://newsroom.churchofjesuschrist.org/article/the-tabernacle-choir-television-special-2021-christmas-concert

2022: https://www.thechurchnews.com/living-faith/2025/12/20/tabernacle-choir-orchestra-christmas-concert-season-of-hope-stream/

2023: https://www.thechurchnews.com/living-faith/2023/12/15/24002165/tabernacle-choir-orchestras-2023-christmas-concert-service-love-michael-maliakel-lesley-nicol/

2024: https://newsroom.churchofjesuschrist.org/article/watch-stream-the-tabernacle-choir-and-orchestra-s-2024-christmas-concert

2025: https://newsroom.churchofjesuschrist.org/article/tabernacle-choir-draws-thousands-celebrate-2025-christmas-season

176.    Six years after explicitly abandoning the use of "Mormon" in the name of the choir, on March 1, 2024 the Church, via its appointed representatives, submitted to the USPTO sworn declarations of continued use in connection with Registration Nos. 2,766,231 and 2,913,694 pertaining to the abandoned MORMON TABERNACLE CHOIR marks. The declarations falsely stated that the marks were in current use in commerce in connection with live musical performances.

66

177. The declarants submitted with the declarations an uncorroborated specimen of use purporting to be a photocopy of the program handed out at a single and special "alumni" Christmas concert in 2023, depicted below.



178. On information and belief, the submitted program specimen was either not actually used for the concert or, at best, constitutes a token, de minimis use that was done for the sole purpose of creating the sham appearance of use to fraudulently maintain the MORMON TABERNACLE CHOIR trademark registrations for enforcement purposes and does not constitute genuine, bona fide trademark use of the MORMON TABERNACLE CHOIR marks.

179. On information and belief, the declarants also submitted specimens that were altered to misrepresent the nature of the Church's continued use of MORMON TABERNACLE CHOIR. For example, as shown below, the declarants submitted a specimen showing a product page from the Deseret Book website selling a 2005 CD from the choir called "Love Is Spoken Here" found at the URL https://www.deseretbook.com/product/P4940651.html?cgid=content-media-entertain-music. A comparison of the 2024 specimen submitted to the USPTO (top)

versus the very same URL product page for the same album as it exists on the Deseret Book

website today (bottom) shows an alteration of the name of the choir in the 2024 USPTO

specimen versus the rebranded name of the choir adopted several years earlier and actually used

on the website.





180.    It strains credulity that the Deseret Book product page for this album would have stated "Mormon Tabernacle Choir" in 2024 and was only changed to "Tabernacle Choir at Temple Square" thereafter given the extensive and publicized rebranding efforts that began years earlier in 2018 as explained previously. Whether the product page was revised after submitting the specimen in 2024 or whether it was altered for the purpose of creating the specimen doesn't matter. Either way, the "Love Is Spoken Here" specimen was used to knowingly convey a misleading representation about the ongoing nature of Church's trademark use relating to the choir, falsely suggesting that the continued use extends beyond the historical CD covers dating well before the Church's exhaustive rebranding efforts.

181.    The declarants did not submit an example of a single CD album recorded by the choir after 2017 as a specimen of use with the March 1, 2024 declarations to maintain Registration Nos. 2,766,231 and 2,913,694.

182.    The Church did not inform the USPTO at the time of submitting its declarations for Registration Nos. 2,766,231 and 2,913,694 that the Church publicly and permanently abandoned the MORMON TABERNACLE CHOIR marks in 2018, thus intentionally misleading the USPTO examiner to believe that the MORMON TABERNACLE CHOIR marks were in continuous and current use through 2024.

183.    On information and belief, the false declarations and misleading specimens filed on March 1, 2024 were submitted with full knowledge of the Church's abandonment of MORMON TABERNACLE CHOIR and full knowledge that any remaining use thereof, including the specimen use, was at best a token, de minimis use that was done for the purpose of

creating the sham appearance of using MORMON TABERNACLE CHOIR in order to fraudulently maintain a federal registration for an abandoned mark.

184. The declarants of the March 1, 2024 declarations expressly acknowledged that "willful false statements and the like may jeopardize the validity of this submission and the registration[s]" pertaining to the MORMON TABERNACLE CHOIR marks.

185. On information and belief, if the USPTO had been notified of the Church's public and express abandonment of MORMON TABERNACLE CHOIR marks, the USPTO examiner would not have renewed Registration Nos. 2,766,231 and 2,913,694 and would have cancelled them for abandonment.

186. Upon information and belief, the USPTO relied on the materially false statements in the March 1, 2024 declarations and would not have accepted the renewal of the registrations absent the Church's materially false statements, at least with respect to live musical performances.

187. On information and belief, the Church intended to deceive and mislead the USPTO examiner with the false declarations and by withholding information of the Church's express abandonment in order to maintain its federal registrations for the abandoned MORMON TABERNACLE CHOIR trademarks. On further information and belief, the examiner relied on these false statements in renewing the MORMON TABERNACLE CHOIR trademarks.

### Filings Regarding MORMON CHANNEL Mark

188. On August 16, 2016, the USPTO granted the registration for the mark MORMON CHANNEL to the Church under Registration No. 5,020,309.  *See* Complaint Ex. 1, pg. 9.

189.    Three years later, in 2019, the Church explicitly and publicly abandoned the MORMON CHANNEL mark, renaming the channel "Latter-day Saints Channel."

https://newsroom.churchofjesuschrist.org/article/church-name-alignment

190.    Notwithstanding this express abandonment, on March 30, 2022, the Church, via its appointed representatives, submitted to the USPTO a sworn declaration of continued use in connection with Registration No. 5,020,309 pertaining to the abandoned MORMON CHANNEL mark. The declaration falsely represented that the MORMON CHANNEL mark had been "in continuous use in commerce for five consecutive years after the date of registration," even though it was expressly abandoned in 2019—three years after its registration.

191.    The declarant submitted with the declaration a specimen purporting to show current use of MORMON CHANNEL, but which was actually a collection of screen shots from videos posted to YouTube in 2017—before the abandonment occurred. Indeed, no evidence of alleged use accompanying the declaration post-dated 2017.

192.    The Church did not inform the USPTO at the time of submitting the March 30, 2022 declaration that the Church publicly and explicitly abandoned the MORMON CHANNEL mark in 2019, thus misleading the USPTO examiner to believe that the MORMON CHANNEL mark was in continuous and current use through 2022 and beyond.

193.    On information and belief, any ongoing or current use of MORMON CHANNEL by the Church is not a genuine use in commerce but is, if it exists, merely a token or de minimis use insufficient to qualify as genuine trademark use that can dispel the Church's explicit, public, and intentional abandonment thereof.

