Abigail Cook (Bar No. 19781)
Jason Groth (Bar No. 16683)
Masami Kanegae (Bar No. 20270)
ACLU OF UTAH FOUNDATION, INC.
311 South State Street, Suite 310
Salt Lake City, UT 84111
Telephone: (801) 521-9862
Email: acook@acluutah.org
Email: jgroth@acluutah.org
Email: mkanegae@acluutah.org

*Counsel for Amicus Curiae*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| INTELLECTUAL RESERVE, INC., a Utah non-profit corporation; THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole,<br><br>Plaintiffs,<br><br>v.<br><br>OPEN STORIES FOUNDATION, an Arizona non-profit corporation; JOHN P. DEHLIN, an individual,<br><br>Defendants. | **BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF UTAH AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS**<br><br>Case No. 2:26-CV-00321<br><br>Judge Robert Shelby |

## TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE ....................................................................................4
DISCLOSURE STATEMENT ..........................................................................................4
SUMMARY OF ARGUMENT ........................................................................................5
ARGUMENT ...................................................................................................................6

I. THE TERM "MORMON" REPRESENTS AN ENTIRE ETHNORELIGIOUS TRADITION, CULTURE, AND PEOPLE THAT EXTENDS BEYOND ANY ONE INSTITUTION. ....6
A. The scholarship and dictionary definitions around Mormons and Mormonism define the terms broadly to encompass an entire religion and culture....6
B. There are multiple modern religious communities that claim the label "Mormon" besides the LDS Church. ....8
C. Modern reference to Mormons and Mormonism in entertainment often refer to religious communities beyond the LDS Church. ....11
II. FAIR USE AND THE FIRST AMENDMENT PROHIBIT PLAINTIFFS' AIM TO CONTROL THE TERM "MORMON."....12
A. "Mormon" is not used as a source identifier in the Defendants' podcast title "Mormon Stories." ....13
B. The term "Mormon" in "Mormon Stories" is fair use because it describes what the podcast is about and, at times, references the LDS Church as an object of its commentary. ....14

CONCLUSION....18

## TABLE OF AUTHORITIES

**CASES**

*Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884 (9th Cir. 2019) ....15

*Boulder Falcon, LLC v. Brown*, No. 22-00042, 2024 WL 4564635 (D. Utah Oct. 24, 2024)....6

*Cleveland v. U.S.*, 329 U.S. 14 (1946)....10

*Jack Daniel's Props. v. VIP Products LLC*, 599 U.S. 140 (2023) ....13

*Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016) ....7

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004)....5, 15

*Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894 (9th Cir. 2002)....5, 16

*Medina v. Cath. Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017)....7

*Radiance Found. Inc. v. NAACP*, 786 F.3d 316 (4th Cir. 2015) ....14, 16, 17

*Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680 (E.D. Va. 2005) ....12

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012) ....14

*State v. Holm*, 137 P.3d 726 (Utah 2006) ....10

*Tachias v. Sanders*, 130 F.4th 836 (10th Cir. 2025)....15

*The Est. of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016) ....6

*Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045 (10th Cir. 2008) ....15

**STATUTES**

15 U.S.C. § 1115(b)(4) ....12, 14

15 U.S.C. § 1125(c)(3) ....12, 14

**OTHER AUTHORITIES**

Amanda Richards, *Documenting Mormonism's Darkest Hour*, TUDUM BY NETFLIX (July 2017, 2025) ....9

Armand L. Mauss, *Sociological Perspectives on the Mormon Subculture*, 10 ANNUAL REVIEW OF SOCIOLOGY (1984) ....7

Ben Winslow, *Polygamous sect distances itself from FLDS*, DESERET NEWS (May 28, 2008) ....10

Brittanica Editors. *Book of Mormon*, ENCYC. BRITANNICA (July 9, 2026) ....7

D. Michael Quinn, *Plural Marriage and Mormon Fundamentalism*, 31 DIALOGUE, (1993) ....10

D. Michael Quinn, *The Mormon Succession Crisis of 1844*, 16 BYU STUD. 187 (1976) ....8

David J. Howlett, *The RLDS Church, Global Denominations, and Globalization: Why the Study of Denominations Still Matters*, 48 JOURNAL OF MORMON HIST. 2 (2022) ....8

