Mark R. Gaylord (#05073)
Jacqueline Mabatah (#17265)
BALLARD SPAHR LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221
Telephone: (801) 531-3000
Facsimile: (801) 531-3001
gaylord@ballardspahr.com
mabatahj@ballardspahr.com

*Attorneys for Prospective Amicus Curiae*
*Electronic Frontier Foundation*

**IN THE UNITED STATES DISTRICT COURT**

**CENTRAL DIVISION, DISTRICT OF UTAH**

| | |
|---|---|
| **INTELLECTUAL RESERVE, INC., a Utah non-profit corporation; THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**OPEN STORIES FOUNDATION, an Arizona non-profit corporation; JOHN P. DEHLIN, an individual,**<br><br>**Defendants.** | **AMICUS BRIEF OF ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF DEFENDANTS' OPEN STORIES FOUNDATION AND JOHN P. DEHLIN'S MOTION TO DISMISS**<br><br>**Case No.: 2:26-CV-00321**<br><br>**Judge Robert J. Shelby**<br>**Magistrate Judge Jared C. Bennett** |

## TABLE OF CONTENTS

PAGE

STATEMENT OF IDENTITY AND INTEREST OF AMICUS ... 1

DISCLOSURE STATEMENT ... 1

INTRODUCTION ... 2

ARGUMENT ... 3

I. Courts Have Long Recognized the Need to Ensure the Lanham Act Does Not Chill Lawful Expression ... 3

II. The *Rogers* Test Offers Balanced and Practical Protections for Social and Political Expression ... 7

A. The *Rogers* Test Increases Predictability ... 8

B. The *Rogers* Test Decreases Litigation Costs ... 10

C. The *Rogers* Test Protects the Legitimate Interests of Consumers and Trademark Owners ... 13

III. Early dismissal under *Rogers* is especially appropriate where, as here, a mark is both likely generic and a necessary component of important commentary on issues of public interest ... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*America Online v. AT&T*,
243 F.3d 812 (4th Cir. 2001) ....................14

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)....................13

*Brown v. Elec. Arts, Inc.*,
724 F.3d 1235 (9th Cir. 2013) ....................9

*Brown v. Entm't Merchants Ass'n*,
564 U.S. 786 (2011)....................13

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*,
886 F.2d 490 (2d Cir. 1989)....................6, 9

*CPC Int'l, Inc. v. Skippy Inc.*,
214 F.3d 456 (4th Cir. 2000) ....................5

*Down to Earth Organics, LLC v. Efron*,
No. 22-CV-06218 (NSR), 2024 WL 1376532 (S.D.N.Y. Mar. 31, 2024)....................11

*Eastland Music Grp., LLC v. Lionsgate Ent., Inc.*,
No. 11 C 8224, 2012 WL 2953188 (N.D. Ill. July 19, 2012), *aff'd on other grounds*, 707 F.3d 869 (7th Cir. 2013) ....................6

*ETW v. Jireh*,
332 F.3d 915 (6th Cir. 2003) ....................6

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988)....................14

*Jack Daniel's v. VIP Products*,
599 U.S. 140 (2023)....................7

*King of the Mountain Sports, Inc. v. Chrysler Corp.*,
185 F.3d 1084 (10th Cir. 1999) ....................8

*Koch Indus., Inc. v. Does*,
No. 2:10-CV-1275-DAK, 2011 WL 1775765 (D. Utah May 9, 2011) ....................5

*KP Permanent Makeup* 543 US 111 (2004) ....................14

*Matal v. Tam*,
582 U.S. 218 (2017)....................3

*Mattel, Inc. v. MCA Records, Inc.*,
296 F.3d 894 (9th Cir. 2002) ....................6

*McCullen v. Coakley*,
573 U.S. 464 (2014)....................13

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018)....................13

*New York Times v. Sullivan*,
376 U.S. 254 (1964)....................13

*Pepperdine Univ. v. Netflix, Inc.*,
827 F. Supp. 3d 1316 (C.D.Cal. 2026) ....................11

*Radiance Found., Inc. v. N.A.A.C.P.*,
786 F.3d 316 (4th Cir. 2015) ....................8

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................13

*Seale v. Gramercy Pictures*,
949 F. Supp. 331 (E.D. Pa. 1996), *aff'd without opinion*, 156 F.3d 1225 (3d Cir. 1998) ....................6

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
59 F.3d 902 (9th Cir. 1995) ....................14

