# EXHIBIT L

## Keystone - Church's attorney DEBUNKS Mormon Stories lawsuit rumors (2026-09-23)

Source: https://www.youtube.com/watch?v=eW0XiaJ0yA4 (Keystone, uploaded September 23, 2026, 35 min)
Host: David Snell. Guest: David Jordan, attorney for the Church. Five short passages are clips of John Dehlin played within the video.
Machine transcript (AssemblyAI, September 23, 2026), unverified against the audio; speaker names assigned by voice and context. Not a Mormon Stories episode.

**[0:00] David Jordan:** It's not about the word Mormon. Nobody owns the word Mormon.

**[0:04] David Snell:** It's just that all of those things combined, that's the issue.

**[0:09] David Jordan:** Yeah. And let me give you some more examples from the mediation that will dispel the narrative that Mr. Dehlin has projected.

**[0:16] David Snell:** David Jordan is the former U.S. Attorney for the District of Utah, and he's the lead attorney in the Church's lawsuit against John Dehlin and the Open Stories Foundation. That's like the dominant narrative online right now, that it's this David and Goliath story where the Church is Goliath and just trying to shut down the little guy.

**[0:37] David Jordan:** That's just not true. We made it clear, include the verbal disclaimer and make a written disclaimer that people can actually find and see, we'll dismiss the case.

**[0:47] David Snell:** Why is the Church still moving forward with litigation even after John Dehlin has changed a lot of the problematic branding? I'm really interested in hearing the church's side of things in this interview. Could you give us a brief rundown of what has happened thus far in this story? And as you do that, we're going to jump into some of the more specific questions and allegations that I have seen floating around out there.

**[1:19] David Jordan:** There's some history before the lawsuit was filed, and it really begins with a very nicely worded letter from the church pointing out that Mr. DeLynn was using the church's trademarks in a way that mimicked the church's branding, and also that he was using copyrighted images, pictures that he was not authorized to use, and asking him to please stop doing those things. That led to an exchange of email communications and ultimately to a proposal by the church that the parties mediate to see if they could come to some amicable resolution of the dispute without the need for resort to the courts. Mediation is non-binding. You're not committed to do anything unless you reach a final resolution as a result of the mediation. We thought it might be helpful, and the Church even volunteered to pay all the costs of the mediation, which would include the fees of the mediator.

**[2:35] David Snell:** And who is the mediator in this kind of a scenario?

**[2:40] David Jordan:** Well, the mediator in this particular case was a very fine lawyer from Texas, not a member of the Church, who is an expert in intellectual property law, trademark law, What does mediation look like?

**[2:57] David Snell:** Because in my mind, I've been thinking you both sit down at a nice long mahogany table, one side on, on one side of the table, the other on the other, and then you've got the mediator, you know, sitting at the head of the table, just kind of like going back and forth between the two as you're talking at each other. What does it actually look like?

**[3:15] David Jordan:** Well, you could do it that way, but it's not usually done that way. Usually, and what happened in this circumstance, is that Mr. DeLynn and his lawyers were in one room, and I, with my client representative from the church, were in a different room. So we weren't together. And the mediator engages in what's sometimes referred to as shuttle diplomacy. She was moving from one room to the other room, shuttling proposals. from both sides and trying to encourage both sides to arrive at a compromised solution.

**[3:57] David Snell:** So you say a compromised solution. So this wasn't necessarily the church with a list of demands saying, you have to do this or we're going to take you to court, per se?

**[4:09] David Jordan:** No, it wasn't like that at all. It's a negotiation. And so you may start with one position as your initial proposal, And the other side may say, no, that's not acceptable, but what if we did this? And it goes back and forth. And there was a good deal of that over the course of the mediation. And some of the proposals that were made were in fact adopted by Mr. DeLind. So for example, I believe he's made certain changes to his website to remove some images that are copyrighted images belonging to the church. And he's also changed his logo, for example. His logo in many ways mimicked trademarks of the church in ways that if you looked at the complaint, there's actually a picture of his logo compared to other church logos for various programs. And the similarity is striking.