194.    On information and belief, the false declaration and misleading specimen filed on March 30, 2022 were submitted with full knowledge of the Church's abandonment of MORMON CHANNEL and full knowledge that any remaining use thereof, including the specimen use, was at best a token, de minimis use that was done for the purpose of creating the sham appearance of using MORMON CHANNEL to fraudulently maintain a registration for an abandoned mark for improper enforcement purposes.

195.    The declarant of the March 30, 2022 declaration expressly acknowledged that "willful false statements and the like may jeopardize the validity of this submission and the registration" pertaining to the MORMON CHANNEL mark.

196.    On information and belief, if the USPTO had been notified of the Church's public and express abandonment of MORMON CHANNEL as a mark, the USPTO examiner would not have renewed Registration No. 5,020,309 and would have cancelled it for abandonment.

197.    Upon information and belief, the USPTO relied on the materially false statements in the March 30, 2022 declaration and would not have accepted the renewal of the registrations absent the Church's materially false statements.

198.    On information and belief, the Church intended to deceive and mislead the USPTO examiner with the false declaration and by withholding information of the Church's express abandonment to maintain its federal registration for the abandoned MORMON CHANNEL trademark.

### Filings Regarding MORMON MESSAGES Mark

199.    On August 16, 2016, the USPTO granted the registration for the mark MORMON MESSAGES to the Church under Registration No. 5,020,314. *See* Complaint Ex. 1, pg. 8.

200.    Three years later, in 2019, the Church explicitly and publicly abandoned the MORMON MESSAGES mark, renaming that service as "Inspirational Messages."

https://newsroom.churchofjesuschrist.org/article/church-name-alignment

201.    Notwithstanding this express abandonment, on January 21, 2022, the Church, via its appointed representatives, submitted to the USPTO a sworn declaration of continued use in connection with Registration No. 5,020,314 pertaining to the abandoned MORMON MESSAGES mark. The declaration falsely represented that the MORMON MESSAGES mark had been "in continuous use in commerce for five consecutive years after the date of registration," even though it was expressly abandoned three years after its registration.

202.    The declarant submitted with the declaration a specimen showing use of MORMON MESSAGES in videos posted to YouTube by the Church in 2014 and 2013, long before the express abandonment occurred, and did not provide evidence of use from 2018 to the filing of the January 21, 2022 declaration.

203.    The Church did not inform the USPTO at the time of submitting the January 21, 2022 declaration that the Church publicly and explicitly abandoned the MORMON MESSAGES mark in 2019, thus misleading the USPTO examiner to believe that the MORMON MESSAGES mark was in continuous and current use through 2022 and beyond.

204.    On information and belief, any ongoing or current use of MORMON MESSAGES by the Church is not a genuine use in commerce but is, if it exists, merely a token or de minimis use insufficient to qualify as genuine trademark use that can dispel the Church's explicit, public, and intentional abandonment thereof.

205.     On information and belief, the false declaration and misleading specimen filed on January 21, 2022 were submitted with full knowledge of the Church's abandonment of MORMON MESSAGES and full knowledge that any remaining use thereof, including the specimen use, was at best a token, de minimis use that was done for the purpose of creating the sham appearance of using MORMON MESSAGES to maintain a registration for an abandoned mark for improper enforcement purposes.

206.     The declarant of the January 21, 2022 declaration expressly acknowledged that "willful false statements and the like may jeopardize the validity of this submission and the registration" pertaining to the MORMON MESSAGES mark.

207.     On information and belief, the declarant of the January 21, 2022 declaration knew that if the USPTO had been notified of the Church's public and express abandonment of MORMON MESSAGES as a mark, the USPTO examiner would not have renewed Registration No. 5,020,314 and would have cancelled it for abandonment.

208.     Upon information and belief, the USPTO relied on the materially false statements in the January 21, 2022 declaration and would not have accepted the renewal of the registrations absent the Church's materially false statements.

209.     On information and belief, the Church intended to deceive and mislead the USPTO examiner with the false declaration and by withholding information of the Church's express abandonment in order to maintain its federal registration for the abandoned MORMON MESSAGES trademark.

***Filings Regarding BOOK OF MORMON STORIES Mark***

210.　On August 16, 2024, Plaintiffs filed U.S. Trademark Application No. 98702873 to register the mark BOOK OF MORMON STORIES in connection with, *inter alia*, "entertainment services, namely, providing podcasts in the field of history and religion."

211.　Plaintiffs declared in U.S. Trademark Application No. 98702873 that the Church's first use of BOOK OF MORMON STORIES in connection with podcasts was November 1, 2010.

212.　At the time Plaintiffs filed this application, Plaintiffs were very familiar with Defendants and Defendants' 20-year history of providing entertainment services relating to the fields of history and religion in the form of the MORMON STORIES podcast and thus knew that Defendants' first use of MORMON STORIES for podcasting services pre-dated the Church's by several years.

213.　With the filing of U.S. Trademark Application No. 98702873, Plaintiffs, via their appointed representatives, declared under oath that nobody other than the Church "[has] the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

214.　On information and belief, the Church's declarant in the August 16, 2024 declaration either did not believe that the parties' respective uses of MORMON STORIES and BOOK OF MORMON STORIES in connection with podcast services is likely to cause confusion or mistake, in contradiction to Plaintiffs' allegations in the above-captioned case, or

falsely attested that the marks were unlikely to cause confusion as Plaintiffs now allege, making the declaration materially false.

215. The USPTO relied on Plaintiffs' false statement and granted Plaintiffs Registration No. 7,840,811.

### G. The Church's Belated Enforcement Efforts

216. For two decades since the launch of the MORMON STORIES podcast, as set forth in the preceding allegations, the Church was intimately aware of Dehlin and the MORMON STORIES podcast and had many direct interactions with Dehlin about the podcast and the content thereof.

217. Despite this, for more than twenty years, the Church never alleged or even suggested that the name of the podcast, the MORMON STORIES logos, Defendants' use of blue in its logos and branding, Defendants' use of light rays designs, the use of Church-related images in the podcast or thumbnails, or any other aspect of the MORMON STORIES branding or website designs was causing confusion or infringing Plaintiffs' intellectual property rights.

218. Rather, the only concerns ever expressed by the Church for more than twenty years related to its concerns about the content of the MORMON STORIES podcast episodes— the opinions and stories, not the branding.

219. Indeed, even after OSF adopted the updated blue MORMON STORIES logo in December 2022, the Church took three years to raise any branding concerns with OSF and Dehlin, and took more than three years to file the present lawsuit.

220. After spending the better part of a decade publicly abandoning the use of "Mormon" as a brand as set forth above, in November 2025, the Church unexpectedly sent OSF

an email raising for the first time allegations of trademark and copyright infringement.  *See* Complaint Exhibit 5.

221.    The Church's trademark and copyright objections came two decades after the MORMON STORIES podcast was launched and three years after the MORMON STORIES blue logo was adopted.