Felicia R. Lee, *'Big Love': Real Polygamists Look at HBO Polygamists and Find Sex*, THE N.Y. TIMES (Mar. 28, 2006) ....11

H.R. Rep. No. 116-645 (2020) ....12

*Hist. of Mormonism*, SOUTHERN QUARTERLY REV. (1842) ....6

J. Gordon Melton, *Church of Jesus Christ of Latter-day Saints*, ENCYC. BRITANNICA (July 9, 2026) ....7, 9

Janet Bennion, *Women of Principle: Female Networking in Contemporary Mormon Polygamy*, OXFORD UNIVERSITY PRESS (1998). ....10

*Journal of Mormon History*, MORMON HIST. ASS'N (2026) ....6

Michael Austin, *Four Consenting Adults in the Privacy of Their Own Suburb: Big Love and the Cultural Significance of Mormon Polygamy*, UNIV. PRESS OF COLO. 37 ....11

*Mormon*, MERRIAM-WEBSTER (2026) ....7

*Mormons seek distance from polygamist sects*, NBC NEWS (June 26, 2008) ....10

Shannon Carlin, *The True Story Behind Hulu's Under the Banner of Heaven*, TIME (April 28, 2022) ....11

Stephanie Francis Ward, *Discovering Eldorado: In A Massive Clash Between Church and State, A Band of Tex. Laws. Learns That Individual Stories Still Count*, 94 ABA JOURNAL, 58 (2008) ....9

Steven L. Shields, *Cmty. of Christ's Evolving Approach to Mission*, 39 JOURNAL OF MORMON HIST., 139 (2013) ....8

*Taking Down Warren Jeffs - Elissa Wall*, MORMON STORIES (Sep. 7, 2022) ....15

THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, Registration Nos. 6974951, 2309318, 7108440, 6901693, 2133837, 2133843, 1757271, 1776809, 1980319, 2097186, 2163221, 1864725, 1963567, 1738742, and 2135319. ..... 16

*Under the Banner of Heaven: A Story of Violent Faith*, AMAZON (2026) ..... 11

Whitney Danhauer, *Are the 'Sister Wives' Mormon? Details on the Reality TV Stars' Religious Beliefs*, YAHOO ENT. (Sep. 14, 2024) ..... 10

*Why I Resigned as a Mormon Bishop - Nick and Amanda Jones*, MORMON STORIES (Feb. 1, 2024) ..... 15

## INTERESTS OF AMICUS CURIAE

The American Civil Liberties Union ("ACLU") is a nationwide, non-profit, non-partisan organization of over 1.6 million members. Since 1920, the ACLU has sought to protect the constitutional rights and civil liberties of all Americans through litigation, policy advocacy, and organizing. The ACLU has frequently appeared as counsel in cases implicating the First Amendment. The ACLU also files amicus curiae briefs in courts across the country, weighs in as subject matter experts on First Amendment issues, and seeks to educate the public and contribute to the important jurisprudence addressed in this case. The American Civil Liberties Union of Utah is the state affiliate of the ACLU and works to protect the First Amendment rights of all Utahns.

## DISCLOSURE STATEMENT

Pursuant to Local Rule 7-6(d), I certify that the enclosed brief is the work of undersigned counsel and not authored by counsel for either party. No party or party's counsel contributed money intended to fund the preparation of this brief, and no person contributed money to fund the preparation or submission of this brief. Pursuant to Federal Rule of Civil Procedure 7.1(a), Amicus ACLU of Utah certifies that it does not have a parent corporation and no publicly held corporation owns 10% or more of its stock. Finally, I certify that all parties of record have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The ability to identify the subject of one's speech is a core component of free speech—criticism, parody, and imitation cannot function as intended unless speakers are able to identify the person, organization, or idea that is their subject. To name a song mocking the Barbie doll, call it "Barbie Girl." To name a movie about fictional dancers who imitate Fred Astair and Ginger Rogers, call it "Ginger and Fred." To comment on a company, start a website and call it "company".com.[1] But to name a podcast about Mormon stories? Plaintiffs argue calling it "Mormon Stories" is unacceptable and prohibited by trademark law. Congress, courts, and the United States Constitution have all recognized that this kind of chokehold on language is an inappropriate weaponization of intellectual property law beyond its intended purpose. Trademark law does not override the public right to mention, criticize, or discuss.