*UFO Mag., Inc. v. Showtime Network, Inc.*,
No. 22-CV-078-NDF, 2022 WL 16645041 (D. Wyo. July 21, 2022)....................6, 11

*Univ. of Ala. Bd. of Trustees v. New Life Art*,
683 F.3d 1266 (11th Cir. 2012) ....................6

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)....................3

*Westchester Media v. PRL USA Holdings, Inc.*,
214 F.3d 658 (5th Cir. 2000) ....................6

**Other Authorities**


4 McCarthy on Trademarks and Unfair Competition § 31:144.50 (5th ed.) ............................6, 11

Jonathan Swift, *A Modest Proposal: For Preventing the Children of Poor People in Ireland, from Being a Burden on Their Parents or Country, and for Making Them Beneficial to the Publick* (1729)..........................................................................9

Alan Sokal, *A Physicist Experiments with Cultural Studies*, Lingua Franca 62 (1996), *available at* https://physics.nyu.edu/faculty/sokal/lingua_franca_v4/lingua_franca_v4.html ....................10

Alan Sokal, *Transgressing the Boundaries: Towards a Transformative Hermeneutics of Quantum Gravity*, 46/47 Social Text 217 (1996), *available at* https://physics.nyu.edu/faculty/sokal/transgress_v2/transgress_v2_singlefile.html ..........................................................................................................................10

Am. I.P. Law Ass'n, Report of the Economic Survey 2025, at 42 (2025), https://www.aipla.org/docs/default-source/adr-neutrals/aipla-2025_report_protected_updated-address.pdf..........................................................................11

*Barbie goes mycelial*, The Yes Men, https://theyesmen.org/project/barbie ..................................4

Cara Gagliano, *Sorry, Gas Companies - Parody Isn't Infringement (Even If It Creeps You Out)*, Elec. Frontier Found. (Oct. 30, 2024), https://www.eff.org/deeplinks/2024/10/sorry-gas-companies-parody-isnt-infringement-even-if-it-creeps-you-out ...................................................................1, 12

Corynne McSherry, *Mr. Peabody's Coal Train Tries To Run Down Free Speech*, Elec. Frontier Found. (May 13, 2011), https://www.eff.org/deeplinks/2011/05/mr-peabodys-coal-train-tries-run-down-free-speech ..........................................................................................................1

David Bank, *Happy Returns: Elaborate spoof takes aim at Vanguard's retreat from climate commitments*, Impact Alpha (Mar. 14, 2024), https://impactalpha.com/elaborate-spoof-takes-aim-at-vanguards-retreat-from-climate-commitments/..........................................................................................4

Elec. Frontier Found., *Dating Site Fights Outrageous Trademark Claim from Mormon Church* (June 2, 2014), https://www.eff.org/press/releases/dating-site-fights-outrageous-trademark-claim-mormon-church.......................................................15

Elec. Frontier Found., *EFF to Represent Yes Men in Court Battle Over Chamber of Commerce Action* (Nov. 11, 2009), https://www.eff.org/press/archives/2009/11/11;.......................................................................1

Elec. Frontier Found., *Religious Group Shows Little Tolerance for Parody* (July 17, 2013), https://www.eff.org/takedowns/religious-group-shows-little-tolerance-parody; Letter from Cara Gagliano, Staff Attorney, Elec. Frontier Found., to Jeffrey Moreira, Rico Management (Mar. 18, 2021), https://www.eff.org/document/eff-letter-re-virtual-coachella-video ........................................1

Ellen Huet, *Google Nest Spoof by German Activists Promises Eerie, Data-Driven Future*, Forbes (May 7, 2014), https://www.forbes.com/sites/ellenhuet/2014/05/07/google-nest-spoof-by-german-activists-promises-eerie-data-driven-future/ ................................................................4

Hannibal Travis, *The Battle for Mindshare: The Emerging Consensus That the First Amendment Protects Corporate Criticism and Parody on the Internet*, 10 Va. J.L. & Tech. 3, 14 (2005) ..........................................................................................11

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:139 (5th ed. Dec. 2022 Update) ..........................................................................................6, 7

Lynn M. Jordan & David M. Kelly, *Another Decade of Rogers v. Grimaldi: Continuing to Balance the Lanham Act with the First Amendment Rights of Creators of Artistic Works*, 109 Trademark Rptr. 833 (2019) ..................................................6

Mary Walrath-Holdridge, *Absurd look, serious message: Why a man wearing a head bubble spoofed his way onto local TV*, USA Today (Mar. 18, 2024) ...........................4, 5