**[5:10] David Snell:** I agree with that. It was several, a few to several years ago when I saw that logo and I was like, hmm, that looks very, very similar to the church's branding. And I wonder, I wonder if that's going to fly for very long, which is part of the whole subject of this case.

**[5:31] David Jordan:** Well, you raise a really interesting point. I think Mr. DeLynn has projected that he's being singled out in some way. And that's not really true because the church often has to have conversations, which it tries to do in a friendly and gentle way, even with active members who, with no intent to take the church's intellectual property, will brand themselves in a way that is confusingly similar to the church's branding. And when that happens, we reach out to them and in the nicest way say, please don't do that. That's important because obviously the church is not a company. We're not selling something like Nike. And Nike is very defensive of their swoosh.

**[6:27] David Snell:** Yeah.

**[6:27] David Jordan:** And rightly so, because they want people to know when they see the swoosh that they're getting a Nike product. It's a little bit different for a church, for a religion, but every religion has a message that it wants to communicate. And you want to make sure that people who are looking for your message can find it and not have it confused with someone else's message. Right.

**[6:57] David Snell:** John Dehlin and many others have placed a very heavy emphasis on the idea that The church is simply trying to control the word Mormon and who can use it and who can't. In fact, I have a quote here from John Dehlin's video. He's talking about mediation.

**[7:16] John Dehlin (clip played in the video):** He said, When we got into mediation, they ended up asking for a list of what we felt were outrageous and unreasonable requests. Some of them included asking me To literally agree to never initiate any project ever again on the internet that used the word Mormon. My memory is that they asked us to agree that they own all the rights to the word Mormon and to its usages.

**[7:43] David Snell:** Is that accurate?

**[7:44] David Jordan:** It's not accurate. So let me give you some examples. There's a somewhat popular TV program called Secret Lives of Mormon Wives. You've probably heard of it. I've not seen an episode.

**[7:58] David Snell:** PTSD flashbacks. Insert the segment.

**[8:01] David Jordan:** You! You're a liar!

**[8:04] David Snell:** Whose idea was it to put stripper poles in buses? This group is so toxic! Yes, I'm vaguely familiar with it.

**[8:13] David Jordan:** All right, think about that for a minute. The church has— what network is that on? Netflix?

**[8:19] David Snell:** Hulu.

**[8:19] David Jordan:** Hulu?

**[8:20] John Dehlin (clip played in the video):** Yeah.

**[8:20] David Jordan:** Church has not written a letter to Hulu saying, you're infringing our trademarks.

**[8:27] David Snell:** Yeah.

**[8:27] David Jordan:** Because the heart of trademark law is confusion. Is there— is the mark being mimicked in such a way that it's likely to cause confusion to people? I don't think anybody sees an advertisement for Secret Lives of Mormon Wives on Hulu and thinks to themselves, I wonder if that's affiliated with the Church of Jesus Christ of Latter-day Saints. Right. They're not

thinking that. And there are lots of other people who use the word Mormon in contexts where it's not going to be confusing. And of course, nobody owns the word Mormon. You can use the word Mormon in an unlimited number of ways. It's when you use it as part of your brand And it causes confusion in the context in which it's used that then can give rise to a trademark infringement.

**[9:32] David Snell:** Like, that's like the dominant narrative online right now, that it's this David and Goliath story where the church is Goliath and just trying to shut down the little guy. And one of the questions that people have asked is, well, Mormon Stories has been operating for I don't know, 20 years now, and the church has never had a problem with the name Mormon Stories before. But what I'm hearing from you is that in the past, the name Mormon Stories hasn't necessarily been also combined with the Light Rays trademark and copyrighted images. It's just that all of those things combined, that's the issue, is what I'm understanding.