222.    Despite finding the Church's allegations lacking in merit, particularly following twenty years of inaction and a very public and explicit rebranding campaign to abandon the use of "Mormon" as a brand, Defendants responded to the Church's email within 24 hours expressing a desire to cooperate and make changes to accommodate the Church's concerns. Defendants did so in good faith and to avoid the risk of expensive litigation given the stark imbalance of resources between the parties. *See* Exhibit B.

223.    For example, Defendants immediately proposed an orange logo to replace the blue MORMON STORIES logo to which the Church had objected. Defendants also immediately replaced photos the Church identified as copyrighted. *Id*.

224.    From the first notice of the Church's allegation and through months of negotiations, Defendants cooperated in good faith expressed a willingness to make nearly all of the branding changes the Church requested hoping to find a resolution, despite finding the Church's infringement allegations to be without merit.

225.    Defendants voluntarily undertook a variety of changes in the spirit of cooperation (with no legal obligation to do so), including changing the MORMON STORIES logo to orange, changing the font, discontinuing the use of Defendants' long-used light rays design, and

including a reference to "Dr. John Dehlin" near the logo on its podcast platforms, some of which are illustrated below.

**YouTube** (https://www.youtube.com/mormonstories)



**Spotify** (https://open.spotify.com/show/4sDzk7dRjODTSEqzZKZJzk)



**Apple** (https://podcasts.apple.com/us/podcast/mormon-stories-podcast/id312094772)



226.    Despite the fact that Defendants' use of certain Church images falls squarely within the fair use exception to copyright infringement under 17 U.S.C. § 107, and despite the free license provided by Plaintiffs to use these images for the same purposes that Defendants

used them, Defendants offered to, and did, remove the complained-of images from the MORMON STORIES podcast episode thumbnails that the Church identified and objected to.

227. Defendants also removed the faint background image of the Christus logo, which was fairly used to illustrate the subject matter discussed in the podcast, from the banner on its YouTube page.

228. In February 2026, Defendants also adopted at the Church's request a disclaimer. Consistent with standard practice in such situations, the disclaimer was placed in the footer of the MORMON STORIES website and in the podcast description field on the platforms carrying the MORMON STORIES podcast.

229. On Defendants' YouTube channel, the description of the MORMON STORIES podcast includes the following statement: "Mormon Stories is a product of the Open Stories Foundation - a 501c3 non-profit dedicated to supporting Mormons in religious transition. Mormon Stories is not affiliated with, endorsed or sponsored by The Church of Jesus Christ of Latter-day Saints." https://www.youtube.com/mormonstories

230. Defendants' Spotify channel similarly includes the following statement in the description of the MORMON STORIES podcast: "Mormon Stories is a product of the Open Stories Foundation - a 501c3 non-profit dedicated to supporting Mormons in religious transition. Mormon Stories is not affiliated with or sponsored by The Church of Jesus Christ of Latter-day Saints." https://open.spotify.com/show/4sDzk7dRjODTSEqzZKZJzk

231. Defendants' Apple podcast channel also includes this statement in the description of the MORMON STORIES podcast: "Mormon Stories is a product of the Open Stories Foundation - a 501c3 non-profit dedicated to supporting Mormons in religious transition.

Mormon Stories is not affiliated with or sponsored by The Church of Jesus Christ of Latter-day Saints." https://podcasts.apple.com/us/podcast/mormon-stories-podcast/id312094772

232.    Every page of Defendants' website, www.mormonstories.org, includes the following disclaimer: "Mormon Stories is not affiliated with, endorsed or sponsored by The Church of Jesus Christ of Latter-day Saints."

233.    In March 2026, Defendants updated the Church about all the changes it had made in the spirit of cooperation, including the adoption of a disclaimer. Defendants also reiterated their willingness to remain cooperative as the Church raised other IP concerns in the future.  A copy of Defendants' email to the Church is attached as Exhibit C.

234.    Because of the lack of confusion during two decades of the MORMON STORIES podcast, Defendants did not believe a disclaimer of any kind was necessary.  However, Defendants adopted the forgoing disclaimers in a good faith spirit of compromise and cooperation at the Church's request.

235.    The Church pressed Defendants to have the disclaimer displayed and read audibly multiple times during every single podcast episode and to place the disclaimer in bold white lettering in the top banner of Defendants' channels and websites.

236.    Defendants did not agree to this request, finding it unusual, unnecessary, and not wanting to effectively have a disclaimer become the podcast's brand after twenty years of developing the MORMON STORIES brand identity.

237.    Despite the Church knowing that Defendants' voluntarily adopted the foregoing disclaimers at the Church's request as early as February 2026, the Church filed the present lawsuit on April 17, 2026 and simultaneously issued a press release titled "Getting it Right."

238.   Defendants were shocked to see their cooperation in branding changes and adoption of a disclaimer to be met with a lawsuit and press release false portraying the preceding events to the public.

239.   Specifically, the Church's "Getting it Right" press release describes "what happened" by indicating that Church proposed "several options" but failing to acknowledge that Defendants agreed to many, or most, of them.

> The Church then engaged in good-faith mediation and proposed several options to reduce confusion while minimizing disruption. When those efforts did not result in resolution, the Church filed a complaint in federal court to protect its intellectual property.

https://newsroom.churchofjesuschrist.org/article/getting-it-right-clarifying-trademark-branding-concerns

240.   Worse yet, as quoted below, the Church falsely stated that Defendants refused to adopt a disclaimer, leaving the public with the mistaken impression that Defendants were unwilling to do so.

> To address that, **the Church proposed a simple solution: a brief disclaimer that the podcast is not affiliated with or endorsed by The Church of Jesus Christ of Latter-day Saints**. This is a common and straightforward way to help audiences understand the source of content. **That step was not adopted**. As a result, the likelihood of confusion remains, and the Church moved forward to protect its trademarks.

https://newsroom.churchofjesuschrist.org/article/getting-it-right-clarifying-trademark-branding-concerns

241.   The Church's deceptive press release resulted in numerous online comments labeling Dehlin as deceitful and even threatening comments directed toward Dehlin, such as

people hoping that Dehlin is squashed like a cockroach or threatening Dehlin with something far worse than a lawsuit.

242. In addition to the press release, the Church's allegations of confusion in the Complaint are also deceptive and misleading. At paragraph 54 of the Complaint, the Church identified 15 online comments and falsely characterized them to be "comments on the Mormon Stories Facebook and YouTube pages."

243. The Church was aware that this was a false statement at the time the Complaint was filed. During the parties' negotiations, the Church and Defendants discussed 33 online comments selected by the Church (including the 15 identified in the Complaint). On April 8, 2026, Defendants informed the Church that the vast majority of the selected comments were not posted on any MORMON STORIES social media pages, and that most were comments made recently in response to videos from supporters of the Church discussing and celebrating the Church's current trademark enforcement efforts against Defendants.