The Lanham Act excludes fair use (descriptive, nominative) and expressive commentary, despite some potential confusion, because these are uses protected by the First Amendment and not intended to be controlled by the statute—as long as the use is not operating as a "source identifier." The word "Mormon" is not a source identifier. It is a term that describes an entire ethnoreligious culture, tradition, and people, many of whom are not members of the Church of Jesus Christ of Latter-day Saints ("LDS Church"). For that reason, uses of the term—including the use in the title of Defendants' podcast—are not source identifying without more. While the term "Mormon" is a word that might be used to nickname or reference the LDS Church for purposes of commentary, those uses are protected by fair use and the First Amendment.

[1] *See Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894 (9th Cir. 2002); *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989); and *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004), respectively.

Because "Mormon" is not a source identifier, the use of the term must be protected, regardless of which test applies. Amicus Curiae respectfully submits that the Court should reject this attempt to weaponize trademark enforcement to suppress speech and criticism, and grant Defendants' Motion to Dismiss (ECF No. 41).

## ARGUMENT

### I. The term "Mormon" represents an entire ethnoreligious tradition, culture, and people that extends beyond any one institution.

The ordinary public understanding of the term "Mormon" extends beyond the LDS Church. The term is commonly understood to refer to a broader religious movement and cultural tradition encompassing multiple religious communities. This is evident from scholarship and dictionary definitions, the successor denominations who continue to identify and be referred to as Mormon, and contemporary media and entertainment using "Mormon" to reference a broad array of religious communities.

#### A. The scholarship and dictionary definitions around Mormons and Mormonism define the terms broadly to encompass an entire religion and culture.

The scholarship discusses and defines Mormonism as broadly encompassing a new sect of Christianity whose origins trace back to Joseph Smith and his discovery and translation of the Book of Mormon.[2] For example, the Journal of Mormon History explains on its homepage that its

[2] At any stage of the proceeding a court may take judicial notice of any "fact that is not subject to reasonable dispute because it: (1) is generally known within the trial courts territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Boulder Falcon, LLC v. Brown*, No. 22-00042, 2024 WL 4564635, at *2 (D. Utah Oct. 24, 2024) (citing Fed. R. Evid. 201). "Courts commonly take judicial notice of reliable online information, particularly when it pertains to the entity that owns the website providing it." *Id*. It is especially appropriate to take judicial notice of newspapers when the asserted purpose is to show "that something is publically known, not for the truth of the article's other assertions." *The Est. of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir.

mission is to "examine[] the Mormon past," and, "[i]mportantly, Mormonism is interpreted to encompass all traditions that trace their origins to Joseph Smith Jr." *Journal of Mormon History*, MORMON HIST. ASS'N (2026), https://mormonhistoryassociation.org/journal-of-mormon-history/; *see also*, *Hist. of Mormonism*, SOUTHERN QUARTERLY REV., Apr. 1842, at 400, https://jstor.org/stable/community.35250061

("What is Mormonism? It is a new species of religion."). Some scholarship also discusses Mormonism as a subculture or even an ethnic group:

> A small part of the literature has attempted to highlight Mormons' efforts to maintain their cultural uniqueness, at least one author has even argued that Mormons are a separate ethnic group. The vast majority of social scientists who address this issue, however, think the Mormon subculture has traveled a long way down the road toward modernization, accommodation, and assimilation with American society more generally.

Armand L. Mauss, *Sociological Perspectives on the Mormon Subculture*, 10 ANNUAL REVIEW OF SOCIOLOGY 437, 446 (1984), http://www.jstor.org/stable/2083184 (citations omitted).