Nardine Saad, *Daryl Hannah announced a plastic-free Barbie, but it was actually a hoax - here's what happened*, L.A. Times (Aug. 3, 2023), https://www.latimes.com/entertainment-arts/movies/story/2023-08-02/daryl-hannahs-ecowarrior-barbie-mattel-hoax# ......................................................................4

Pratheepan Gulasekaram, *Policing the Border Between Trademarks and Free Speech: Protecting Unauthorized Trademark Use in Expressive Works*, 80 Washington L. Rev. 887, 903 (2005)............................................................................6

R. Kravitz, *Trademarks, Free Speech and the Gay Olympics Case*, 69 BULR 131 (1989).................................................................................................................14

Robert Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols*, 1982 Wis. L. Rev. 158, 195–96 (1982)..........................................................................................3

*Vanguard's climate anxiety toolkit boosts anxiety*, https://theyesmen.org/project/vanguard..........................................................................4, 5

Vera Ranieri, *Not Mormon®, But Still Mormon*, Elec. Frontier Found. (Feb. 9, 2016), https://www.eff.org/deeplinks/2016/02/not-mormonr-still-mormon ...........................15

William T. Gallagher, *Trademark and Copyright Enforcement in the Shadow of IP Law*, 28 Santa Clara Computer & High Tech. L.J. 453, 478, 485–88 (2012).......................8

## STATEMENT OF IDENTITY AND INTEREST OF AMICUS

*Amicus curiae* Electronic Frontier Foundation ("EFF") is a nonprofit civil liberties organization that has worked for more than 30 years to protect free expression, innovation, and civil liberties in the digital world. As part of its mission, EFF regularly represents individuals and organizations that use trademarks in the course of political commentary and, as a result, find themselves the target of legal threats.[1] EFF, its clients, and its more than 30,000 members have a strong interest in ensuring that trademark law avoids chilling future speech by individuals and groups with limited resources to defend themselves in court.

## DISCLOSURE STATEMENT

Pursuant to Local Rule 7-6(d), I certify that no counsel for any party authored this brief in whole or in part. No party or party's counsel contributed money to support the preparation of this brief, nor did any other entity or person aside from amicus, its members, or its counsel make any monetary contribution intended to fund the preparation of this brief. Pursuant to Federal Rule of Civil Procedure 7.1(a), amicus states that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

---

[1] *See, e.g.*, Elec. Frontier Found., *EFF to Represent Yes Men in Court Battle Over Chamber of Commerce Action* (Nov. 11, 2009), https://www.eff.org/press/archives/2009/11/11; Corynne McSherry, *Mr. Peabody's Coal Train Tries To Run Down Free Speech*, Elec. Frontier Found. (May 13, 2011), https://www.eff.org/deeplinks/2011/05/mr-peabodys-coal-train-tries-run-down-free-speech; Elec. Frontier Found., *Religious Group Shows Little Tolerance for Parody* (July 17, 2013), https://www.eff.org/takedowns/religious-group-shows-little-tolerance-parody; Letter from Cara Gagliano, Staff Attorney, Elec. Frontier Found., to Jeffrey Moreira, Rico Management (Mar. 18, 2021), https://www.eff.org/document/eff-letter-re-virtual-coachella-video;

## INTRODUCTION

Amicus Electronic Frontier Foundation (EFF) submits this brief to call the Court's attention to the stakes of this case beyond the specific concerns of the parties and advocate for application of an infringement test that safeguards First Amendment interests.

*First*, the test first set forth in *Rogers v. Grimaldi*, and adopted in varying forms by courts around the nation, is a necessary shield against the trademark owner's sword. Its importance lies not only in the substantive standard it sets but also in its procedural application. The complexity and fact-intensive nature of traditional infringement tests often lead to prolonged, expensive, and unpredictable litigation. Rather than shoulder that burden to defend their rights, many speakers will capitulate to unreasonable demands or choose not to speak in the first place. The *Rogers* test, by contrast, offers a simple rubric that is easy to apply and facilitates early resolution where, as here, trademark claims target critical commentary.

*Second*, applying the *Rogers* test is especially appropriate where the trademark at issue pertains to a commonly accepted, well-known term for an established faith tradition. For several years, EFF has provided legal counsel to individuals and organizations that have faced legal threats for using the term "Mormon" while engaging in, or providing, commentary and discussion related to the Church of Jesus Christ of Latter-Day Saints (the "LDS Church"). But not every target is able to obtain counsel, nor should they have to. Trademark law has never given a mark owner veto power over all uses of its mark, particularly where use of the mark is necessary to discuss a topic of significant public interest.