**[10:16] David Jordan:** That's certainly a significant part of the issue, and the Mormon Stories branding of 20 years ago is not like the Mormon Stories branding that was the subject of our mediation and our letter that preceded it, or even this litigation. Now it's been changed, and you can form your own conclusions about why Mr. DeLynn has changed it as a result of the discussions we've had with him. But it's not about the word Mormon. It's about using the word Mormon in a context like you've described, with color schemes, with font schemes, with light rays, with the copyrighted images. It's that context which gives rise to the likelihood of confusion, and that's what gives rise to a trademark claim.

**[11:13] David Snell:** I mean, I just, I feel like because there's such a distrust towards institutions in general, particularly religions, I feel like nowadays people are getting really defensive about this lawsuit and the motivations of the church for moving forward with it. But if it was Disney stories, like I would fully expect Disney to come in and protect their copyrighted No, I understand what you're saying.

**[11:42] David Jordan:** And let me give you some more examples from the mediation that will, I think, dispel the narrative that Mr. Dehlin has projected. At one point in the mediation, we suggested maybe a dozen different ways to add words to the title Mormon Stories That might mitigate the risk of confusion. We said, why don't you call it Former Mormon Stories? That will certainly mitigate the risk of confusion. We tried any number of those, and there was no interest in the other room in adopting any of those. Then we shifted gears in the negotiation and said, Well, perhaps the confusion can be mitigated by an appropriate disclaimer. And the disclaimer that we suggested was that in his podcast, Mr. Dehlin state, this podcast is not affiliated with, supported by, or endorsed by the Church of Jesus Christ of Latter-day Saints. I don't know how long it took me to say that. 5 seconds, maybe? And we talked about how often that should appear in the podcast verbally. And our initial proposal was we'll do it several times over the course of the mediation. And I think he's talked about that in some of the comments that he's made.

**[13:14] David Snell:** Several times over the course of each episode.

**[13:16] David Jordan:** Right. But as we went back and forth, the proposal we ultimately made was All right, just put it at the beginning, at the beginning of each podcast. It'll take you 5 seconds to say it in a podcast that's 2 hours long, and it's truthful in every way and will go a ways towards mitigating the risk of confusion. And that was unacceptable. And the heart of that particular proposal was You don't have to change your name. We'll resolve the case with you. It can still be Mormon Stories. Just include a verbal disclaimer of the kind we're describing right at the beginning of your podcast. And put a written disclaimer on your website or wherever you have a written version of your podcast.

**[14:16] David Snell:** So why isn't a written version enough? Or even on each YouTube video having it, you know, written at the bottom of the screen? Why does it need to be verbal?

**[14:28] David Jordan:** Well, you would know better than I, but as I understand it, if you went to certain social media platforms, you would never see anything in writing. You would just hear the podcast. And if all you do is hear the podcast, then a written disclaimer is of no effect at all. We did have discussions about, and negotiations about, the placement of a written disclaimer, and Mr. DeLynn wanted to put it down in the footer that would appear at the bottom of a webpage. Well, that's not really a place where viewers are going to find it. We suggested placing it more at the top of the webpage. So it would actually be a meaningful disclaimer in the sense that people would really have an opportunity to see it without having to search for it. And ultimately the mediation failed over the whole issue of disclaimers. But the idea that the last position in the negotiation was You have to say it multiple times. That's not the case.

**[15:38] David Snell:** I think that's really interesting because I have had in the past this idea of mediation as we're going to bring forth our demands and you either meet them or we're taking you to court. But what you're saying is that it's a conversation and there's going to be negotiating on both sides and malleability on both sides. And so I can see from John Dehlin's perspective why it would be frustrating to have to say, by the way, this is not endorsed or affiliated with the Church of Jesus Christ of Latter-day Saints. Having to say that every 10, 15 minutes, that would be frustrating, but the church isn't asking that anymore, or you guys recognize that and took it off the table. And I also think it's interesting that The intermediary is not just playing telephone, right? They're not just delivering messages between the two. They're also offering their own insights and coming up with some of their own solutions and suggestions. So I wonder also how many things might have come from the mediator that maybe have been portrayed as coming from the church itself. Is that a risk at all?