244. In truth, only 6 comments in paragraph 54 of the Complaint were posted on the MORMON STORIES Facebook or YouTube pages. The other comments, as Defendants had already informed the Church, were posted in response to third-party videos from faithful members of the Church discussing and supporting the Church's recent trademark enforcement efforts at issue in this case.

245. On information and belief, the Church chose not to provide the links from which the comments were obtained in paragraph 54 in order to conceal its misrepresentation in the Complaint.

246.    Two of the comments in paragraph 54 of the Complaint were made just six months ago in December 2025 in response to a YouTube video posted by David Alexander titled, "HOORAY! CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS PRESSURES 'MORMON STORIES' TYPES TO 'REBRAND'!".  These two comments were selected from among 163 comments made in response to the video. For one of the comments, the Church selected just 17 words out of the full 166-word comment to put in the Complaint, which removed important context. See https://www.youtube.com/watch?v=C1UTv3r5oes&lc=Ugxptc8-VPMTeF-Q6Ct4AaABAg.

247.    Five of the comments in paragraph 54 of the Complaint were made in November 2025 in response to a YouTube video posted by a podcaster using the name "Latter Daily Saints" and titled, "LDS Church Exposes Most Deceptive Anti-Mormon and Campbell's VP Gross Confession." This video also reported on and celebrated the recent news of the Church accusing Defendants of trademark infringement. These five comments were selected from among 1,143 comments posted in response to the video.  https://www.youtube.com/watch?v=bPq3wZJa_zY

248.    One of the comments in paragraph 54 of the Complaint was also made just six months ago in December 2025 in response to a YouTube video posted by Jasmin Rappleye titled, "Is the church disproportionately targeting exmormon podcasts?" and supporting the Church's recent trademark enforcement efforts against Defendants. This comment was selected from among 195 other comments. See https://www.youtube.com/watch?v=zPM355Acs48&lc=Ugw_j8kqh6bL6hH-Lep4AaABAg

249.    One of the comments in paragraph 54 of the Complaint was posted in July 2025 in response to a post from someone's personal X account expressing frustration that Dehlin was

interviewing a true crime podcaster that had covered a nationally reported murder case involving members of the Church.

250.    For the very few comments that were actually made in response to a MORMON STORIES video post, none of them express source or brand confusion and they were selectively pulled by the Church from among thousands of other comments made in response to videos collectively receiving millions of views.

251.    The Church's selective mining of online comments, and deceptive allegations regarding the origin of the same, fails to provide any meaningful or credible basis for the Church's allegations of source or affiliation confusion stemming from Defendants use of the MORMON STORIES name or its logos and branding.

252.    The Church's deliberate decision to take no action regarding its trademark rights and copyrights against Defendants for two decades, and to wait for more than three years after Defendants' logo change, belies its claims that there is any risk of source confusion.

253.    Over the more than 20 years of the MORMON STORIES podcast, there has not been any meaningful degree of confusion about the source of the podcast or whether the podcast is affiliated with or sponsored by the Church.

254.    On information and belief, and in view of the history of Dehlin's excommunication, President Oaks's aforementioned 2026 talk, the Church's belief that Defendants are a major cause of a loss of membership, and the Church's reliance on online comments reflecting uncertainty about the viewpoints or leanings of the podcast rather than genuine source confusion, the present lawsuit is not motivated by a genuine concern over source affiliation confusion, but instead by a desire to silence, or at a minimum limit the reach of, the

content, opinions, and viewpoints shared on the MORMON STORIES podcast and its affiliate sites.

255.    On information and belief, and based on the Church's delay of two decades and its refusal to accept Defendants' voluntary cooperation and compromise of changing nearly every branding concern the Church raised, the present lawsuit was brought for the improper purpose of using the pressure and expense of the litigation process, rather than the meritorious outcome of litigation, to achieve the Church's desired outcome of diminishing the reach and impact of Defendants' podcast.

## COUNT I
### (Declaratory Judgment of No Trademark Infringement under 15 U.S.C. § 1114)

256.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

257.    Count I in the Complaint fails to adequately plead a claim of infringement with sufficient specificity to give notice of the claim. Instead, Count I generically alleges that all of Defendants' actions collectively infringe all of the Church's trademarks collectively, providing no specific basis for infringement that gives Defendants sufficient notice of what specific actions infringe which specific alleged trademarks.

258.    Plaintiffs do not own trademark rights in the name "Mormon" because the word is generic, and to the extent any rights could be acquired in the name "Mormon," which Defendants do not concede, Plaintiffs expressly abandoned any such rights.

259.    Numerous religious sects in addition to the Church have used "Mormon" for religious services dating to at least as early as the date the "Book of Mormon" was published and continuously through to today.

260.    Defendants' use of "Mormon" is descriptively fair to identify the various sects of Mormonism, including the Church, discussed in podcast episodes.

261.    Because "Mormon" is generic for various religious sects, cultures, traditions, and genealogical roots, it is not capable of acting as a source identifier and no one sect should be able to prevent Defendants or others from using the word for its general meaning.

262.    The Church's Mormon-styled alleged trademarks are not commercially strong given the genericness and descriptiveness of "Mormon" for the Church's religious based services and given the many uses of "Mormon" in branding by others.

263.    Plaintiffs do not own, nor do they purport to own, trademark or trade dress rights in the color blue.

264.    Plaintiffs have not established secondary meaning in the color blue as a source identifying design feature.

265.    The Church's use of blue in some of its branding is not unique to the Church, but is consistent with the fact that blue is a commonly used color in the branding for U.S.-based religious organizations, such as Scientology, Jehovah's Witnesses, and the Seventh-day Adventist Church.



https://www.scientology.org/what-is-scientology/#slide1



https://www.jw.org/en/



https://www.nadadventist.org/about/brand-guidelines/color-typography/

266.   The color blue is embraced by various faiths because of its origins in the Old Testament and Quran, and has been described as God's favorite color.  *See* https://gracefiber.com/blogs/bible/biblical-meaning-of-blue?srsltid=AfmBOopyfbB5UjW55VjJCdIbL2eGFcav_OfZRSLruzZ836mMbknoxpgc ("In the Bible, blue represents divinity, heavenly authority, and God's commandments. … The color's rarity and association with the sky made it a sacred hue.").

267.   MORMON STORIES began using blue in the background for its online content on the first day it launched the podcast in 2005 and has continuously used blue in some form in its branding and logos.

268.   The Church's November 2025 email and Complaint selectively used only the Church's blue icons alongside Defendants' blue MORMON STORIES updated logo to support its allegations and omitted from its email and Complaint the many other different-colored icons and logos used by the Church, some of which are depicted below.