While dictionary definitions are certainly not dispositive of the public understanding of a word, courts have a longstanding tradition of looking to dictionary definitions to "help … determine [the] ordinary meaning" of a word. *Medina v. Cath. Health Initiatives*, 877 F.3d 1213, 1225 (10th Cir. 2017) (citing *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1231 (10th Cir. 2016)).

The Encyclopedia Britannica definition of the "Book of Mormon" begins with "work accepted as holy scripture, in addition to the Bible, in the Church of Jesus Christ of Latter-day Saints and other Mormon churches." Brittanica Editors. *Book of Mormon*, ENCYC. BRITANNICA

2016) (citations omitted). Many of the sources cited in this brief are presented to demonstrate how the term "Mormon" is used, not for the truthfulness of the source.

(July 9, 2026), https://www.britannica.com/topic/Book-of-Mormon. It separately defines the LDS Church as:

> [a] church that traces its origins to a religion founded by Joseph Smith in the United States in 1830. The term Mormon, often used to refer to members of this church, comes from the Book of Mormon, which was published by Smith in 1830; use of the term is discouraged by the church.

J. Gordon Melton, *Church of Jesus Christ of Latter-day Saints*, ENCYC. BRITANNICA (July 9, 2026), https://www.britannica.com/topic/Church-of-Jesus-Christ-of-Latter-day-Saints. It goes on to discuss other Mormon denominations like the Community of Christ—which is organizationally and theologically distinct from the LDS Church—in the definition as well. *Id*. Similarly, Merriam-Webster defines "Mormon" as "the ancient redactor and compiler of the Book of Mormon presented as divine revelation by Joseph Smith," and then secondarily, "a member of the Church of Jesus Christ of Latter-day Saints." *Mormon*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/Mormon (last visited Aug. 7, 2026).

By discussing and distinguishing between the LDS Church and "other Mormon churches" and denominations, Britannica expressly uses "Mormon" as a descriptor for a broader family of religious communities rather than as a synonym for a single institution. And while Merriam-Webster includes a definition of membership to the LDS Church, that is secondary to the broader, umbrella definition of the entire religion. These reference works are just a small snapshot of how society defines these words but—alongside the historians and researchers' definitions—they paint a clear picture of the breadth of religious communities covered by the term Mormon.

### B. There are multiple modern religious communities that claim the label "Mormon" besides the LDS Church.

Multiple religious communities claim the name "Mormon" and its associated history. This is best explained through the "Mormon Succession Crisis" which refers to "[t]he schismatic

fragmentation of the LDS Church that followed [the death of Joseph Smith in 1844].” D. Michael Quinn, *The Mormon Succession Crisis of 1844*, 16 BYU STUD. 187, 188 (1976). Due to “multipl[e] … succession precedents and a general lack of understanding of what Joseph Smith’s provisions for succession actually were,” the religion branched in multiple directions. *Id*. “The once-unified membership was divided into many groups, disagreeing over both leadership and doctrine.” Steven L. Shields, *Cmty. of Christ’s Evolving Approach to Mission*, 39 JOURNAL OF MORMON HIST., 139, 140 (2013), http://www.jstor.org/stable/24243898.

Since the “Mormon Succession Crisis,” a number of distinct religious communities have fallen within the broader Mormon tradition. *See generally* David J. Howlett, *The RLDS Church, Global Denominations, and Globalization: Why the Study of Denominations Still Matters*, 48 JOURNAL OF MORMON HIST., 2, (2022) https://www.jstor.org/stable/e48510526. (discussing “American-based Mormon denominations” including a case study of “post-World War II Mormonism in both the Church of Jesus Christ of Latter-day Saints and in the Reorganized Church of Jesus Christ of Latter Day Saints”); *see also* Melton, *Church of Jesus Christ of Latter-day Saints*, ENCYC. BRITANNICA (“In the history of the Church of Jesus Christ of Latter-day Saints, more than 150 different independent groups have formed . . . .”). Even though these religious communities differ significantly in doctrine, governance, and practice, many of them still call themselves Mormon or maintain their title as a Mormon denomination.