Because even allowing this case to proceed to discovery would burden Defendants' expression and chill others from speaking about a powerful cultural institution, amicus urges the Court to dismiss this case with prejudice.

## ARGUMENT

### I. COURTS HAVE LONG RECOGNIZED THE NEED TO ENSURE THE LANHAM ACT DOES NOT CHILL LAWFUL EXPRESSION

The Lanham Act, like every other law that regulates speech, is subject to First Amendment scrutiny. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 223 (2017) (subjecting the Lanham Act's disparagement clause to First Amendment scrutiny). Congress's efforts to accommodate free speech concerns notwithstanding, statutory rights cannot override constitutional rights.

Online and off, trademarks—words, symbols, images, and colors—are also essential components of everyday language, used by companies, consumers, and citizens to share information. Famous trademarks "become an important, perhaps at times indispensable, part of the public vocabulary. Rules restricting the use of well-known trademarks may therefore restrict the communication of ideas." Robert Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols*, 1982 Wis. L. Rev. 158, 195–96 (1982). *See also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943) ("Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind.").

Trademarks are also used to great effect in modern social and political activism. To offer just a few examples:

- In 2014, German activists created a website touting four new Google products—Google Trust (data "insurance"), Google Bee (personal drones), Google Hug

(location-based, crowdsourced hug matching) and Google Bye (an online profile for the afterlife)—to raise awareness about Google's privacy policies.[2] The spoof was a great success, prompting a wave of commentary and coverage that recognized it for the satire that it was.

- In 2023, environmental activists teamed up with actress and environmentalist Daryl Hannah to create a series of fake Mattel press releases and advertisements that claimed Mattel was beginning to phase out plastic from its products, beginning with a line of biodegradable "Eco-Warrior Barbie" dolls made of materials like mushrooms, algae, and clay.[3] The action received broad national coverage and sparked discussion about plastic pollution and corporations' misleading recycling promises.
- In 2024, another elaborate campaign took aim at Vanguard Group, the world's largest investor in fossil fuels, for its retreat from climate commitments.[4] The

[2] Ellen Huet, *Google Nest Spoof by German Activists Promises Eerie, Data-Driven Future*, Forbes (May 7, 2014), https://www.forbes.com/sites/ellenhuet/2014/05/07/google-nest-spoof-by-german-activists-promises-eerie-data-driven-future/.

[3] Nardine Saad, *Daryl Hannah announced a plastic-free Barbie, but it was actually a hoax — here's what happened*, L.A. Times (Aug. 3, 2023), https://www.latimes.com/entertainment-arts/movies/story/2023-08-02/daryl-hannahs-ecowarrior-barbie-mattel-hoax#; *Barbie goes mycelial*, The Yes Men, https://theyesmen.org/project/barbie.

[4] Mary Walrath-Holdridge, *Absurd look, serious message: Why a man wearing a head bubble spoofed his way onto local TV*, USA Today (Mar. 18, 2024), https://www.usatoday.com/story/news/nation/2024/03/15/vanguard-happy-returns-climate-spoof-tv-spot/72988194007/; David Bank, *Happy Returns: Elaborate spoof takes aim at Vanguard's retreat from climate commitments*, Impact Alpha (Mar. 14, 2024), https://impactalpha.com/elaborate-spoof-takes-aim-at-vanguards-retreat-from-climate-

campaign, which included infiltrating a Wall Street conference and a local TV appearance, centered on a Vanguard-branded "Many Happy Returns Climate Adaptation Toolkit" that promised to help Vanguard employees and customers mitigate stress over climate change by turning a blind eye to it. Elements of the toolkit included a fake medication called Dissonex to ease cognitive dissonance and a TerraDome "portable ecosystem"—a sort of terrarium helmet. As one of the activists explained to USA Today, "The hoax phase of these projects is intentionally really short . . . it's [usually] mere hours because the whole point is to actually do the reveal and say why we did it."[5]

Accordingly, First Amendment protections are no less important in the context of trademark law than they are in defamation law or any other area. In a world where trademarks are part of common social and political discourse, "trademarks [must] not be transformed from rights against unfair competition to rights to control language." *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 462 (4th Cir. 2000) (internal quotation marks and citation omitted) (quoting Mark Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1710–11 (1999)). After all, "[t]he Lanham Act regulates only economic, not ideological or political, competition." *Koch Indus., Inc. v. Does*, No. 2:10-CV-1275-DAK, 2011 WL 1775765, at *5 (D. Utah May 9, 2011) (citing *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045 (10th Cir. 2008)).