**[16:56] David Jordan:** I don't really think that's a significant risk, but you're right, David, to characterize it as a negotiation. And you're also right to say that the mediator will come up with her own suggestions about how either side might modify their position to make it more acceptable to the other side. And that certainly was the case in this mediation. When we initially proposed including a verbal disclaimer at multiple points in the course of a 2-hour podcast, she

communicated back to us, that's going to be a tough one for the other side to accept. And she encouraged us to soften that position to only require the verbal disclaimer at the very beginning of the podcast episodes. We agreed to that.

**[17:53] David Snell:** There's another quote from John Dehlin's video that I'd like to bring up that relates to this.

**[17:57] John Dehlin (clip played in the video):** He said, My memory is, is that they also wanted us to not only provide an audible disclaimer at the beginning of every Mormon Stories episode from now until the end of time, I believe my memory is, is that they also wanted it to be repeated Multiple times in each episode.

**[18:21] David Snell:** So you just answered that question that initially that was a request.

**[18:25] David Jordan:** Yes.

**[18:26] David Snell:** That you eventually softened on and took off the table. What I want to hone in on here is that he was asked to have an audible disclaimer at the beginning of every Mormon Stories episode from now until the end of time. In every episode here on out, is that what was asked?

**[18:46] David Jordan:** I don't think we ever got to the point of negotiating about how long it would last. We probably simply said we'd like this at the beginning of each podcast episode. It's important for you to know this as well. We recently filed our answer to Mr. DeLind's counterclaim. And in the introduction to the counterclaim response, the answer to the counterclaim, We made it clear what our proposal was that was on the table when the mediation ended. And we renewed the offer. And I think that's critical. We said, this was not only the offer then, it's still open. It's still available. If you would like to accept it now and include the verbal disclaimer and make a written disclaimer that people can actually find and see, On your website or other pages where you advertise your podcast, we'll dismiss the case. So when people talk about this is a David and Goliath story, or they talk about us trying to put Mr. DeLynn out of business, that's just not true. And think about it. It's an honest disclaimer. How does it in any way impact the content? of the Mormon Stories podcast for Mr. DeLind to say, this podcast is not affiliated with the Church of Jesus Christ of Latter-day Saints. It's just the truth.

**[20:20] David Snell:** Because it just seems interesting to me that, like, one, like you mentioned, it's true. The disclaimer is true. Like, they're not affiliated. On the other hand, I understand, you know, doing YouTube, the beginning of your episode is very important. And so I could see from his perspective not wanting to take time out of that beginning to insert a disclaimer. At the same time, it is a generally critical podcast of the church, right? If he wanted to, he could even make a joke out of it, couldn't he? Couldn't he just say, oh, by the way, so I don't get sued by the church, I have to tell you we're not affiliated with the church. Like, he could even do that, couldn't he?

**[21:03] David Jordan:** I think that would be pretty clear to the audience. Yeah.

**[21:06] David Snell:** I see ways that you could incorporate a disclaimer in there that would still be interesting to your audience, that wouldn't be compromising to you. But I don't know, I just find it interesting that that's the hill that they're gonna die on, so to speak. So this is a big one, and it's one that's on a lot of people's minds. Why is the church still moving forward with litigation Even after John Dehlin has changed a lot of the problematic branding?

**[21:38] David Jordan:** The missing piece is the disclaimer.

**[21:41] David Snell:** So why do we need the disclaimer when presumably the branding is now in the same type of situation that it was in 10 years ago?

**[21:50] David Jordan:** Because now there's been a history of confusion that's been embedded in people's minds.

**[21:59] David Snell:** Some people see some hypocrisy in this situation where several years ago President Russell M. Nelson kind of backed off from the term Mormon, and then you have the Church coming forward saying like, no, this is a protected trademark. This is one of our protected marks, and you need to be careful how you use it. How do you respond to those claims?