269.    What the Church calls its "Light-Rays Design" mark (shown below) is described in its trademark registration as follows: "The mark consists of a collection of geometric shapes comprising a rectangle and three overlapping triangles extending therefrom, with two triangles extending from a first side of the rectangle and a third triangle extending from an opposite second side of the rectangle, with the various shapes in the design having differing shading" (the "rectangular overlapping triangles mark"). *See* Trademark Registration No. 6,142,065 (Complaint Ex. 1).



270.    MORMON STORIES has never used the Church's rectangular overlapping triangles mark for any reason.

271.    Defendants' blue updated MORMON STORIES logo was created using the following free blue design downloaded from Freepik.



272.    The use of blue backgrounds with crisscrossing lines is a ubiquitous design used in a variety of contexts, such that the Church's rectangular overlapping triangles mark is not distinctively or commercially strong.

273.    For example, Microsoft's PowerPoint application has a standard design template that bears a stark resemblance to the Church's rectangular overlapping triangles mark.



274.    A search in Google's image search using the portion of the Church's overlapping triangles mark used in the Church's logos above results in hundreds of hits showing blue designs with crisscrossing lines, some of which are depicted below.



275.    Given the weakness of the Church's rectangular overlapping triangles mark as a distinctive source identifier, the blue updated MORMON STORIES logo implementing the Freepik design did not create a chance of source confusion.

276.    Defendants have never used the "Christus Symbol" (as seen in Registration No. 6,974,951) as a source identifier.

277.    Defendants launched the MORMON STORIES podcast in 2005 and have continuously used "Mormon" and MORMON STORIES since that time, while Plaintiffs' first use of "Book of Mormon Stories" or any other Mormon-styled name in connection with a podcast occurred in 2010 at the earliest. Accordingly, to the extent Plaintiffs have any valid trademark rights in "Mormon," which Defendants do not concede, Defendants have priority of use of "Mormon" and MORMON STORIES in connection with podcast services.

278.    Defendants' use of MORMON STORIES does not create a likelihood of confusion as to the source or affiliation of the MORMON STORIES podcast.

279.    Defendants' use of blue, light rays motifs, and other design elements in its branding does not create a likelihood of confusion as to the source or affiliation of the MORMON STORIES podcast.

280.    None of Defendants' actions with its branding create a likelihood of confusion about the Church being the source of or sponsoring, or being affiliated with MORMON STORIES podcast.

281.    On August 16, 2024, in connection with applying for a trademark registration for BOOK OF MORMON STORIES, Plaintiffs made a binding declaration under oath to the USPTO that no existing similar marks in use for podcast services, which would include

90

Defendants' long-time use of MORMON STORIES at the time, creates a likelihood of confusion with Plaintiffs' use of BOOK OF MORMON STORIES for podcast services.

282.    Defendants are entitled to a declaratory judgment of no trademark infringement under 15 U.S.C. § 1114.

283.    The Church's trademark claims are exceptionally baseless, in part because they come twenty years after the allegedly infringing conduct started and they seek to enforce trademark rights the Church spent years publicly abandoning. In view of the egregious nature of the Church's deceptive and belated claims, this is an exceptional case and Defendants are entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

## COUNT II
### (Declaratory Judgment of No Trademark Infringement under 15 U.S.C. § 1125)

284.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

285.    Count II in the Complaint fails to adequately plead a claim of infringement with sufficient specificity to give notice of the claim. Instead, Count II generically alleges that all of Defendants' actions collectively infringe all of the Church's trademarks collectively, providing no specific basis for infringement that gives Defendants sufficient notice of what specific actions infringe which specific alleged trademarks.

286.    Defendants' actions with its branding do not include any false designation of origin or false or misleading statements of fact and do not constitute trademark infringement under 15 U.S.C. § 1125.

287. Plaintiffs do not own trademark rights in the name "Mormon" because the word is generic, and to the extent any rights could be acquired in the name "Mormon," which Defendants do not concede, Plaintiffs' expressly abandoned any such rights.

288. Numerous religious sects in addition to the Church have used "Mormon" for religious services dating to at least as early as the date the "Book of Mormon" was published and continuously through to today.

289. Defendants' use of "Mormon" is descriptively fair to identify the various sects of Mormonism, including the Church, discussed in podcast episodes.

290. Because "Mormon" is generic for various religious sects, cultures, traditions, and genealogical roots, it is not capable of acting as a source identifier and no one sect should be able to prevent Defendants or others from using the word for its general meaning.

291. The Church's Mormon-styled alleged trademarks are not commercially strong given the genericness and descriptiveness of "Mormon" and given the many uses of "Mormon" in branding by others.

292. Plaintiffs do not own, nor do they purport to own, trademark or trade dress rights in the color blue.

293. Plaintiffs have not established secondary meaning in the color blue as a source identifying design feature.

294. Defendants launched the MORMON STORIES podcast in 2005 and have continuously used "Mormon" and MORMON STORIES since that time, while Plaintiffs' first use of "Book of Mormon Stories" or any other Mormon-styled name in connection with a podcast occurred in 2010 at the earliest. Accordingly, to the extent Plaintiffs have any valid

trademark rights in the term Mormon, which Defendants do not concede, Defendants have priority and superior rights in the use of "Mormon" and MORMON STORIES in connection with podcast services.

295.    Defendants' use of MORMON STORIES does not create a likelihood of confusion as to the source or affiliation of the MORMON STORIES podcast.

296.    Defendants' use of blue, light rays motifs, and other design elements in its branding does not create a likelihood of confusion as to the source or affiliation of the MORMON STORIES podcast.

297.    None of Defendants' actions with its branding create a likelihood of confusion about the Church being the source of or sponsoring, or being affiliated with MORMON STORIES podcast.

298.    Defendants are entitled to a declaratory judgment of no trademark infringement under  15 U.S.C. § 1125.

299.    The Church's trademark claims are exceptionally baseless, in part because they come twenty years after the allegedly infringing conduct started and they seek to enforce trademark rights the Church spent years publicly abandoning. In view of the egregious nature of the Church's deceptive and belated claims, this is an exceptional case and Defendants are entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

## COUNT III
### (Declaratory Judgment of No Common Law Trademark Infringement)

300.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

301.    Count III in the Complaint fails to adequately plead a claim of infringement under common law or Utah State Law with sufficient specificity to give notice of the claim. The Church has failed to identify or plead any unlawful act by Defendants.

302.    The Church has failed to alleged or plead a diminution in value of the Church's intellectual property.

303.    Defendants' actions with their branding are not likely to cause, and have not caused, confusion, mistake, and deception among the public, but rather accurately and truthfully indicate to the public the subject matter and topics discussed on the podcast.

304.    Defendants' actions with its branding do not constitute palming off, imitating, or likely confusion or deception.

305.    Defendants' actions do not constitute trademark infringement under common law or Utah Code Ann. § 13-5a-102 or § 13-5a-103.