One of the most prominent examples is the Fundamentalist Church of Jesus Christ of Latter-Day Saints (“FLDS”). The FLDS movement emerged after the mainline church renounced polygamy, with fundamentalist groups breaking away in the early twentieth century to continue the practice. Stephanie Francis Ward, *Discovering Eldorado: In A Massive Clash Between Church and State, A Band of Tex. Laws. Learns That Individual Stories Still Count*, 94 ABA JOURNAL, 58–

70 (2008), http://www.jstor.org/stable/27846819. The Utah Supreme Court has described the FLDS Church as "one of a number of small religious communities in Utah that continue to interpret the early doctrine of the Church of Jesus Christ of Latter-day Saints (the 'LDS Church' or 'Mormon Church') as supporting the practice of 'plural marriage,' or polygamy." *State v. Holm*, 137 P.3d 726, ¶ 2 n.1 (Utah 2006).

FLDS communities are "often referred to as 'fundamentalist Mormons,'" by courts, the entertainment industry, and historians. *Id*. The Supreme Court of the United States referred to FLDS petitioners as "members of a Mormon sect, known as Fundamentalists," and compared them to "other Mormons." *Cleveland v. U.S.*, 329 U.S. 14, at 16 (1946). Netflix described its documentary *Keep Sweet: Pray and Obey* as "the horrifying true story of the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS), a polygamist Mormon denomination led by Warren Jeffs." Amanda Richards, *Documenting Mormonism's Darkest Hour*, TUDUM BY NETFLIX (July 2017, 2025), https://www.netflix.com/tudum/articles/keep-sweet-warren-jeffs-documentary. And there is a whole branch of research committed to documenting the history and culture of Mormon Fundamentalists. *See, e.g.*, D. Michael Quinn, *Plural Marriage and Mormon Fundamentalism*, 31 DIALOGUE, (1993). Jan Shipps, a celebrated historian in the field of Mormon history, highlighted the connection between the LDS and the FLDS Church, emphasizing that they both "call themselves Mormon." *Mormons seek distance from polygamist sects*, NBC NEWS (June 26, 2008, at 6:01 PM MDT), https://www.nbcnews.com/id/wbna25396937.

Another successor community that maintains the title Mormon is the Apostolic United Brethren (AUB) which developed as a "highly rigid, patriarchal Mormon polygamous community." Janet Bennion, *Women of Principle: Female Networking in Contemporary Mormon Polygamy*, OXFORD UNIVERSITY PRESS, at 3 (1998). While the LDS Church opposed the practice of plural

marriage, the AUB continued their commitment to plural marriages, seeing themselves as the "conduits of the true Joseph Smith gospel" for doing so. *Id*. at 20. In public statements, AUB leaders have affirmed that they call themselves "Fundamentalist Mormons." Ben Winslow, *Polygamous sect distances itself from FLDS*, DESERET NEWS (May 28, 2008, at 12:05 AM MT), https://www.deseret.com/2008/5/28/20254906/polygamous-sect-distances-itself-from-flds/.

**C. Modern reference to Mormons and Mormonism in entertainment often refer to religious communities beyond the LDS Church.**

Television and streaming media routinely apply "Mormon" to characterize and describe groups with no institutional ties to the LDS Church. TLC's long-running reality series *Sister Wives* follows a family belonging to the Apostolic United Brethren, which mainstream press coverage describes as "a Mormon fundamentalist group that practices polygamy." Whitney Danhauer, *Are the 'Sister Wives' Mormon? Details on the Reality TV Stars' Religious Beliefs*, YAHOO ENT. (Sep. 14, 2024, at 10:32 AM MT), https://www.yahoo.com/entertainment/sister-wives-mormon-details-reality-163238225.html. FX's limited series *Under the Banner of Heaven*, adapted from Jon Krakauer's bestselling book, is marketed as taking "readers inside America's isolated Mormon Fundamentalist communities," *Under the Banner of Heaven: A Story of Violent Faith*, AMAZON, https://a.co/d/09CULLau (last visited Aug. 7, 2026); *see also* Shannon Carlin, *The True Story Behind Hulu's Under the Banner of Heaven*, TIME (April 28, 2022, at 10:48 AM MT), https://time.com/6171741/under-the-banner-of-heaven-true-story/ (describing the book as a series of murders that "shocked a quiet Mormon town" and questions the danger of the "rise of fundamentalism in Mormonism"). HBO's *Big Love* portrayed a fictional polygamous Mormon family in Salt Lake City unconnected to the LDS Church. Felicia R. Lee, *'Big Love': Real Polygamists Look at HBO Polygamists and Find Sex*, THE N.Y. TIMES (Mar. 28, 2006), https://www.nytimes.com/2006/03/28/arts/television/big-love-real-polygamists-look-at-hbo-