---

commitments/; *Vanguard's climate anxiety toolkit boosts anxiety*, https://theyesmen.org/project/vanguard.

5 Walrath-Holdridge, *supra* n. 4 (internal quotation marks omitted, alteration in original).

As discussed in greater detail below, *infra* at Part II, the *Rogers* test helps prevent that transformation.[6] *See generally* Pratheepan Gulasekaram, *Policing the Border Between Trademarks and Free Speech: Protecting Unauthorized Trademark Use in Expressive Works*, 80 Washington L. Rev. 887, 903 (2005) ("The balancing test articulated by the *Rogers* court is compelling because it is the only approach attuned to the primary purpose of trademark laws: protecting the public against confusion and fraud.")

Not surprisingly, every circuit court to consider the issue has applied some form of the test in trademark and right of publicity cases involving expressive works. *See, e.g.*, *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*, 886 F.2d 490, 495 (2d Cir. 1989); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664–65 (5th Cir. 2000); *ETW v. Jireh*, 332 F.3d 915, 928 (6th Cir. 2003); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 898 (9th Cir. 2002); *Univ. of Ala. Bd. of Trustees v. New Life Art*, 683 F.3d 1266, 1277 (11th Cir. 2012). District courts in other circuits, including this one, have done likewise. *See, e.g.*, *UFO Mag., Inc. v. Showtime Network, Inc.*, No. 22-CV-078-NDF, 2022 WL 16645041, at *4 (D. Wyo. July 21, 2022); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 339 (E.D. Pa. 1996), *aff'd without opinion*, 156 F.3d 1225 (3d Cir. 1998); *Eastland Music Grp., LLC v. Lionsgate Ent., Inc.*, No. 11 C 8224, 2012 WL 2953188, at *3 (N.D. Ill. July 19, 2012), *aff'd on other grounds*, 707 F.3d 869 (7th Cir. 2013). *See also* 4 McCarthy on Trademarks and Unfair Competition § 31:144.50 (5th ed.) ("The Second Circuit's *Rogers* balancing test has been used by almost all courts."); Lynn M. Jordan & David M. Kelly, *Another Decade of Rogers v. Grimaldi: Continuing to Balance the Lanham Act with the*

[6] Defendants have accurately described the origin and nature of the test in their own briefing, (*see* Mot. to Dismiss at 2–3), so amicus will not repeat it here.

*First Amendment Rights of Creators of Artistic Works*, 109 Trademark Rptr. 833, 834 (2019) (the *Rogers* test has "clearly become the standard in disputes involving trademarks and creative works").

In *Jack Daniel's v. VIP Products*, the Supreme Court considered whether and how *Rogers* applied to a source-identifying commercial use, but expressly declined to take a position on the *Rogers* test's appropriateness for other use cases, leaving it to lower courts to decide. 599 U.S. 140, 163 (2023). And as Defendants note, district and circuit courts have continued to embrace *Rogers* ever since. *See* Mot. to Dismiss at 12–13 (citing cases).

## II. THE *ROGERS* TEST OFFERS BALANCED AND PRACTICAL PROTECTIONS FOR SOCIAL AND POLITICAL EXPRESSION

Thanks to its simplicity and influence, the *Rogers* test offers not just abstract but practical and necessary protections for speakers. Individuals who use trademarks to critique their owners are regularly subject to legal threats they cannot afford to litigate. EFF and other public interest organizations are able to assist some of those speakers, but pro bono trademark counsel is not easy to find. And even the most committed public interest counsel will hesitate to sign up to defend a lawsuit that relies on the standard likelihood of confusion test, which usually will require lengthy discovery, including expert discovery, and potentially a trial. "Faced with hugely expensive and lengthy litigation over vague standards, the recipient of a cease-and-desist letter will most often capitulate." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:139 (5th ed. Dec. 2022 Update).

The *Rogers* test helps activists and others fight back by increasing predictability and reducing litigation costs.