**[22:19] David Jordan:** Well, President Nelson did make it clear that the name of the Church is The Church of Jesus Christ of Latter-day Saints. Or sometimes just the Church of Jesus Christ. The Church even issued a style guide encouraging the media, for example, to refer to the Church in that way. That's the way we describe ourselves. But that's not the way other people describe us, and it's not the way other people know us. And even though the Church has issued a style guide for the media, Just look at any publication, any newspaper. They still call us the Mormon Church. And because that's the way we are branded by others, that's the way other people still recognize and know us, it's important for us to protect that trademark. Otherwise, people who don't know us as the Church of Jesus Christ of Latter-day Saints— will be easily confused. Think about this for a minute. I'm sure you've had the experience of talking to someone who's not a member of the Church, and they ask you the question, so what's your religion? And you say, I'm a member of the Church of Jesus Christ of Latter-day Saints. And they look at you blankly. And then you say, sometimes we're called the Mormons. and then the light comes on and they know who you are. You've probably had that experience, David.

**[23:53] David Snell:** Sure.

**[23:53] David Jordan:** That's because as much as we don't self-identify in that way, as President Nelson has encouraged us, others still identify us that way.

**[24:06] David Snell:** And I think that brings up a good point about brand confusion, because a lot of people are saying, oh, nobody would ever be confused by John Dehlin's content. Well, what people? You know, like members of the church? Members of the church in the United States?

What about non-members of the church in the United States? What about English-speaking non-members around the world as well? I think that maybe here within Utah, there might be a better general understanding of who John Dehlin is and what type of content he creates. And a little branch of Latter-day Saints in Zimbabwe might be more confused by Mormon Stories than my ward in Provo, Utah. You know what I mean? And so I think these are considerations that we don't always think about when it comes to brand confusion.

**[25:07] David Jordan:** It is a worldwide church, as you've correctly said. But there are a lot of people all over the country who are not members of the church who only know us as the Mormon Church.

**[25:20] David Snell:** Yeah.

**[25:21] David Jordan:** So you don't have to go all the way to Zimbabwe to be thinking about issues of confusion. That's— there's just a lot of history behind that name. And that's the way people think of us in their own minds. As much as we'd like for them to immediately recognize us when we say, I'm a member of The Church of Jesus Christ of Latter-day Saints, you'll still get a lot of blank looks when you say that.

**[25:47] David Snell:** What evidence of actual brand confusion has your team been able to uncover?

**[25:54] David Jordan:** So certainly we've had comments from multiple people over the years leading up to this litigation where they've reported to us, I thought this was in some way affiliated with the church, somehow sponsored by the church. And so there is that evidence of actual confusion. In a trademark case, the standard is not how much actual confusion can you actually show, It's what is the likelihood of confusion? That's the standard in the law. So there is certainly evidence of actual confusion. But I think if people just use their common sense and they say, okay, I see this blue circle, it's got these light rays in it, it has the word Mormon Stories in it, and the words Mormon Stories don't suggest anything about non-affiliation. If anything, they suggest affiliation to just a common person seeing those words. If you see the words bad Mormon, you're not thinking, oh, I bet that's affiliated with the church. Probably being too specific here. But if you see the word Mormonish, you're probably not thinking, I'll bet that the church chose that as an affiliated site. No. But if you see the words Mormon Stories, it might remind you of Book of Mormon Stories, or any other number of ways in which historically the word Mormon has been used. So it really is about likelihood of confusion.

**[27:49] David Snell:** And again, that is within the context of Mormon stories being paired with other branding elements that make that connection stronger.

**[28:00] David Jordan:** Yes, including, for example, copyrighted images taken without authorization from the church's website. I'll give this to you as an example. Some years ago, the church came up with a very iconic symbol to represent the church. It's an arched doorway that shows Christ emerging from that doorway, and underneath it, the words The Church of Jesus

Christ of Latter-day Saints appear. That icon was used by Mr. Dehlin in the background of his principal website for the Mormon Stories podcast. Now, that is a trademarked image, and using that exact image is not consistent with trademark law. Now, he stopped doing that at our request.

**[28:53] David Snell:** And I saw his defense in a way of that.

**[28:57] John Dehlin (clip played in the video):** Why would I put my face, someone who's noted and has been named out by the church publicly in a press release as the church's number one enemy? Why would I allow my face to be prevalent in all of our branding? If I wanted to fool and deceive people about whether or not the church owns and controls Mormon Stories podcast.