306.    Defendants are entitled to a declaratory judgment of no trademark infringement under common law or Utah Code Ann. § 13-5a-102 or § 13-5a-103.

307.    The Church's trademark claims are exceptionally baseless, in part because they come twenty years after the allegedly infringing conduct started and they seek to enforce trademark rights the Church spent years publicly abandoning. In view of the egregious nature of the Church's deceptive and belated claims, this is an exceptional case and Defendants are entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

### COUNT IV
### (Declaratory Judgment of no Copyright Infringement)

308.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

309.    The Church alleges copyright infringement in violation of 17 U.S.C. § 501 in fifty-one registered works attached as Exhibit 2 to the Complaint (the "Works at Issue").

310.    Defendants do not infringe the Church's purported copyrights because, for example, the Church cannot show ownership of each asserted copyright, or unauthorized copying of any original, protected elements of each of the Works at Issue, including within the statute of limitations period.

311.    Moreover, Defendants do not infringe because they have valid defenses to infringement, as set forth in their affirmative defenses.

312.    For example, any reproduction, use, or display of the Works at Issue by Defendants qualifies as fair use under 17 U.S.C. § 107, because, *inter alia*, Defendants' accused use of the Works at Issue (a) is for purposes of criticism, comment, and reporting such that; (b) is highly transformative with a purpose and character vastly different from the original work; (b) involves works that are factual, not creative in nature (*e.g.*, photographs of people and places), (c) involve accused use of the Christus work (Image 13 of Exhibit 2), which if any valid copyright exists, which Defendants do not concede, it should be afforded thin protection at most; (d) is *de minimis*, limited to only what was necessary, and/or tailored to further the transformative purpose; and (e) has no effect upon the Church's potential market for or value of the copyrighted works, which is evidenced, *inter alia*, by virtually all of the fifty-one Works at Issue being available for free license by the Church for the very purposes underlying Defendants' accused and transformative use of the Works at Issue.

313.    Defendants published the Works at Issue in good faith with an understanding that their use qualified as copyright fair use under 17 U.S.C. § 107.

314.    Defendants are, therefore, entitled to a declaratory judgment of non-infringement of copyright under 17 U.S.C. § 501.

315.    As another example, Defendants are not liable as to at least forty-eight of the fifty-one Works at Issue on the grounds that the Church offers a free license for each of these works on its website located at www.churchofjesuschrist.org.

316.    Any reproduction or display by Defendants of these forty-eight works falls within the scope of the Church's Terms of Use, which provides, *inter alia*, that "materials from this site may be reproduced by media personnel for use in traditional public news forums unless otherwise indicated."

317.    Defendants used the forty-eight works in good faith with an understanding that the Church's license for the works covered Defendants' public news forum use.

318.    Defendants, therefore, are entitled to a declaratory judgment of non-infringement of copyright under 17 U.S.C. § 501 as a result of the license granted by the Church.

319.    Defendants should be awarded their attorneys' fees and costs under 17 U.S.C. § 505, and any other relief that the Court may deem just and proper.

### COUNT V
### (Cancellation of Reg. No. 3,239,919 for MORMON)

320.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

321.    Plaintiffs abandoned and disavowed use of "Mormon" as a trademark by at least 2018 for all goods and services, a date that is more than three years ago.

322.    Plaintiffs' abandonment of "Mormon" was public, explicit, and intentional, leaving no room for any residual token use or de minimis use to overcome the abandonment.

323.    Plaintiffs have not evinced any bona fide intent to resume use of "Mormon" as a trademark in commerce in connection with the services identified in the Registration No. 3,239,919, and upon information and belief, Plaintiffs do not have a bona fide intent to resume use of the term as a trademark.

324.    Plaintiffs are not entitled to Registration No. 3,239,919 because the Church has abandoned its rights in the registered mark in connection with services identified in the registration.

325.    The "mark" that is the subject of the Registration No. 3,239,919 does not meet the statutory definition of a trademark under 15 U.S.C. § 1127 because it does not "identify and distinguish" Registrant's services and does not "indicate the source" of such services, where Registrant has expressly disavowed the term through its express public pronouncements and though its conduct, including acts of omission and/or commission.

326.    Registration No. 3,239,919 should, therefore, be cancelled pursuant to 15 U.S.C. §§ 1064 and 1127.

327.    "Mormon" is a religious term that primarily denotes in the minds of the public a category of religious faith, education or tradition and does not indicate a unique source for educational or genealogical services; as such "Mormon" is generic and cannot be appropriated as a trademark for the services identified in Registration No. 3,239,919.

328.    Registration No. 3,239,919 for MORMON is also and independently subject to cancellation under 15 U.S.C. §§ 1064 and 1119 because the term "Mormon" is generic for the services identified.

329. Plaintiffs' reliance on their expressly abandoned "Mormon" mark for their enforcement efforts against Defendants, especially after two decades of inaction, is a misuse of trademark rights and renders this case exceptional. Defendants are, therefore, entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

**COUNT VI**
**(Cancellation of Reg. No. 3,715,744 for MORMON.ORG)**

330. Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

331. Plaintiffs abandoned and disavowed use of "Mormon" as a trademark by at least 2018 for all goods and services, a date that is more than three years ago, including "Mormon.org".

332. Plaintiffs discontinued the use of "Mormon.org" as a trademark and began using the www.mormon.org domain solely to redirect to the Church's main website, www.churchofjesuschrist.org, in 2019.

333. Plaintiffs have not evinced any bona fide intent to resume use of "Mormon.org" as a trademark in commerce in connection with the services identified in Registration No. 3,715,744, and upon information and belief, Plaintiffs do not have a bona fide intent to resume use of the term as a trademark.

334. The "mark" that is the subject of the Registration No. 3,715,744 does not meet the statutory definition of a trademark under 15 U.S.C. § 1127 because it does not "identify and distinguish" the Church's services and does not "indicate the source" of such services, where the Church has expressly disavowed the term through its conduct, including acts of omission and/or commission.

335.     Plaintiffs are not entitled to Registration No. 3,715,744 because the Church has abandoned its rights in the registered mark in connection with services identified in the registration, pursuant to 15 U.S.C. §§ 1064 and 1127.

336.     Plaintiffs' reliance on their expressly abandoned "Mormon.org" mark for their enforcement efforts against Defendants, especially after two decades of inaction, is a misuse of trademark rights and renders this case exceptional. Defendants are, therefore, entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

## COUNT VII
### (Cancellation of Reg. Nos. 2,883,572; 8,018,073; 7,840,811; 7,840,809; 7,840,810; and 7,822,271 for BOOK OF MORMON marks)

337.     Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

338.     Plaintiffs abandoned and disavowed use of "Mormon" as a trademark by at least 2018 for all goods and services, a date that is more than three years ago, including "Mormon.org".