polygamists-and-find.html; Michael Austin, *Four Consenting Adults in the Privacy of Their Own Suburb: Big Love and the Cultural Significance of Mormon Polygamy*, UNIV. PRESS OF COLO., 37–61 (2010) https://doi.org/10.2307/j.ctt4cgr9g.5 ("When HBO premiered its polygamy-themed series *Big Love* in March of 2006, both polygamy and Mormonism had been the focus of considerable attention for the better part of the decade.").

Taken together, these programs demonstrate the term "Mormon" functioning in popular media as a broad cultural and religious descriptor spanning institutional insiders, institutional outsiders, and groups with no formal church affiliation at all. From historians' research and dictionaries to modern day entertainment and more, the term "Mormon" commonly identifies or describes an entire ethnoreligious tradition, culture, and people that extends beyond any one institution.

## II. Fair Use and the First Amendment prohibit Plaintiffs' aim to control the term "Mormon."

Trademark enforcement "must be balanced by the concern that trademark protection [does] not become a means of monopolizing language" or a way for entities to protect themselves from criticism. *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 688 (E.D. Va. 2005) (citation omitted), *aff'd*, 227 F. App'x 239 (4th Cir. 2007). To establish this balance, Congress enumerated free-speech protections in the Lanham Act, which "properly operate[s] to protect First Amendment considerations." H.R. Rep. No. 116-645, at 19–20 (2020) (indicating that the Lanham Act operates properly in part *because* courts are expected to appropriately "cabin the reach of the Lanham Act in cases involving expressive works," by applying the *Rogers* test).

Accordingly, the Lanham Act and application of *Rogers* provide broad categories of speech that are excluded from liability, including fair use and expressive commentary. 15 U.S.C. §

1125(c)(3) (applying to dilution claims, but equally applicable to infringement and unfair competition claims); 15 U.S.C. § 1115(b)(4) (a trademark owner "cannot exclude others from making a fair use of that trademark."). These categories of speech are broadly protected across intellectual property claims, provided the mark is not being used as a "designation of source for the person's own goods or services" or "source identifier." *Jack Daniel's Props. v. VIP Products LLC*, 599 U.S. 140, 162 (2023).

**A. "Mormon" is not used as a source identifier in the Defendants' podcast title "Mormon Stories."**

Because the Lanham Act exclusions (the *Rogers* test, fair use and expressive commentary) only apply if the mark is not being used as a "designation of source" or "source identifier," this is a threshold question aimed at addressing the "cardinal sin" under the Lanham Act: Does the use of the mark threaten to confuse consumers about who is responsible for a product? *Jack Daniel's Props.* 599 U.S. at 156–57. If the mark is being used as a source identifier, the Court must proceed to the likelihood of confusion analysis; if not, it must determine whether an exclusion from Lanham Act liability applies.

When a mark is used as a source identifier, it functions "to indicate the source of goods and so to 'distinguish' the goods from ones 'manufactured or sold by others.'" *Id.* In *Jack Daniel's*, the infringer conceded that it was using the Jack Daniel's trademarks and trade dress on its "Bad Spaniels" dog toys as source identifiers. *Id.* at 160. By using Jack Daniel's distinctive trademarks and trade dress to market its own products, the infringer benefited from creating the appearance, or confusion, "that Jack Daniel's had created, or was otherwise responsible for, the dog toy." *Id.* at 144. Therefore, although there were elements of the use that were expressive (parodying Jack Daniel's), any fair use protection or *Rogers* test application was eroded. *Id.*