### A. The *Rogers* Test Increases Predictability

The standard likelihood of confusion analysis is both complex and subjective. In the Tenth Circuit, courts weigh six factors, balancing them with little guidance on the relative importance of each factor. *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089–90 (10th Cir. 1999). As a result, speakers subject to this test may struggle to confidently assess ex ante whether their use risks infringement liability. The problem is often worse in cases involving expressive works, where the traditional likelihood of confusion factors can be a poor fit and awkward to apply. Parody illustrates the point: the "similarity of the marks" and "strength of the mark" factors may appear to favor infringement precisely when the parody is most effective. *See Radiance Found., Inc. v. N.A.A.C.P.,* 786 F.3d 316, 324–25 (4th Cir. 2015). The uncertainty inherent in trying to apply an already unpredictable test to a context for which it was not developed will inevitably chill lawful speech.

Trademark owners and their attorneys are well aware of the coercive power of dubious trademark claims. In one survey of fifty attorneys who practice trademark and copyright law, many of the interviewed attorneys admitted to asserting trademark claims they believed were weak through demand letters—because it works. *See* William T. Gallagher, *Trademark and Copyright Enforcement in the Shadow of IP Law*, 28 Santa Clara Computer & High Tech. L.J. 453, 478, 485–88 (2012). Survey participants also admitted to being more likely to take enforcement action against small-scale actors who would be unlikely to have the resources to resist even a weak claim. *Id.* at 478. *See also id.* at 496 (citing "the costs and uncertainties" of trademark litigation as the likely reason for the effectiveness of aggressive enforcement).

The *Rogers* test helps mitigate these chilling effects in several ways. First, the test is simpler on its face. Rather than inviting open-ended, multifactor balancing, *Rogers* asks two comparatively straightforward questions: (1) whether the use is artistically relevant to the expressive work, and (2) whether it is explicitly misleading. Second, the *Rogers* test also increases predictability by focusing on the nature of the user's behavior, "not the impact of the use." *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1246 (9th Cir. 2013). Under this framework, a speaker possesses all of the information needed to assess liability risk in advance.

Importantly, the *Rogers* test also recognizes that some degree of confusion need not change the analysis. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 495 (2d Cir. 1989). Effective political commentary often involves some confusion. In 1729, for example, Jonathan Swift published *A Modest Proposal: For Preventing the Children of Poor People in Ireland, from Being a Burden on Their Parents or Country, and for Making Them Beneficial to the Publick.*[7] The "proposal" advocated for the consumption of Irish babies; Swift's intent was to call attention to the extreme poverty of the Irish people under English rule. The point was initially lost on some shocked readers, but it stands as one of the most influential political writings in Anglo-American history. In 1996, the spring issue of a leading journal of cultural and scientific studies, *Social Text*, included an article by Alan Sokal, a physics professor at New York University, arguing that gravity, as normally construed, was a "capitalist fiction" and should be replaced by a new theory, "quantum gravity," that would better reflect post-modern political thinking, if not

7 *Available at* https://www.gutenberg.org/cache/epub/1080/pg1080-images.html.

actual physical reality.[8] That same day, Sokal published a piece in another academic publication, *Lingua Franca*, explaining that the first piece was a hoax and that any competent mathematician or physicist would have known it.[9] As Sokal intended, the article and its aftermath sparked a widespread debate about postmodern science studies.

These successful satires relied on two elements: (1) presenting a surprising or disturbing proposition that would provoke an immediate reaction from an audience; and (2) some sort of "reveal," without which the satire would be ineffective. Swift's "Proposal" would not accomplish its purpose if the reader did not come to understand his true point about the desperate circumstances of the Irish. Sokal's hoax would not have accomplished its purpose if he had not published the accompanying piece in *Lingua Franca*. Both are effective precisely because they involve, in part, some initial confusion.

### B. The *Rogers* Test Decreases Litigation Costs

The complexity of the standard multifactor test also translates into significant litigation costs, even for a defendant who is ultimately vindicated. A survey conducted by the American Intellectual Property Law Association found that in 2024, the median total cost of litigating a trademark claim through trial and any appeal was between $250,000 and $1,100,000 per party,

8 Alan Sokal, *Transgressing the Boundaries: Towards a Transformative Hermeneutics of Quantum Gravity*, 46/47 Social Text 217 (1996), *available at* https://physics.nyu.edu/faculty/sokal/transgress_v2/transgress_v2_singlefile.html.

9 Alan Sokal, *A Physicist Experiments with Cultural Studies*, Lingua Franca 62 (1996), *available at* https://physics.nyu.edu/faculty/sokal/lingua_franca_v4/lingua_franca_v4.html.

depending on the amount in controversy.[10] The median cost of a trademark case through the end of discovery and motion practice ranged from $100,000 to $375,000.