**[29:23] David Snell:** And it kind of presupposes, well, you're assuming that people know who you are, and people know that you're an excommunicated former member. To people who are not familiar with, with the content, they don't know that. That's—

**[29:37] John Dehlin (clip played in the video):** they—

**[29:37] David Snell:** you just look like a normal guy.

**[29:39] David Jordan:** I can just tell you this before I was engaged to help with this case, I couldn't have picked Mr. Dehlin out of a crowd.

**[29:49] David Snell:** So let's talk about fair use of the church's copyrighted images. Lots of people, frankly, use the church's images, friendly to the faith and also not so friendly to the faith. Why is it that John Dehlin is kind of singled out here amongst all the different people who who use those images?

**[30:10] David Jordan:** Well, he's not singled out, and people do use images, and the church puts some images on its website and makes them available for people to use for non-commercial purposes. So for example, the media can go to the website and they'll see that there's a license there that says if you're using this for non-commercial purposes, You have certain rights. It's all spelled out in writing on the church's website. But if you're going to make a commercial use of a copyrighted image, you don't have authority to just do that because it's on the church's website. The Salt Lake Tribune, as a media outlet, could use an image for non-commercial purposes consistent with the license language on the church's website that displays those images. But Mr. DeLynn is not within the language of that license. He's using them for a commercial purpose to promote his product and doing it without authorization. And that's a violation of copyright law.

**[31:25] David Snell:** But a lot of people do that, right? like just boots on the ground, a lot of people use these images when they technically probably shouldn't, but I don't see them getting sued for it. Is that just kind of a judgment call that the church has to make on, you know, hey, yes, they're doing it, but they don't have a logo that is mimicking the church's branding?

**[31:47] David Jordan:** It's partly that, and it's partly That when people make an isolated one-time use of a copyrighted image, it may not rise to the level of the church feeling like they have to do something to stop that conduct.

**[32:10] David Snell:** Yeah, just not worth the time and effort.

**[32:13] David Jordan:** Right. And it's not like the church can scour every corner of the internet to see whether or not people are doing that. But Mr. DeLynn has used scores and scores and scores of copyrighted images and not sort of a one-off or a two-off instance. It's something that has happened and continued to happen and continued to happen and continued to happen. That's just flaunting the license that's granted for non-commercial uses.

**[32:49] David Snell:** What would the consequences be for the Open Stories Foundation, for Mormon Stories podcast, if they lost this lawsuit? Like, are we looking at the end of Mormon Stories as we know it, if they should lose?

**[33:04] David Jordan:** Well, of course, that's up to a judge and a jury ultimately to decide if we can't resolve it by settlement. But there are a number of options that are open. So for example, the court can enter an injunction. An injunction is an order of the court saying don't do these things or do, do these things. For example, the court could order a disclaimer. The court could order a name change. The court could order any number of things that the court considered appropriate for an injunction to mitigate the likelihood of confusion. Juries also have the right under trademark and copyright statutes to award damages if they choose to. Now, you'll notice if you look at the Church's original complaint, we haven't asked for some number in damages. That's not What we're really trying to accomplish here, we're trying to eliminate confusion. We're not trying to stop his business.

**[34:17] David Snell:** So the church isn't looking for damages at all?

**[34:20] David Jordan:** It's certainly nothing that we've asked for to this point.

**[34:24] David Snell:** So if Mormon Stories loses this case, it could be something as simple as the court orders them to put that disclaimer at the beginning of their episodes?

**[34:37] David Jordan:** It could. It could be something as simple as the court ordering a name change. The jury has the right to award damages if they think that's an appropriate remedy. But we're, we're not looking for it to come to that. What we're looking for still is a way to resolve this short of going to a judge and a jury.

**[35:00] David Snell:** Guys, thanks for watching. Thanks for sticking with us. I hope this cleared up some questions that people have about this. While you're here, go check out this episode and I will see you there.