339.     Plaintiffs publicly and definitively declared in 2018 that their use of "Mormon" is not a trademark or source-identifying use, but is limited to descriptive and nominative reference to the religious text, Book of Mormon, and other historical nouns relating to Mormonism, which is insufficient to support trademark rights.

340.     Plaintiffs have not evinced any bona fide intent to resume use of "Book of Mormon" as a trademark in commerce in connection with the services identified in Registration Nos. 2,883,572; 8,018,073; 7,840,811; 7,840,809; 7,840,810; and 7,822,271 ("the Book of

Mormon Registrations"), and upon information and belief, Plaintiffs do not have a bona fide intent to resume use of the term as a trademark.

341.    The "marks" that is the subject of the Book of Mormon Registrations do not meet the statutory definition of a trademark under 15 U.S.C. § 1127 because they do not "identify and distinguish" the Church's services and does not "indicate the source" of such services, where the Church has expressly disavowed the term through its conduct, including acts of omission and/or commission.

342.    Plaintiffs are not entitled to the Book of Mormon Registrations because the Church abandoned its rights in the registered marks in connection with services identified in the registration, declaring its use to be non-source identifying and nominative in nature, pursuant to 15 U.S.C. §§ 1064 and 1127.

343.    Plaintiffs' reliance on their expressly abandoned "Mormon" marks for their enforcement efforts against Defendants, especially after two decades of inaction, is a misuse of trademark rights and renders this case exceptional. Defendants are, therefore, entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

## COUNT VIII
### (Alternative Cancellation of Reg. No. 7,840,811 for BOOK OF MORMON STORIES)

344.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

345.    Plaintiffs abandoned and disavowed use of "Mormon" as a trademark by at least 2018 for all goods and services, a date that is more than three years ago, including the "Mormon Channel."

346.    On August 16, 2024, Plaintiffs made a binding declaration under oath to the USPTO relating to Registration No. 7,840,811 indicating that Defendants' use of MORMON STORIES for podcast services is not likely to cause confusion, mistake, or to deceive regarding the source or affiliation of Defendants' services.

347.    Alternatively, if Plaintiffs genuinely believed that Defendants' use of MORMON STORIES for podcast services is likely to cause confusion, mistake, or to deceive, then Plaintiffs, via its appointed representatives, knowingly made material and false representations relating to the Church's use of "Book of Mormon Stories" for podcasting to the USPTO in connection with the Church's efforts to acquire Registration No. 7,840,811.

348.    Given the Church's knowledge that Dehlin began the MORMON STORIES podcast in 2005, the Church knew the representations it made about "Book of Mormon Stories" for podcasting were false and intended to deceive and mislead the USPTO examiner into mistakenly believing that the Church had exclusive genuine, bona fide use in commerce of "Book of Mormon Stories" for podcasting as of 2010.

349.    The USPTO examiner relied on the Church's false and material statements in granting Registration No. 7,840,811, and would have refused to issue Registration No. 7,840,811 if the Church had not misrepresented the facts regarding the use of "Book of Mormon Stories" for podcasting.

350.    Accordingly, Registration No. 7,840,811 should be cancelled for the additional and independent ground of fraud under 15 U.S.C. §§ 1064 and 1119.

351.    Plaintiffs' reliance on Registration No. 7,840,811 for their enforcement efforts against Defendants, who have priority of use in the podcasting field by several years, especially

after two decades of inaction, is a misuse of trademark rights and renders this case exceptional. Defendants are, therefore, entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

### COUNT IX
### (Cancellation of Reg. No. 5,020,309 for MORMON CHANNEL)

352.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

353.    Plaintiffs abandoned and disavowed use of "Mormon" as a trademark by at least 2018 for all goods and services, a date that is more than three years ago, including the "Mormon Channel."

354.    Plaintiffs renamed the "Mormon Channel" to "Latter-day Saint Channel" in 2019 and have not evinced any bona fide intent to resume use of "Mormon Channel" as a trademark in commerce in connection with the services identified in Registration No. 5,020,309.

355.    Upon information and belief, Plaintiffs do not have a bona fide intent to resume use of the term "Mormon Channel" as a trademark.

356.    The "mark" that is the subject of the Registration No. 5,020,309 does not meet the statutory definition of a trademark under 15 U.S.C. § 1127 because it does not "identify and distinguish" the Church's services and does not "indicate the source" of such services, where the Church has expressly disavowed the term through its express public pronouncements and though its conduct, including acts of omission and/or commission.

357.    Plaintiffs are not entitled to Registration No. 5,020,309 because the Church has abandoned its rights in the registered mark in connection with services identified in the registration.

358.    Registration No. 5,020,309 should, therefore, be cancelled pursuant to 15 U.S.C. §§ 1064 and 1127.

359.    The Church, via its appointed representatives, knowingly made material and false representations relating to the use of "Mormon Channel" to the USPTO in connection with the Church's efforts to maintain Registration No. 5,020,309 after expressly abandoning "Mormon Channel".

360.    The Church knew the representations it made about "Mormon Channel" were false and intended to deceive and mislead the USPTO examiner into mistakenly believing that the Church had continued genuine, bona fide use in commerce of "Mormon Channel" in order to maintain Registration No. 5,020,309.

361.    The USPTO examiner relied on the Church's false and material statements in renewing and maintaining Registration No. 5,020,309, and would have refused renewal and cancelled Registration No. 5,020,309 if the Church had not misrepresented the facts regarding its use of "Mormon Channel" and had informed the USPTO examiner of its express abandonment.

362.    Accordingly, Registration No. 5,020,309 should be cancelled for the additional and independent ground of fraud under 15 U.S.C. §§ 1064 and 1119.

363.    Plaintiffs' reliance on their expressly abandoned "Mormon Channel" mark for their enforcement efforts against Defendants, especially after two decades of inaction, is a misuse of trademark rights and renders this case exceptional. Defendants are, therefore, entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

## COUNT X
### (Cancellation of Reg. No. 5,020,314 for MORMON MESSAGES)

364.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

365.    Plaintiffs abandoned and disavowed use of "Mormon" as a trademark by at least 2018 for all goods and services, a date that is more than three years ago, including "Mormon Messages".

366.    Plaintiffs renamed "Mormon Messages" to "Inspirational Messages" in 2019 and have not evinced any bona fide intent to resume use of "Mormon Messages" as a trademark in commerce in connection with the services identified in Registration No. 5,020,314.

367.    Upon information and belief, Plaintiffs do not have a bona fide intent to resume use of the term "Mormon Messages" as a trademark.

368.    The "mark" that is the subject of the Registration No. 5,020,314 does not meet the statutory definition of a trademark under 15 U.S.C. § 1127 because it does not "identify and distinguish" the Church's goods and services and does not "indicate the source" of such goods and services, where the Church has expressly disavowed the term through its express public pronouncements and though its conduct, including acts of omission and/or commission.