The use of the word "Mormon" in the podcast title "Mormon Stories" is not a source identifier. Although "Mormon Stories" is the title of the podcast, the word "Mormon" is essentially a generic reference to a broad socioreligious category encompassing multiple denominations in a diverse religious tradition. *See supra* Section I. The term by itself does not refer exclusively to the LDS Church, let alone identify the Church as the particular source of a good or service. Here, there is nothing additional about the title that would suggest Plaintiff LDS Church created, endorsed, or is otherwise associated with the podcast (or any other particular good, product, or service). The term "Mormon" is not a source identifier and therefore the Court must determine if a Lanham Act exclusion applies.[3]

**B. The term "Mormon" in "Mormon Stories" is fair use because it describes what the podcast is about and, at times, references the LDS Church as an object of its commentary.**

Fair use protections include "nominative or descriptive fair use," and use in connection with "identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner." 15 U.S.C. § 1125(c)(3) (applying to dilution claims, but equally applicable to infringement claims); 15 U.S.C. § 1115(b)(4). Descriptive fair use applies when a mark is being used "in its primary, descriptive sense to describe the defendant's goods or services," whereas nominative fair use is referential and "comes into play when the defendant uses the famous mark to identify or compare *the trademark owner's* product." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 169 (4th Cir. 2012) (internal citations omitted). For example, in *Radiance Found. Inc. v. NAACP*, the Fourth Circuit opined that the use of "NAACP" in an article title was essentially "descriptive or nominative fair use" because it functioned to "identify the

[3] Although the use of the term "Mormon" is certainly expressive, and thus protected under *Rogers*, this issue has been thoroughly briefed by the Defendants and thus omitted from discussion here.

[organization] as the object of . . . criticism." 786 F.3d 316, 328 (4th Cir. 2015) (holding that using "NAACP" in the article title was protected by fair use).

Even when courts apply other exclusions to infringement liability or fail to use the term "fair use," they often apply its animating principles concerned with protecting speech and the ability to describe or identify an object of criticism. For example, several courts have found that using a mark in a domain name may be fair use where the domain name describes or names the target of commentary or criticism. *See Lucas,* 359 F.3d at 811; and *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch*., 527 F.3d 1045, 1058 (10th Cir. 2008) (collecting cases).

Although the courts in those cases were applying a different Lanham Act exclusion (the noncommercial use exclusion), they all opined that the name identified the object of criticism or described the content of the website. *E.g., Lucas,* 359 F.3d at 808, 811 (where the Defendant registered the domain "lucasnursery.com" to comment on her experience with a landscaping business called "Lucas Nursery"). In *Tachias v. Sanders*, the court held that a threatened trademark infringement claim would have been "legally baseless" against a Facebook page entitled "Los Lunas School District Parent Discussion Page," in part because the trademarked "Los Lunas Public Schools" name was used "solely in connection with their 'critical commentary about the trademark owner.'" 130 F.4th 836, 846 (10th Cir. 2025) (also focusing its analysis on the noncommercial use exclusion and not calling this "fair use.").

These cases highlight that, whether labeled as "fair use" or not, it is particularly important to recognize that where a mark is "the only word reasonably available to describe a particular thing," such use "lies outside… of trademark law." *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893 (9th Cir. 2019). In the context of the podcast title and its commentary, "Mormon

Stories" is both descriptive and nominative fair use of the term "Mormon"—at least inasmuch as the term "Mormon" can be considered a mark at all—and bar Plaintiffs' claims.