For many, those costs alone act as an effective bar to defending their rights:

> Many non-competitive users of trademarks in artistic, cultural, and political speech have finally prevailed in court only after incurring massive costs. Such costs, including attorney's fees, the costs of expert witnesses, lost time, and uncertainty can deter both lawful and unlawful conduct—indeed, the "specter of such expenses" is part of traditional deterrence analysis.

Hannibal Travis, *The Battle for Mindshare: The Emerging Consensus That the First Amendment Protects Corporate Criticism and Parody on the Internet*, 10 Va. J.L. & Tech. 3, 14 (2005).

The *Rogers* test helps lower that bar by allowing courts to resolve appropriate cases early, with limited or no discovery. *See, e.g.*, *UFO Mag., Inc.*, 2022 WL 16645041, at *4 (dismissing case under Rule 12(b)(6) and observing that "[n]umerous courts have applied *Rogers* at this stage of litigation"); *Pepperdine Univ. v. Netflix, Inc.*, 827 F. Supp. 3d 1316, 1324–25 (C.D.Cal. 2026) (granting 12(b)(6) motion under *Rogers*); *Down to Earth Organics, LLC v. Efron*, No. 22-CV-06218 (NSR), 2024 WL 1376532, at *9 (S.D.N.Y. Mar. 31, 2024) (rejecting argument that *Rogers* cannot be applied at 12(b)(6) stage and granting motion); *see also* 4 McCarthy on Trademarks and Unfair Competition § 31:144.50 (5th ed.) ("As applied by the courts over a 30-year period, use of the *Rogers* test has almost always resulted in dismissal of the infringement claim, often on a pre-trial Rule 12(b)(6) dismissal or on summary judgment."). *Rogers* requires a court to answer just two questions, both of which will often be readily determinable based only on a review of the

---

[10] Am. I.P. Law Ass'n, Report of the Economic Survey 2025, at 42 (2025), https://www.aipla.org/docs/default-source/adr-neutrals/aipla-2025_report_protected_updated-address.pdf.

defendant's use and the plaintiff's mark. Even where a *Rogers* case cannot be resolved before discovery, the test's relative simplicity and its focus on user conduct rather than consumer perception reduce litigation costs by narrowing the issues and avoiding the need for costly survey experts.

In addition to making litigation less costly, the *Rogers* test's greater suitability to early resolution increases the availability of pro bono counsel to those who need it. For example, EFF represented a group of activists who created a parody website to draw attention to the environmental damage and human toll caused by the liquefied natural gas industry.[11] The website purportedly offered energy companies the opportunity to purchase "life offsets" that balance the human deaths their activities cause by extending the lives of individuals deemed economically valuable. Under the heading "Featured Partners" appeared the logos of three real energy companies, two of whom quickly threatened legal action if their trademarks were not removed. Relying in part on the First Amendment balancing test described by *Rogers* and its progeny, EFF was able to stave off that threat. EFF is proud to defend this form of criticism, but as a small nonprofit we do not have unlimited resources to fund discovery or retain survey experts, nor do the private law firms who may serve as pro bono co-counsel. We, and our clients, depend on streamlined tests like *Rogers* to help avoid or swiftly resolve litigation over expressive uses.

---

[11] Cara Gagliano, *Sorry, Gas Companies - Parody Isn't Infringement (Even If It Creeps You Out)*, Elec. Frontier Found. (Oct. 30, 2024), https://www.eff.org/deeplinks/2024/10/sorry-gas-companies-parody-isnt-infringement-even-if-it-creeps-you-out.

### C. The *Rogers* Test Protects the Legitimate Interests of Consumers and Trademark Owners

The *Rogers* test is relatively easy to address for plaintiffs as well as defendants, particularly as compared to other First Amendment standards for common law or statutory claims. For example, the *Rogers* test falls far short of the strict scrutiny analysis applied to practically every other content-based restriction on speech. *See Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015). Under that test, the law is presumptively unconstitutional and is upheld only if the restriction is actually necessary to advancing a compelling state interest. *Id.* at 171; *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011). The *Rogers* test is also less demanding than the intermediate scrutiny test courts apply to content-neutral restrictions on speech, *see Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 773 (2018) (finding a state law failed intermediate scrutiny when it was not sufficiently drawn to achieve a substantial state interest); the time, place, and manner test applied to content-neutral restrictions on speech in public forums, *McCullen v. Coakley*, 573 U.S. 464, 477 (2014); or the "exacting scrutiny" test applied to compelled associational disclosures, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (requiring "a substantial relation between the disclosure requirement and a sufficiently important governmental interest").