369.    Plaintiffs are not entitled to Registration No. 5,020,314 because the Church has abandoned its rights in the registered mark in connection with goods and services identified in the registration.

370.    Registration No. 5,020,314 should, therefore, be cancelled pursuant to 15 U.S.C. §§ 1064 and 1127.

371.    The Church, via its appointed representatives, knowingly made material and false representations relating to the use of "Mormon Messages" to the USPTO in connection with the Church's efforts to maintain Registration No. 5,020,314 after expressly abandoning "Mormon Channel".

372.    The Church knew the representations it made about "Mormon Messages" were false and intended to deceive and mislead the USPTO examiner into mistakenly believing that the Church had continued genuine, bona fide use in commerce of "Mormon Messages" in order to maintain Registration No. 5,020,314.

373.    The USPTO examiner relied on the Church's false and material statements in renewing and maintaining Registration No. 5,020,314, and would have refused renewal and cancelled Registration No. 5,020,314 if the Church had not misrepresented the facts regarding its use of "Mormon Messages" and had informed the USPTO examiner of its express abandonment.

374.    Accordingly, Registration No. 5,020,314 should be cancelled for the additional and independent ground of fraud under 15 U.S.C. §§ 1064 and 1119.

375.    Plaintiffs' reliance on their expressly abandoned "Mormon Messages" mark for their enforcement efforts against Defendants, especially after two decades of inaction, is a misuse of trademark rights and renders this case exceptional. Defendants are, therefore, entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

## COUNT XI
### (Cancellation of Reg. Nos. 2,766,231 & 2,913,694 for MORMON TABERNACLE CHOIR)

376.    Defendants re-allege and incorporate by reference each and every admission, denial, and averment of this Answer and Counterclaim as though set forth fully herein.

105

377.    Plaintiffs abandoned and disavowed use of "Mormon" as a trademark by at least 2018 for all goods and services, a date that is more than three years ago, including "Mormon Tabernacle Choir".

378.    Plaintiffs renamed "Mormon Tabernacle Choir" to "The Tabernacle Choir at Temple Square" in 2018 and have not evinced any bona fide intent to resume use of "Mormon Tabernacle Choir" as a trademark in commerce in connection with the services identified in Registration Nos. 2,766,231 & 2,913,694.

379.    Upon information and belief, Plaintiffs do not have a bona fide intent to resume use of the term "Mormon Tabernacle Choir" as a trademark.

380.    The "mark" that is the subject of the Registration Nos. 2,766,231 & 2,913,694 does not meet the statutory definition of a trademark under 15 U.S.C. § 1127 because it does not "identify and distinguish" the Church's goods and services and does not "indicate the source" of such goods and services, where the Church has expressly disavowed the term through its express public pronouncements and though its conduct, including acts of omission and/or commission.

381.    Plaintiffs are not entitled to Registration Nos. 2,766,231 & 2,913,694 because the Church has abandoned its rights in the registered mark in connection with goods and services identified in the registration.

382.    Registration Nos. 2,766,231 & 2,913,694 should, therefore, be cancelled pursuant to 15 U.S.C. §§ 1064 and 1127.

383.    The Church, via its appointed representatives, knowingly made material and false representations relating to the use of "Mormon Tabernacle Choir" to the USPTO in connection

with the Church's efforts to maintain Registration Nos. 2,766,231 & 2,913,694 after expressly abandoning "Mormon Tabernacle Choir".

384.    The Church knew the representations it made about "Mormon Tabernacle Choir" were false and intended to deceive and mislead the USPTO examiner into mistakenly believing that the Church had continued genuine, bona fide use in commerce of "Mormon Tabernacle Choir" in order to maintain Registration Nos. 2,766,231 & 2,913,694.

385.    The USPTO examiner relied on the Church's false and material statements in renewing and maintaining Registration Nos. 2,766,231 & 2,913,694, and would have refused renewal and cancelled Registration Nos. 2,766,231 & 2,913,694 if the Church had not misrepresented the facts regarding its use of "Mormon Tabernacle Choir" and had informed the USPTO examiner of its express abandonment.

386.    Accordingly, Registration Nos. 2,766,231 & 2,913,694 should be cancelled for the additional and independent ground of fraud under 15 U.S.C. §§ 1064 and 1119.

387.    Plaintiffs' reliance on their expressly abandoned "Mormon Tabernacle Choir" mark for their enforcement efforts against Defendants, especially after two decades of inaction, is a misuse of trademark rights and renders this case exceptional. Defendants are, therefore, entitled to recover their attorneys' fees and expenses under 15 U.S.C. § 1117.

## PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully requests that this Court enter judgment in their favor and against Plaintiffs, and grant the following relief:

A. Dismissing Plaintiffs' Complaint with prejudice and entering judgment in favor of Defendants.

B.  Denying each and every prayer for relief requested by Plaintiffs in the Complaint;

C.  Declaring that Defendants have not infringed and do not currently infringe any trademarks or copyrights owned by Plaintiffs;

D.  Declaring that Defendants' use of Plaintiffs' asserted copyrighted images in connection with Defendants' podcast constitutes fair use under 17 U.S.C. § 107;

E.  Enter an order directing the USPTO to cancel Trademark Registration Nos. 2,766,231; 2,913,694; 3,239,919; 5,020,309; 5,020,314; 2,883,572; 8,018,073; 7,840,811; 7,840,809; 7,840,810; and 7,822,271 and declaring such marks invalid and unenforceable by the Church;

F.  Declaring that Plaintiffs have abandoned any and all trademark rights in the term "Mormon" and any other Mormon-styled name;

G.  Entering judgment that Plaintiffs' trademark infringement claims are barred by laches, estoppel, and acquiescence;

H.  Entering judgment that Plaintiffs' copyright infringement claims are barred by laches, estoppel, acquiescence, and the statute of limitations;

I.  Declaring that Plaintiffs have engaged in trademark and copyright misuse and declaring all intellectual property rights asserted in the action by Plaintiffs to be unenforceable as to Defendants;

J.  Enjoining Plaintiffs from misusing the Church's trademark rights and copyrights as a pretext to interfere with Defendants' podcasting and other operations;

K.  Declaring that this is an exceptional case pursuant to 15 U.S.C. § 1117(a), and awarding Defendants their attorneys' fees and costs; and

L.  Awarding Defendants such other and further relief as this Court may deem just and

proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants demand a

trial by jury on all issues triable of right by jury.

DATED this 22nd day of June, 2026

*/s/ Mark A. Miller*
Mark A. Miller
Elliot Hales
Olivia McQuarrie
Mike Keyes
**Dorsey & Whitney, LLP**

Elissa Brockbank Reese
**Potomac Law Group, PLLC**

Ryan E. Hatch
**Hatch Law, PC**

*Attorneys for Defendants Open Stories*
*Foundation and John P. Dehlin*