First, the term "Mormon" is used descriptively in the podcast title "Mormon Stories" because it describes what the Defendants' podcast is about in a general sense, and what content a listener may reasonably expect to hear: stories and experiences involving the various religious denominations that self-identify as "Mormon" and their adherents. These stories capture a broad range of ideas that the term "Mormon" expresses, making "Mormon" the most apt descriptor for what the podcast is about. For example, Episode 1654 is about Elissa Wall's story related to Warren Jeffs and the FLSD "polygamy cult" (*Taking Down Warren Jeffs - Elissa Wall*, MORMON STORIES (Sep. 7, 2022), https://www.mormonstories.org/warren-jeffs-take-down-elissa-wall/), while Episode 1861 is Nick Jones's story of his resignation as a Mormon Bishop in Mississippi (*Why I Resigned as a Mormon Bishop - Nick and Amanda Jones*, MORMON STORIES (Feb. 1, 2024), https://www.mormonstories.org/i-resigned-as-mormon-bishop/). This fair use is further highlighted by the fact that the Defendants' choice to use the word "Mormon" as their descriptor is itself expressive. The Defendants' have maintained their use of the term "Mormon" to describe their content, even when the term was unpopular and actively discouraged by the LDS Church—as well as through fluctuations in the Church's popularity generally.

Thus, although titles—including "Mormon Stories"—may serve other expressive or commercial functions, the title "Mormon Stories" does exactly what consumers understand titles to do: describe something about the underlying work. *Mattel*, 296 F.3d at 902 ("Consumers understand and expect titles to pertain to the contents of the underlying work rather than authorship or the publisher.").

Second, the term "Mormon" is used in the podcast title "Mormon Stories" to identify the subject and at times, reference the Plaintiff LDS Church. Similar to how the organization acronym and mark "NAACP" was functionally the sole identifier of the organization in *Radiance Foundation*, "Mormon" is among the only terms that would be used to identify the trademark owner and subject of discussion. 786 F.3d at 328. Moreover, from a common-sense perspective, it is unclear what other title would appropriately describe Dr. Dehlin's podcast about Mormon stories or name the Plaintiff LDS Church as relevant without using the term "Mormon." This is particularly important where the term "Mormon" refers to more than just an organization, product, or service name, and encompasses far more than just Plaintiff LDS Church. Therefore, even if the podcast could use another term to refer nominatively to the LDS Church at times (which also controls numerous trademarks for the more specific and formal identifier "The Church of Jesus Christ of Latter-Day Saints"), it would not encompass the same subject, scope, or accurately describe the podcast. THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, Registration Nos. 6974951, 2309318, 7108440, 6901693, 2133837, 2133843, 1757271, 1776809, 1980319, 2097186, 2163221, 1864725, 1963567, 1738742, and 2135319.

Similar to the use of NAACP in the title of the article in *Radiance Foundation*, "it is not immediately apparent how someone would confuse [a podcast] which is strongly critical of an organization with the organization itself." 786 F.3d at 328. Just like the mark NAACP was used to "identify the organization as the object of . . . criticism," this use is closer to being "a descriptive or nominative fair use albeit by employing a modified version of the name." *Id.*

The use of "Mormon" in the podcast title "Mormon Stories" is descriptive and nominative, falling squarely within the well-established category of fair use protected by intellectual property law and the First Amendment. To find otherwise would ignore what the Court in *Radiance*

*Foundation* so aptly observed: "Admittedly, the attention span on the Internet may not be long, but the briefest familiarity with the article would quickly create the impression the author was no friend of the NAACP," which becomes clear in "just the first two lines" of the article. *Id.* at 328. Holding social commentary "actionable risks creating the paradox that criticism equals confusion, thereby permitting [organizations] to shield themselves from adverse assessments." *Id.*

## CONCLUSION

Defendants do not use the term "Mormon" as a source identifier. They use it to describe their podcast, which produces and broadcasts stories about Mormon culture and history, as well as the lived experiences of Mormons and former Mormons. The term Mormon is not limited to the LDS Church but instead reflects a much more expansive set of social, cultural, and religious groups. Therefore, Defendants' use is nominative and descriptive fair use, which is protected speech under the Lanham Act. Moreover, the use is unlikely to cause confusion among consumers. For all these reasons, Amicus Curiae respectfully urge this Court to grant Defendants' Motion to Dismiss with prejudice (ECF No. 41).

Respectfully submitted this 7th of August, 2026,

/s/ ______________________________

Abigail Cook
Attorney for Amicus Curiae, ACLU of Utah

**CERTIFICATE OF SERVICE**

I certify that on August 7, 2026 , the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/

Abigail Cook