Because it is largely objective, the *Rogers* test is also less demanding than the subjective actual malice standard the Supreme Court imposed upon a centuries-old body of common law defamation law, requiring public figures to prove by clear and convincing evidence that the speaker knew a statement was false or seriously doubted its truth. *See New York Times v. Sullivan*, 376 U.S. 254, 280–81 (1964). The Supreme Court later imposed a similar rigorous standard on the tort of intentional infliction of emotional distress when the predicate conduct is the making of a false

statement, requiring the public figure plaintiff to prove that the defendant subjectively intended for others to believe a false statement to be true. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

## III. EARLY DISMISSAL UNDER *ROGERS* IS ESPECIALLY APPROPRIATE WHERE, AS HERE, A MARK IS BOTH LIKELY GENERIC AND A NECESSARY COMPONENT OF IMPORTANT COMMENTARY ON ISSUES OF PUBLIC INTEREST

Trademarks claims based on generic terms are especially offensive to First Amendment principles because they allow a single entity to control use of a common term for its common meaning. As the Supreme Court has observed, trademark law should not be used to deny speakers "the ordinary utility of descriptive words." *KP Permanent Makeup* 543 US 111, 122 (2004),; *see also America Online v. AT&T*, 243 F.3d 812 (4th Cir. 2001) ("[Trademark law] protects for public use those commonly used words and phrases that the public has adopted, denying to any one competitor a right to corner those words and phrases by expropriating them from the public 'linguistic commons.'"); R. Kravitz, *Trademarks, Free Speech and the Gay Olympics Case*, 69 BULR 131, 136 (1989) (exclusion of generic terms "prevents trademark law from severely intruding on others' freedom of expression").

The potential First Amendment harms are even more acute when a generic term refers to something as culturally significant as a religious tradition. Here, the term at issue, "Mormon," is popularly understood to refer to a way of life that is common to many and owned by none. *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 909 (9th Cir. 1995) "Mormons" are members of the Church of Jesus Christ of Latter-day Saints (the "LDS Church"), as well as other faiths/denominations/groups centered on the Book of Mormon, just as "Catholic" is a commonly understood term for members of the Catholic Church. There is no other

term that so accurately and precisely describes those who follow what they see as the teachings of the Book of Mormon (whether through the LDS Church or otherwise), or who are members of the broader community. Accordingly, locking up the term creates an improper barrier to criticism and commentary about the LDS Church, its doctrines, and even unaffiliated groups.

Unfortunately, Plaintiffs have a history of this kind of trademark abuse. In 2016, for example, they threatened the Mormon Mental Health Association, a professional organization of mental health providers, clinicians, educators and advocates who work with members of the LDS Church. [12] With EFF's assistance, MMHA fought back, but not every person or organization will have the knowledge or resources to do so, much less litigate the matter in court. An early ruling against Plaintiffs in this case will help ensure that they do not have to.

Dated: August 10, 2026

Respectfully submitted,

*/s/ Jacqueline Mabatah*
Mark R. Gaylord, Esq.
Jacqueline Mabatah, Esq.
BALLARD SPAHR LLP
*Attorneys for Prospective Amicus Curiae Electronic Frontier Foundation*

[12] Vera Ranieri, *Not Mormon®, But Still Mormon*, Elec. Frontier Found. (Feb. 9, 2016), https://www.eff.org/deeplinks/2016/02/not-mormonr-still-mormon; *see also* Elec. Frontier Found., *Dating Site Fights Outrageous Trademark Claim from Mormon Church* (June 2, 2014), https://www.eff.org/press/releases/dating-site-fights-outrageous-trademark-claim-mormon-church.

**CERTIFICATION OF PAGE AND WORD LIMIT, DUCIVR 7-6(C)(1)-(2)**

I, Jacqueline Mabatah, certify that the foregoing Amicus Brief of Electronic Frontier Foundation in Support of Defendants' Open Stories Foundation and John P. Dehlin's Motion to Dismiss was prepared using Times New Roman, 12 point, and contains 4,101 words.

Dated: August 10, 2026

*/s/ Jacqueline Mabatah*
Jacqueline Mabatah

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the United States District Court, District of Utah by using the CM/ECF system on August 7, 2026.

I certify that all participants in the case are registered ECF users and that service will be accomplished by the ECF system.

Dated: August 10, 2026

*/s/ Jacqueline Mabatah*
Jacqueline Mabatah